2022-1175

---

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

**SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,
THAI PREMIUM PIPE COMPANY LTD.,**
*Plaintiffs-Appellees*

**PACIFIC PIPE PUBLIC COMPANY LIMITED,**
*Plaintiff*

v.

**UNITED STATES,**
*Defendant*

**WHEATLAND TUBE COMPANY,**
*Defendant-Appellant.*

———————————

Appeals from the United States Court of International Trade in
Nos. 1:18-cv-00214-JCG, 1:18-cv-00219-JCG, and 1:18-cv-00231-JCG,
Judge Jennifer Choe-Groves

———————————

OPENING BRIEF OF APPELLANT
WHEATLAND TUBE COMPANY

———————————

Roger B. Schagrin, Esq.
Elizabeth J. Drake, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW; Suite 500
Washington, DC 20001
202-223-1700

*Counsel for Wheatland Tube Company*

September 12, 2022

FORM 9. Certificate of Interest

Form 9 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2022-1175

**Short Case Caption** Saha Thai Steel Pipe Public Company Limited v. US

**Filing Party/Entity** Wheatland Tube Company

---

**Instructions:** Complete each section of the form. In answering items 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance. **Please enter only one item per box; attach additional pages as needed and check the relevant box**. Counsel must immediately file an amended Certificate of Interest if information changes. Fed. Cir. R. 47.4(b).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 09/12/2022

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

FORM 9. Certificate of Interest

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☐ None/Not Applicable |
| Wheatland Tube Company | | Zekelman Industries, not publicly traded |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☐    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| Paul Jameson, formerly of Schagrin Associates | | |
| | | |
| | | |

**5. Related Cases.**  Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.  Do not include the originating case number(s) for this case.  Fed. Cir. R. 47.4(a)(5).  See also Fed. Cir. R. 47.5(b).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# Table of Contents

I. INTRODUCTION ....................................................................................1

II. STATEMENT OF RELATED CASES.........................................................3

III. JURISDICTIONAL STATEMENT ..............................................................4

IV. STATEMENT OF ISSUES ..........................................................................6

V. STATEMENT OF THE CASE .....................................................................6

    A. Congress Introduced the Cost-Based Particular Market Situation Provision and Revised the Definition of "Outside the Ordinary Course of Trade" in the 2015 Trade Preferences Extension Act ......................7

    B. Commerce Found a PMS to Exist in Thailand During the Period of Review and Adjusted COP to Account for the Distortions it Caused ..8

    C. The Court of International Trade Rejected Commerce's Interpretation of the Antidumping Statute, as amended by the TPEA ......................12

VI. SUMMARY OF ARGUMENT....................................................................15

VII. ARGUMENT...............................................................................................16

    A. Standard of Review .........................................................................16

    B. Commerce's First Remand Determination is in Accordance with Law ..................................................................................................19

        1. *Commerce's determination that it could not base normal value on home market prices, and therefore had to rely on constructed value, is in accordance with law* ...........................19

        2. *Once Commerce determined to base normal value on constructed value, its adjustment to respondents' costs to account for the PMS is authorized by the statute* ....................27

VIII. CONCLUSION.............................................................................................29

i

# Table of Authorities

## CASES

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003) .....................17

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961 (1986), *aff'd*, 810 F.2d 1137 (Fed. Cir. 1987). ..................................................18

*Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837 (1984) .........................................................................17

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed.Cir.1996)...................... 18-19

*Hyundai Steel Co. v. United States*, 19 F.4th 1346 (Fed. Cir. 2021)............. 1, 26, 27

*Peer Bearing Co. – Changshan v. United States*, 766 F.3d 1396 (Fed. Cir. 2014)..................................................................... 16-17

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001)........................................................................17

*PSC VSMPO-Avisma Corp. v. United States*, 688 F.3d 751 (Fed. Cir. 2012) ........18

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 422 F. Supp. 3d 1363 (Ct. Int'l Trade 2019)...............................................................12

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 538 F. Supp. 3d 1350 (Ct. Int'l Trade 2021)...............................................................15

*Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 487 F.Supp.3d 1323 (Ct. Int'l Trade 2020).......................................................... passim

*Thai Pineapple Public Co. v. United States*, 187 F.3d 1362 (Fed. Cir. 1999) . 18, 19

*Timken Co. v. United States*, 354 F.3d 1334 (Fed. Cir. 2004)......................... 17, 18

*Torrington Co. v. United States*, 68 F.3d 1347 (Fed. Cir. 1995)............................18

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009).................................................17

<u>S</u>TATUTES

19 U.S.C. § 1516a(a)...................................................................5

19 U.S.C. § 1516a(b) ...............................................................17

19 U.S.C. § 1677(15) ........................................................ passim

19 U.S.C. § 1677b(a) ........................................................ passim

19 U.S.C. § 1677b(b) ...............................................................23

19 U.S.C. § 1677b(e) ........................................................ passim

28 U.S.C. § 1295(a) .................................................................5

19 U.S.C. § 217(b) ...................................................................5

19 U.S.C. § 2645(c) .................................................................5

<u>A</u>DMINISTRATIVE <u>M</u>ATERIALS

*Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg.
    15,127, 15,128 (Dep't Commerce April 9, 2018)...................................9

*Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final
    Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed.
    Reg. 51,927 (Dep't Commerce Oct. 15, 2018) ......................................4

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    82 Fed. Reg. 21,513, 21,515 (Dep't of Commerce May 9, 2017) ......................8

<u>O</u>THER <u>L</u>EGISLATIVE <u>M</u>ATERIALS

161 Cong. Rec. S2897 (daily ed. May 14, 2015).....................................8

S. Rep. No. 114-45 - Trade Facilitation and Trade Enforcement Act of 2015
    (2015) ..........................................................................8

Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, 129 Stat. 362
    (2015) ........................................................................7-8

iii

## I. INTRODUCTION

In *Hyundai Steel*, this Court ruled that the antidumping statute does not permit the U.S. Department of Commerce ("Commerce") to adjust a respondent's cost of production to account for a cost-distorting particular market situation ("PMS") when testing whether home market sales used for normal value are below the cost of production. *Hyundai Steel Company v. United States*, 19 F.4th 1346 (Fed. Cir. 2021). The Court, however, explained that "it is not the case that … Commerce is powerless to address home market sales that are affected by a PMS yet still pass the sales-below-cost test," noting that Commerce may depart from using home market sales if it finds that a PMS in the exporting country "does not permit a proper comparison with the export price or constructed export price." *Id*. at 1355.

In the underlying antidumping review on circular welded carbon steel pipes ("CWP") from Thailand, Commerce found that the respondents' costs were distorted by a PMS based on the collective effect of Thai government subsidies to producers of hot-rolled steel coil ("HRC"), which is the main input into CWP, distortions in the prices of Thai imports of HRC due to dumping, subsidization, and global overcapacity, and the fact that Thai government measures to address these distortions were not imposed on HRC used to produce CWP for export.

1

Commerce therefore adjusted the respondents' costs to account for the distortion when performing the sales-below-cost test.

On appeal, the U.S. Court of International Trade ("CIT") did not reach the question of whether Commerce's finding that a PMS existed was supported by substantial evidence. Instead, the CIT found that the statute did not permit an adjustment for a cost-based PMS for the purposes of the sales-below-cost test, relying on reasoning similar to that which would later be articulated by this Court in *Hyundai Steel*. The CIT thus remanded the determination to Commerce.

In its first remand determination, Commerce found that its inability to account for the PMS when testing whether home market sales were below the cost of production made it impossible to determine whether the home market sales were in the ordinary course of trade, and thus could form the basis of a proper comparison with export prices or constructed export prices. Commerce therefore based normal value on constructed value, and the agency accounted for the PMS in the constructed value calculation.

The CIT also rejected this revised approach, and again remanded the determination to Commerce. In the second remand results, Commerce, under protest, based normal value on respondents' home market sales and made no

adjustments for the PMS that distorted respondents' costs. The CIT affirmed, and this appeal ensued.

This appeal seeks to reinstate Commerce's first remand determination in the case below. Consistent with this Court's guidance in *Hyundai Steel*, the approach Commerce took in that first remand determination is permitted by the antidumping statute. Moreover, recourse to such an approach allows Commerce to account for distorted costs and thus meet its statutory obligation to achieve a fair comparison in its dumping calculations, as intended by Congress. Commerce's first remand determination should therefore be upheld.

## II.     STATEMENT OF RELATED CASES

One other appeal in or from the same proceedings in the lower court was previously before this appellate court. The title of that appeal was *Saha Thai Steel Pipe Public Company Limited v. US*. The number of that appeal was 2022-1173. The appellant was the United States. This appeal was consolidated with that appeal on November 23, 2021. ECF No. 2. On July 12, 2022, the Court granted the United States' unopposed motion to voluntarily dismiss its own appeal, Appeal No. 2022-1173. ECF No. 39. That appeal was dismissed before any briefs or argument on the merits, and there was no panel composed or decision issued in that appeal.

Counsel knows of no other case pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal, based on the understanding that cases are not considered "related" merely because they involve the same general legal issue. *See* Fed. Cir. R. 47.5 and accompanying Practice Note.

## III.   JURISDICTIONAL STATEMENT

Wheatland appeals the final decision of the CIT concerning the results of Commerce's antidumping administrative review of the antidumping duty order on CWP from Thailand for the period of review ("POR") March 1, 2016, through February 28, 2017. Commerce published its notice of its final determination on October 15, 2018. *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) ("*Final Results*") (Appx20032-20034), and accompanying *Issues and Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2016-2017* (Oct. 4, 2018) ("*Final IDM*") (Appx20035-20053).

Pacific Pipe Public Company Limited ("Pacific Pipe"), Saha Thai Steel Pipe Public Company Limited ("Saha Thai"), and Thai Premium Pipe Company Ltd. ("Thai Premium") filed initiating documents with the CIT on October 14, 2018

4

(CIT Court No. 18-00231), October 18, 2018 (CIT Court No. 18-00214), and October 23, 2018 (CIT Court No. 18-00219), respectively. These actions were subsequently consolidated under Consolidated Court No. 18-00214. The CIT exercised jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final determination in an annual administrative review of an antidumping order. Final judgment was entered in the action on September 17, 2021 (Appx00001-00002).

Wheatland filed a notice of appeal with this Court on November 15, 2021 (Appx00059). As noted above, Wheatland's and the United States' appeals were initially consolidated on November 23, 2021, but the United States' appeal has since been voluntarily dismissed. This appeal is timely pursuant Rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure and 28 U.S.C. §§ 2107(b), 2645(c).[1] Pursuant to 28 U.S.C. § 1295(a)(5), the U.S. Court of Appeals for the Federal Circuit has jurisdiction over this appeal.

---

[1] The Court ordered Wheatland to file its appellant's brief within 60 days of the Court's order of July 12, 2022. ECF No. 39. That deadline fell on September 10, 2022, a Saturday. Consistent with Rule 26(a)(1)(C) of the Federal Rules of Appellate Procedure, this brief is timely filed on the next business day.

## IV.    STATEMENT OF ISSUES

Whether Commerce's decision in the first remand determination to base normal value on constructed value due to the inability to determine whether home market sales were made in the ordinary course of trade is in accordance with law.

Whether Commerce's adjustment to respondents' costs to account for a PMS that distorted the costs of the HRC input when calculating constructed value in the first remand determination is in accordance with law.

## V.    STATEMENT OF THE CASE

This case concerns Commerce's discretion to account for distortions to costs when calculating normal value in antidumping determinations, where a PMS exists such that a respondent's reported costs do not reasonably or accurately reflect the cost of production ("COP") of the merchandise in the ordinary course of trade. In 2015, Congress passed legislation amending the antidumping statute to expand and clarify Commerce's ability to address a specific problem that had arisen with respect to distortions to costs in antidumping cases. This Court has ruled that the statute, as amended, does not permit Commerce to adjust costs to account for a PMS when performing the sales-below-cost test on home market sales, but the Court has also stated that this prohibition does not render Commerce completely powerless to address a PMS when normal value is based on home market sales.

6

Commerce sought to exercise that authority in the first remand results issued during an appeal from an administrative review of the antidumping duty order on CWP from Thailand is the subject of this appeal. The CIT's rejection of those remand results misconstrues the statute, contradicts the guidance issued by this Court, and further impairs Commerce's ability to address distorted costs as Congress intended.

A.    <u>Congress Introduced the Cost-Based Particular Market Situation Provision and Revised the Definition of "Outside the Ordinary Course of Trade" in the 2015 Trade Preferences Extension Act</u>

Recognizing that distorted production costs could frustrate the calculation of an accurate dumping margin, Congress, through the Trade Preferences Extension Act of 2015, added a cost-based PMS provision to the constructed value subsection of the normal value statute. Trade Preferences Extension Act of 2015, Pub. L. No. 114-27, § 504(c), 129 Stat. 362, 385 (2015) ("TPEA"). The provision, as amended by the TPEA, now provides that in calculating constructed value, "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology." 19 U.S.C. § 1677b(e). Further, the TPEA amended the definition of "ordinary course of

7

trade" to make clear that Commerce "shall consider" as outside the ordinary course of trade "{s}ituations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price." TPEA § 504(a); 19 U.S.C. § 1677(15)(C).

These amendments were designed to ensure that "Commerce has flexibility in calculating a duty that is not based on distorted pricing or costs" where a PMS exists. S. Rep. No. 114-45 - Trade Facilitation and Trade Enforcement Act of 2015, at 37 (2015) ("Senate Finance Committee Report"). Congress passed the amendments to expand and clarify Commerce's ability to address a specific problem that had arisen with respect to distortions to costs that had been observed in certain cases, including, specifically, cases involving steel pipe products. *See* 161 Cong. Rec. S2897, S2900 (daily ed. May 14, 2015) (statement of Sen. Sherrod Brown).

B.    Commerce Found a PMS to Exist in Thailand During the Period of Review and Adjusted COP to Account for the Distortions it Caused

On May 2, 2018, Commerce initiated an administrative review of the antidumping duty order on CWP from Thailand for the POR March 1, 2017, through February 28, 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 Fed. Reg. 21,513, 21,515 (Dep't of Commerce May 9,

8

2017) (Appx20001-20004). Commerce selected three mandatory respondents: Pacific Pipe, Saha Thai, and Thai Premium. *Id.*

On February 5, 2018, Wheatland alleged that a PMS exists in Thailand such that the COP of CWP in Thailand were distorted during the period of review, did not reflect the COP in the ordinary course of trade, and therefore warranted corrective adjustments. Wheatland PMS Allegation, Feb 5, 2018 ("Wheatland PMS Allegation") (Appx20054-20275). The allegation included evidence showing that a PMS existed in Thailand due to (1) Thai government subsidies to the Thai HRC producers that enabled "them to sell HRC at below-market prices to downstream producers of CWP," (2) distortions to the prices for HRC imports into Thailand caused by dumping, subsidization, and global overcapacity; and (3) trade remedy measures imposed by the Thai government in response to the influx of low-priced imports that did not apply to imported HRC used by Thai producers in the production of CWP for export. *Id.* at 3-19 (Appx20056-20072).

On April 9, 2018, Commerce published the preliminary results of its review, calculating weighted-average dumping margins of 10.66 percent, 0.00 percent, and 5.34 percent for Pacific Pipe, Saha Thai, and Thai Premium, respectively. *Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 83 Fed. Reg. 15,127, 15,128 (Dep't of Commerce April 9, 2018) ("*Preliminary Results*") and accompanying

Preliminary Decision Memorandum ("*PDM*") (Appx20005-20024). Commerce

indicated that "{b}ecause of the timing of the filing of this allegation" it did not

make a determination with regard to the PMS allegation, but would "consider these

allegations further prior to the final results." *PDM* at 4 (Appx20011).

On August 31, 2018, Commerce issued a post-preliminary memorandum

finding that there was sufficient evidence that the PMS alleged by Wheatland

distorted the acquisition cost of HRC in Thailand during the POR, resulting in

those costs not reflecting the cost of production in the ordinary course of trade.

Commerce Post-Preliminary Decision Memorandum on Particular Market

Situation Allegation (Aug. 31, 2018) ("Post-Prelim PMS Memo") at 1, 4 – 6,

(Appx20025, Appx20028-20030). Commerce preliminarily found that a

combination of the U.S. subsidy rate on Thai producers of HRC and the Thai

antidumping and safeguard rates on HRC imported into Thailand were an

appropriate basis for an adjustment to Thai CWP producers' input costs. *Id*. at 6

(App20030).

After the submission of case and rebuttal briefs and an administrative

hearing, Commerce issued its final determination on October 4, 2018. *See Final*

*IDM* (Appx20035-20053). Commerce continued to find that a PMS distorted the

acquisition cost of HRC during the POR, and it continued to apply an adjustment

to respondents' HRC costs to account for this PMS. *See id*. at Comments 1 – 3 (Appx20037-20048). As to the existence of a PMS, Commerce considered the evidence on the record concerning each of the and found that the "evidence, taken as a whole, demonstrates that the prices of domestically-sourced and imported HRC in Thailand were distorted during the POR, such that the cost of producing subject merchandise in Thailand was outside the ordinary course of trade." *Final IDM* at 9 (Appx20043). To address these distortions, Commerce increased the respondents' acquisition costs for HRC by (1) the United States subsidy rate applicable to Thai producers of HRC; (2) the safeguard duty rates imposed by the government of Thailand on imports of HRC other than imports used to produce CWP for export; and (3) the antidumping duty rates found by government of Thailand for imports of HRC from Taiwan, China, and Korea, but not imposed on HRC imports used to produce CWP for export. *Id.* at 12-15 (Appx20046-20049). This resulted in weighted-average dumping margins of 30.61 percent, 28.00 percent, and 30.98 percent for Pacific Pipe, Saha Thai, and Thai Premium, respectively. *Final Results* at 51,928 (Appx20033).

      This action followed.

C.    The Court of International Trade Rejected Commerce's Interpretation of the Antidumping Statute, as amended by the TPEA

On appeal, the respondents challenged, *inter alia*, Commerce's PMS finding and subsequent adjustments to their reported costs to account for the PMS. Saha Thai specifically challenged Commerce's statutory authority to adjust reported costs to account for a PMS in the context of the sales-below-cost test. After briefing, the CIT ruled that held that, pursuant to section 504 of the TPEA and 19 U.S.C. § 1677b(e), upon the finding of a PMS, Commerce was only permitted to adjust COP for a PMS when calculating constructed value, not when calculating the COP used to test whether home market sales were below the cost of production. *Saha Thai Steel Pipe Pub. Co. Ltd. v. United States*, 422 F. Supp. 3d 1363, 1368-1369 (Ct. Int'l Trade 2019) ("*Saha Thai I*") (Appx00009-00010). Thus, the CIT found that because "Commerce chose to make a comparison between {normal value based on} home-market sales {prices} and U.S. price, Commerce may not apply a cost-based PMS in the context of this sales-based comparison." *Id.* at 1371 (App00011). The CIT did not reach the question of whether Commerce's PMS determination was supported by substantial evidence. *Id.* at 1371 (Appx00011). The CIT remanded Commerce's determination to Commerce "for further consideration consistent with {the CIT's} opinion." *Id.* (Appx00011).

On remand, Commerce continued to find that "a PMS exists in Thailand that distorts the price of hot rolled coil." Final Results of Redetermination Pursuant to Remand, ECF Nos. 62, 63 ("*Remand Results*") (Appx00013-00043). Commerce "respectfully disagree{d}" with the CIT's finding that Commerce's adjustment to COP was not in accordance with 19 U.S.C. § 1677b(e). *Remand Results* at 6-7 (Appx00018-00019). In light of Commerce's position and its continued finding of a cost-distorting PMS, Commerce determined that "absent a PMS adjustment to the cost of production used in the sales-below-cost test," the PMS that existed prevented it from "performing a meaningful sales-below-cost test." *Id.* at 8 (Appx00020). According to Commerce, "{c}omparing home market sale prices to a cost of production that does not accurately reflect production costs in the ordinary course of trade fails to accomplish the intent of the sales-below-cost test, which is to determine whether the respondents' home market sales were made in the ordinary course of trade." *Id.* at 8 (Appx00020). Accordingly, Commerce found that the existence of the PMS prevented a proper comparison of normal value based on home market prices with export prices or constructed export prices, and instead based normal value on constructed value. *Id.* When calculating constructed value, Commerce adjusted respondents' costs to account for the PMS that existed, citing 19 U.S.C. § 1677b(e). *Id*. at 9 (Appx00021).

13

In reviewing the *Remand Results*, the CIT found that "Commerce did not follow the statutory framework in this case." *Saha Thai Steel Pipe Public Company Limited v. United States*, 487 F.Supp.3d 1323, 1334 (Ct. Int'l Trade 2020) ("*Saha Thai II*") (Appx00044-00052). According to the CIT, Commerce's decision to exclude home market sales as outside the ordinary course of trade based on its finding of a cost-based PMS was not in accordance with law. *Id.* The CIT remanded the *Remand Results* to Commerce to remove the cost-based PMS determination and recalculate the weighted-average dumping margins without a PMS adjustment. *Id.*

On the second remand, Commerce, under protest, again found "that a particular market situation existed in Thailand during the period of review that distorted the price of hot-rolled coil, the principle material input for the production of the subject merchandise and significant component of the cost of production of the subject merchandise," *Final Results of Redetermination Pursuant to CIT Order, ECF No. 83* (March 15, 2021) *("Second Remand Results")* at 1-2 (Appx00053-00054), but, in order to comply with the CIT's order, Commerce recalculated the dumping margins without making any adjustments to the reported costs of HRC to account for the PMS. *Id.* at 2 (Appx00054).

14

The CIT sustained the *Second Remand Results*. *Saha Thai Steel Pipe Public Co. Ltd. v. United State*s, 538 F. Supp. 3d 1350, 1354 (Ct. Int'l Trade 2021) ("*Saha Thai III*") (Appx00003-00005).

This appeal followed.

## VI.   SUMMARY OF ARGUMENT

The CIT committed error by finding that Commerce did not act in accordance with law in relying on constructed value in the first remand determination. Commerce reasonably determined that reliance on a sales-below-cost test that did not include a PMS adjustment to account for distorted costs was not meaningful and would not permit Commerce to determine whether home market sales were actually in the ordinary course of trade, as required by the statute. Commerce also reasonably relied on the statute's definition of the ordinary course of trade as excluding situations in which a PMS prevents a proper comparison with export price or constructed export price. As directed by the statute, when Commerce is unable to determine whether home market prices are in the ordinary course of trade and thus may form the basis of normal value, Commerce may instead rely on constructed value for normal value. The constructed value portion of the statute, as amended by Congress, clearly provided

15

Commerce with the authority to use any other methodology when calculating

constructed value to account for the cost-based PMS found to exist.

In rejecting Commerce's first remand determination, the CIT misconstrued

the statute to find that Commerce has no authority to address a PMS when normal

value is based on home market sales. The CIT interpreted the statute as only

providing one tool – the sales-below-cost test – to ensure that home market sales

are in the ordinary course of trade, even though the statute is replete with

references to the ordinary course of trade in various sections besides the sales-

below-cost test. Finally, the CIT's holding is contrary to the this Court's

explanation in *Hyundai Steel* that Commerce in fact does retain the power to

address a PMS when normal value is based on home market sales.

For all of these reasons, this Court should find that Commerce's

interpretation of the antidumping statute in its first remand results was consistent

with the statute and should be reinstated.

## VII.  ARGUMENT

### A.    Standard of Review

This Court will "review a decision of the Court of International Trade

evaluating an antidumping determination by Commerce by reapplying the statutory

standard of review that the Court of International Trade applied in reviewing the

administrative record." *Peer Bearing Co.-Changshan v. United States*, 766 F.3d 1396, 1399 (Fed. Cir. 2014). "Thus, without affording any deference to the Court of International Trade, this court reassesses the administrative record for 'substantial evidence' and for consistency 'with law.'" *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1036 (Fed. Cir. 2003); 19 U.S.C. § 1516a(b)(1)(B)(i).

In determining whether Commerce's interpretation and application of the antidumping statute is in accordance with law, the Court applies the two-step analysis articulated in *Chevron*. *See Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001). Under *Chevron*, the first step is for the Court to determine whether Congress has "directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 842-843 (1984). If so, the agency and the Court must comply with that clear Congressional intent. *Id*. If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. In such cases, Commerce's interpretation governs if it is not unreasonable, *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009), and "{a}ny reasonable construction of the statute is a permissible construction." *Timken Co. v. United States*, 354 F.3d 1334,

17

1342 (Fed. Cir. 2004). The Court also evaluates whether the agency's

interpretation is a "reasonable means of effectuating the statutory purpose."

*Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 966 (1986),

*aff'd*, 810 F.2d 1137 (Fed. Cir. 1987).

      "In antidumping cases, {the Federal Circuit} accord{s} substantial deference

to Commerce's statutory interpretation, as the International Trade Administration

is the 'master' of the antidumping laws." *Torrington Co. v. United States*, 68 F.3d

1347, 1351 (Fed. Cir. 1995). This Court has recognized that Commerce enjoys

greater deference than other agencies due to the fact that antidumping duty

determinations "involve complex economic and accounting decisions of a technical

nature, for which agencies possess far greater expertise than courts." *PSC VSMPO-*

*Avisma Corp. v. United States*, 688 F.3d 751, 764 (Fed. Cir. 2012). As such, "…

reviewing courts must accord deference to the agency in its selection and

development of proper methodologies." *Thai Pineapple Public Co. v. United*

*States*, 187 F.3d 1362, 1365 (Fed. Cir. 1999). Moreover, when "identifying,

selecting and applying methodologies to implement the dictates set forth in the

governing statute," Commerce is accorded a level of deference that is "both greater

than and distinct from that accorded the agency in interpreting the statutes it

administers." *PSC VSMPO-Avisma Corp.*, 688 F.3d at 764 (citing *Fujitsu Gen. Ltd.*

18

*v. United States*, 88 F.3d 1034, 1039 (Fed.Cir.1996)). "Accordingly, '[t]he

methodologies relied upon by Commerce in making its determinations are

presumptively correct." *Id.* (citing *Thai Pineapple*, 187 F.3d at 1365).

    B.    <u>Commerce's First Remand Determination is in Accordance with Law</u>

        1.    Commerce's determination that it could not base normal value
            on home market prices, and therefore had to rely on constructed
            value, is in accordance with law

In its first remand determination, Commerce complied with the CIT's

instruction to remove any PMS adjustment from the sales-below-cost test. *Remand*

*Results* at 7-8 (Appx00019-00020). Commerce found, however, that "absent a

PMS adjustment to the cost of production used in the sales-below-cost test, the

PMS that existed with respect to the cost of production of … {CWP} in Thailand

prevents us from performing a meaningful sales-below-cost test." *Id*. Moreover,

Commerce explained:

> Comparing home market sale prices to a cost of
> production that does not accurately reflect production
> costs in the ordinary course of trade fails to accomplish
> the intent of the sales-below-cost test, which is to
> determine whether the respondents' home market sales
> were made in the ordinary course of trade.

*Id*. at 8 (Appx00020). Thus, Commerce concluded, the existence of the PMS

without recourse to a PMS adjustment in the sales-below-cost test "prevents a

proper comparison" of normal value based on home market sales to export prices

or constructed export prices. *Id*. Deprived of the ability to ensure normal value was based solely on home market sales in the ordinary course of trade, Commerce based normal value on constructed value in the first remand results. *Id*.

Commerce's first remand determination is in accordance with the law. First, as explained by Commerce, home market sales used as normal value must be sold in the ordinary course of trade. *Id*. at 7 (Appx00019) (citing 19 U.S.C. § 1677b(a)(1)(B)(i)). Specifically, the statute requires that when basing normal value on home market sales, those sales must be "in the usual commercial quantities and in the ordinary course of trade …" 19 U.S.C. § 1677b(a)(1)(B)(i). Second, as also explained by Commerce, the statute defines the ordinary course of trade to exclude, *inter alia*, situations in which a PMS prevents a proper comparison with export price. *Remand Results* at 7 (Appx00019) (citing 19 U.S.C. § 1677(15)(C)).

Taken together, these statutory provisions "enquire{} whether the PMS prevents a proper comparison with the export or constructed export price." *Id*. Commerce properly found that the inability to make a PMS adjustment in the sales-below-cost test made it impossible to test whether those sales were in the ordinary course of trade, and thus whether they met the requirement that home market sales be in the ordinary course of trade under of 19 U.S.C.

20

§ 1677b(a)(1)(B)(i). *Id*. at 7-8 (Appx00019-00020). The PMS, together with the

inability to account for it, thus prevented Commerce from being able to make a

proper comparison with export price based on home market sales. *Id*.

Commerce explained in detail how relying on these home market sales

would prevent a proper comparison, given the highly distortive nature of the PMS

at issue:

> We note that comparing home market sale prices to a cost
> of production that does not accurately reflect production
> costs in the ordinary course of trade would be illogical
> and defeat the intent of the sales-below-costs test, which
> is to determine whether a respondent's home market sales
> were made in the ordinary course of trade …. Given that
> {respondents'} distorted HRC costs comprise 80-90
> percent of the cost of production of circular pipes and
> tubes, a sales-below-costs test run without a PMS
> adjustment would lead to a significant number of below-
> cost home market sale prices being used as a basis of NV,
> which would be compared to export price or constructed
> export price. …. the record of the instant review clearly
> demonstrates how running the sales-below-costs test
> without a PMS adjustment to each of the respondent's
> cost of production led to distorted results (i.e., large
> numbers of home market sales made outside the ordinary
> course of trade formed the basis for normal value for
> comparison with export price or constructed export price).
> Given the Court's instructions to not apply a cost-based
> PMS adjustment in the context of the sales-below-costs
> test, pursuant to section 771(15)(C) of the Act, we find
> that the PMS with respect to the cost of production of
> circular pipes and tubes prevents a proper comparison of
> the respondents' home market prices with the
> respondents' export prices or constructed export prices.

*Id*. at 20-22 (Appx00032-00034).

Third, in light of the fact that Commerce was forbidden from ensuring that home market prices were in the ordinary course of trade and permitted a proper comparison, the statute allowed Commerce to rely on constructed value for normal value. *Id*. at 8 and 22 (Appx00020, Appx00034) (citing 19 U.S.C. § 1677b(a)(4)). As noted above, the statute requires that any home market sales used as the basis for normal value be in the ordinary course of trade. *See* 19 U.S.C. § 1677b(a)(1)(B)(i). If, however, Commerce determines that normal value cannot be determined under Section 1677b(a)(1)(B)(i), because, *inter alia*, home market sales are not in the ordinary course of trade, than Commerce may base normal value on constructed value. *See* 19 U.S.C. § 1677b(a)(4). In other words, if normal value "cannot be determined under paragraph (1)(B)(i)," (the paragraph requiring home market sales to be in the ordinary course of trade), then normal value "may be the constructed value." *Id*. In addition, Commerce may go straight to constructed value under this provision, and the agency is not required to first determine whether third country sales may be an alternative basis for normal value. *See id*. (Commerce may rely on constructed value "notwithstanding paragraph (1)(B)(ii)" regarding third country sales). That is what Commerce did in the first remand determination.

22

Despite these statutory provisions, the CIT set aside Commerce's first remand results, finding that its approach was "not authorized by the statute." *Saha Thai II* at 1331 (Appx00048). First, the CIT ruled that Commerce was required to perform the sales-below-cost test under Section 1677b(b)(1) to determine whether home market sales were below the cost of production. *Id*. at 1331-1332 (Appx00049). Commerce reasonably explained that performing the sales-below-cost test without the PMS adjustment rendered that test meaningless, as it permitted sales above a cost distorted by a PMS, and thus outside the ordinary course of trade, to remain the basis of normal value. *Remand Results* at 7-8 and 20-22 (Appx00019-00020, Appx00032-00034). The CIT did not directly address this argument.

Instead, the CIT determined that the sales-below-cost test is the only tool that the statute allows Commerce to use in order to determine whether home market sales are outside the ordinary course of trade. *Saha Thai II* at 1333 (Appx00050). Because Congress provided for a sales-below-cost test in Section 1677(15)(A) an 1677b(b), the CIT reasoned, Congress thereby "obviated consideration of a {PMS} affecting the cost of production from Section 1677(15)(C)." *Id*. Nothing in the statute supports such a draconian reading.

23

To the contrary, Section 1677(15) identifies three categories of "sales and transactions, among others," that Commerce must consider to be outside the ordinary course of trade. 19 U.S.C. § 1677(15)(C). The inclusion of the phrase "among others" indicates that the list is illustrative, and not exclusive. In addition, nothing in the language of Section 1677(15)(C) suggests it cannot apply to circumstances in which a PMS affects the cost of production. The provision is stated broadly to encompass all "{s}ituations" in which a PMS prevents a proper comparison. *Id*. Such "situations" could include, at a minimum, a PMS affecting home market sales, a PMS in a third country market, and a PMS affecting the cost of materials and fabrication. *See* 19 U.S.C. § 1677b(a)(1)(B)(ii)(III), (a)(1)(C)(iii), and (e).

Moreover, if the CIT is correct, and Section 1677(15)(A) provides the exclusive means for determining that "sales" are outside the ordinary course of trade, then Section 1677(15)(B) logically also provides the exclusive means for determining that "transactions" are outside the ordinary course of trade. If this were correct, what "situations," if any, would Section 1677(15)(C) apply to?

In support of its interpretation, the CIT stated that a cost-based PMS presumably affects prices for domestic and export sales alike and thus could not prevent a "proper comparison" between the two. *Saha Thai II* at 1333

24

(Appx00050). Yet Commerce explained that the reason it could not conduct a "proper comparison" was because the agency was prevented from taking the PMS into account when conducting the sales-below-cost test. *Remand Results* at 8 (Appx00020). This would force Commerce to rely on home market sales for normal value even though it could not determine whether those sales were in the ordinary course of trade. *Id*. at 7-8 and 32-34 (Appx00019-00020, Appx00032-00034). Yet the statute instructs Commerce that it can only rely on home market sales for normal value if those home market sales are "in the ordinary course of trade." 19 U.S.C. § 1677b(a)(1)(B)(i). Where such home market sales cannot be shown to be in the ordinary course of trade, Commerce may rely on constructed value. *See* 19 U.S.C. § 1677b(a)(4). That is precisely what Commerce did in its first remand determination.

The CIT also seems to misconstrue Commerce's determination as relying solely or primarily on the presence of the term "ordinary course of trade" in Section 1677b(e), the section regarding constructed value. *Saha Thai II* at 1334 (Appx00050-00051). As noted above, Commerce explained that the reason it could not rely on home market sales was because it could not determine whether they were in the ordinary course of trade, as independently required by the home market sales provision at Section 1677b(a)(1)(B)(i) and the definition of the ordinary

25

course of trade in Section 1677(15). *See Remand Results* at 7 & n.33 (Appx00019). The CIT claims that the references to ordinary course of trade in Sections 1677(15) and 1677b(a)(1)(B)(i) cannot encompass situations in which a distorted cost of production prevents a proper comparison. *Saha Thai II* at 1334 (Appx00051). Yet nothing in the language of the statute itself limits Commerce's ability to take distorted costs into account when determining whether home market prices are in the ordinary course of trade under Sections 1677(15) and 1677b(a)(1)(B)(i).

Indeed, this Court in *Hyundai Steel* recognized that such an analysis was possible under the statute. Specifically, the Court stated "it is not the case that … Commerce is powerless to address home market sales that are affected by a PMS yet still pass the sales-below cost test," noting that Section 1677b(a)(1) "specifically gives Commerce the tools to ensure 'a proper comparison with the export price.'" *Hyundai Steel*, 19 F.4th at 1355. It was precisely one of the provisions within Section 1677b(a)(1) – namely Section 1677(a)(1)(B)(i) – that Commerce relied upon in its first remand determination. *Remand Results* at 7, n.33 (Appx00019). The CIT's decision that home market sales can only be disregarded if they fail to pass the sales-below-cost test (without a PMS adjustment) leads to the precise result this Court rejected in *Hyundai Steel*: it renders Commerce

26

"powerless to address home market sales that are affected by a PMS yet still pass the sales-below cost test."

Finally, Commerce's approach in the first remand results is not only permitted by the statute, it is also necessary to enable the agency to account for distorted costs and thus meet its statutory obligation to achieve a fair comparison in its dumping calculations, as intended by Congress. As this Court recognized in *Hyundai Steel*, in the absence of a PMS adjustment in the sales-below-cost test, the statute still ensures that normal value can be calculated so as to permit a fair comparison, avoiding the absurd result of requiring Commerce to rely on distorted costs to calculate dumping margins. *Hyundai Steel*, 19 F.4th at 1355. These considerations further weigh in favor of reinstating Commerce's first remand determination.

For all of these reasons, the CIT's rejection of Commerce's first remand results should be found in error, and those remand results should be reinstated.

> 2.    Once Commerce determined to base normal value on constructed value, its adjustment to respondents' costs to account for the PMS is authorized by the statute

As noted above, once Commerce found it could not determine whether home market sales were in the ordinary course of trade as required by Section 1677b(a)(1)(B)(i), it was authorized to based normal value on constructed value

27

under Section 1677b(e). *See* 19 U.S.C. § 1677b(a)(4) (permitting reliance on constructed value in such a situation). Under the constructed value portion of the statute, Commerce is allowed to rely on "another calculation methodology under this part or any other calculation methodology" if it finds that a PMS exists such that the costs of materials and fabrication do not accurately reflect the cost of production in the ordinary course of trade. 19 U.S.C. § 1677b(e).

As noted above, the CIT did not address the merits of Commerce's determination that the cost of production of CWP in Thailand was distorted by a PMS. In the first remand determination, Commerce continued to find that such a PMS existed. *Remand Results* at 8-9 (Appx00020-00021). Thus, Commerce adjusted respondents' costs of production under Section 1677b(e) to account for the distorted prices of HRC in Thailand. *Id*. at 9 (Appx00021). This methodology is permitted by the broad language allowing Commerce to employ "any other methodology" to calculate constructed value if it finds a PMS distorts the cost of materials. *See* 19 U.S.C. § 1677b(e).

The CIT rejected Commerce's adjustment to constructed value, but this was based primarily on its finding that Commerce did not have a statutory ground for relying on constructed value in the first place. *Saha Thai II* at 1335 (Appx00051). As explained above, this finding was in error, misconstrued the statute, and

28

contradicts this Court's holding in *Hyundai Steel*. The CIT did not examine the actual adjustment made nor identify any flaws in that adjustment. We note that the respondents also did not raise any objections to Commerce's constructed value calculation, other than the element of constructed value profit. *See Remand Results* at 22-27 (Appx00034-00039). If this Court rejects the CIT's ruling and reinstates Commerce's first remand determination, the Court should also uphold Commerce's adjustment methodology, as the opportunity to challenge any aspects other than CV profit have been waived.

## VIII. CONCLUSION

The CIT erred in rejecting Commerce's first remand results as contrary to the statute. Wheatland respectfully requests that the Federal Circuit reverse the CIT's decision in *Saha Thai II* and find that Commerce's first remand results were in accordance with law.

Respectfully submitted,

/s/ Roger B. Schagrin
Roger B. Schagrin, Esq.
Elizabeth J. Drake, Esq.
SCHAGRIN ASSOCIATES
900 Seventh Street, NW; Suite 500
Washington, DC 20001
202-223-1700

*Counsel for Wheatland Tube Company*

September 12, 2022

29

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:** 2022-1175

**Short Case Caption:** Saha Thai Steel Pipe Public Company Limited v. US

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,266 words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 09/12/2022

Signature: /s/ Roger B. Schagrin

Name: Roger B. Schagrin

Save for Filing

**ADDENDUM OF REQUIRED DOCUMENTS**

| No. | Description | BPI/Public | Appendix Citation |
|-----|-------------|------------|-------------------|
| 1 | Judgment for Saha Thai Steel Pipe Public Company Limited v. United States, Consol. Ct. No. 18-00214, Slip Op. 21-118 (CIT Sept. 17, 2021) | Public | Appx00001-Appx00002 |
| 2 | Saha Thai Steel Pipe Public Company Limited v. United States, 538 F.Supp.3d 1350; Consol. Ct. No. 18-00214, Slip Op. 21-118 (CIT Sept. 17, 2021) | Public | Appx00003-Appx00005 |
| 3 | Saha Thai Steel Pipe Pub. Co. Ltd. v. United States, 422 F.Supp.3d 1363, Consol. Ct. No. 18-00214, Slip Op. 19-165 (CIT Dec. 18, 2019) | Public | Appx00006-Appx00012 |
| 4 | Dept. of Commerce's Final Results of Redetermination Pursuant to Remand, Saha Thai Steel Pipe Public Company, Ltd. et al. v. United States, Court No. 18-00214, Slip Op. 19-165 (March 10, 2020) | Public | Appx00013-Appx00043 |
| 5 | Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323; Consol. Court No. 18-00214, Slip Op. 20-181 (CIT Dec. 21, 2020) | Public | Appx00044-Appx00052 |
| 6 | Dept. of Commerce's Final Results of Redetermination Pursuant to CIT Order, Saha Thai Steel Pipe Co., Ltd. v. United States, Consol. Court No. | Public | Appx00053-Appx00058 |

| No. | Description | BPI/Public | Appendix Citation |
|---|---|---|---|
| | 18-00214, Slip Op. 20-181 (March 15, 2021) | | |
| 7 | *Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2016–2017*, 83 Fed. Reg. 51927 (Oct. 15, 2018) | Public | Appx20032-Appx20034 |
| 8 | *Circular Welded Carbon Steel Pipes and Tubes from Thailand: Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2016-2017* (Oct. 4, 2018) | Public | Appx20035-Appx20053 |

**ADDENDUM 1**

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **SAHA THAI STEEL PIPE PUBLIC COMPANY LIMITED,** | |
| Plaintiff, | |
| and | |
| **THAI PREMIUM PIPE COMPANY LTD. and PACIFIC PIPE PUBLIC COMPANY LIMITED,** | |
| Consolidated Plaintiffs, | **Before: Jennifer Choe-Groves, Judge** |
| v. | **Consol. Court No. 18-00214** |
| **UNITED STATES,** | |
| Defendant, | |
| and | |
| **WHEATLAND TUBE COMPANY,** | |
| Defendant-Intervenor. | |

### <u>JUDGMENT</u>

This case having been duly submitted for decision, and the court, after due deliberation, having rendered a decision; now therefore, in conformity with said decision, it is hereby

**ORDERED** that the U.S. Department of Commerce's final results in <u>Circular Welded Carbon Steel Pipes and Tubes from Thailand</u>, 83 Fed. Reg. 51,927 (Dep't of Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016–2017), as amended by the Final Results of Redetermination Pursuant to Remand, ECF Nos. 62, 63, and the Final Results of

Consol. Court No. 18-00214                                                    Page 2


Redetermination Pursuant to CIT Order, ECF No. 83, are sustained and judgment is entered for

Defendant.

                                                        /s/ Jennifer Choe-Groves
                                                        Jennifer Choe-Groves, Judge


Dated:    September 17, 2021
               New York, New York

# ADDENDUM 2

Case: 22-1175     Document: 6     Page: 44     Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 538 F.Supp.3d 1350...

538 F.Supp.3d 1350
United States Court of International Trade.

SAHA THAI STEEL PIPE PUBLIC
COMPANY LIMITED, Plaintiff,
and
Thai Premium Pipe Company Ltd.
and Pacific Pipe Public Company
Limited, Consolidated Plaintiffs,
v.
UNITED STATES, Defendant,
and
Wheatland Tube Company,
Defendant-Intervenor.

Slip Op. 21-118
|
Consol. Court No. 18-00214
|
September 17, 2021

**Synopsis**

**Background:** Exporters filed suits challenging Department of Commerce's final results in administrative review of antidumping duty order covering circular welded carbon steel pipes and tubes (CWP) from Thailand. Following consolidation, the Court of International Trade, Jennifer Choe-Groves, J., 422 F.Supp.3d 1363, remanded and, subsequently, 487 F.Supp.3d 1323, remanded for second time. On remand, Department of Commerce issued final results of second remand redetermination.

The Court of International Trade, Choe-Groves, J., held that recalculation of dumping margin without particular market situation was lawful.

Sustained.

## Attorneys and Law Firms

**\*1351** Daniel L. Porter, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for Plaintiff Saha Thai Steel Pipe Public Company Limited.

Robert G. Gosselink, Jonathan M. Freed, and Aqmar Rahman, Trade Pacific PLLC, of Washington, D.C., for Consolidated Plaintiff Thai Premium Pipe Company Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP, of Washington, D.C., for Consolidated Plaintiff Pacific Pipe Public Company Limited.

In K. Cho, Trial Attorney, and Franklin E. White, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With them on the brief were Brian M. Boynton, Acting Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief was Brendan S. Saslow, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Roger B. Schagrin and Elizabeth J. Drake, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Wheatland Tube Company.

## OPINION

Choe-Groves, Judge:

**\*1352** Plaintiff Saha Thai Steel Pipe Public Company Limited ("Saha Thai") and Consolidated Plaintiffs Thai Premium Pipe Company Ltd. ("Thai Premium") and Pacific Pipe Public Company Limited ("Pacific Pipe") filed this consolidated action challenging the final results published by the U.S. Department of Commerce ("Commerce") in the 2016–2017 administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes from Thailand. See Circular Welded Carbon Steel Pipes and Tubes from Thailand ("Final Results"), 83 Fed. Reg. 51,927 (Dep't of Commerce Oct. 15, 2018) (final results of antidumping duty admin. review; 2016–2017); see also Decision Mem. for the Final Results of Antidumping Duty Admin. Review; 2016–2017 (Oct. 4, 2018), PR 143. Before the Court are the Final Results of Redetermination Pursuant to CIT Order, ECF No. 83 ("Second Remand Results"), which the Court ordered in Saha Thai Steel Pipe Public Co. v. United States ("Saha Thai II"), 44 CIT ——, 487 F. Supp. 3d 1323 (2020). For

Case: 22-1175     Document: 6     Page: 45     Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 539 F.Supp.3d 1350...

the reasons discussed below, the Court sustains the Second Remand Results.

## BACKGROUND

The Court presumes familiarity with the facts and procedural history set forth in its prior opinions and recounts the facts relevant to the Court's review of the Second Remand Results. See Saha Thai Steel Pipe Pub. Co. v. United States ("Saha Thai I"), 43 CIT ——, 422 F. Supp. 3d 1363, 1365–67 (2019); Saha Thai II, 44 CIT at ——, 487 F. Supp. 3d at 1326–27.

The Court concluded in Saha Thai I that Commerce's particular market situation adjustment to the cost of production for the purpose of the sales-below-cost test was not in accordance with the law and remanded to Commerce for further consideration. 43 CIT at ——, 422 F. Supp. 3d at 1369–70, 1371. Because the Court concluded that the particular market situation adjustment was not in accordance with the law, the Court did not consider whether the particular market situation adjustment, without a duty drawback adjustment for Saha Thai, was supported by substantial evidence; and whether Commerce conducted the underlying administrative review in a fair and impartial manner in accepting the particular market situation allegation submitted by Wheatland Tube Company and in the opportunity Commerce gave to interested parties to offer information. Id. at ——, 422 F. Supp. 3d at 1371–72.

In the Final Results of Redetermination Pursuant to Remand, ECF Nos. 62, 63 ("Remand Results"), filed under respectful protest, Commerce made a particular market situation determination under 19 U.S.C. § 1677(15)(C), disregarded all home market sales without conducting a sales-below-cost test, and calculated normal value based on constructed value. Remand Results at 1–2, 7–8. Commerce also made a particular market situation determination under 19 U.S.C. § 1677b(e) and calculated constructed value with an adjustment to the cost of production as an alternative calculation methodology. Id. at 8–11. The Court concluded in Saha Thai II that Commerce's exclusion of home market sales, Commerce's particular market situation determination under 19 U.S.C. § 1677(15)(C), Commerce's particular market situation determination under 19 U.S.C. § 1677b(e), and Commerce's application of an alternative calculation methodology under 19 U.S.C. § 1677b(e) were not **\*1353** in

accordance with the law and remanded. 44 CIT at ——, 487 F. Supp. 3d at 1331–35.

On second remand, Commerce "continue[d] to find that a particular market situation existed in Thailand during the period of review that distorted the price of hot rolled coil." Second Remand Results at 1–2, 5. Under respectful protest, however, Commerce recalculated the dumping margins without a particular market situation adjustment. Id. at 2, 5–6.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the Court authority to review actions contesting the final results of an administrative review of an antidumping duty order. The Court shall hold unlawful any determination found to be unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The Court also reviews determinations made on remand for compliance with the Court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

Saha Thai, Pacific Pipe, and Defendant United States ask the Court to sustain the Second Remand Results. Pl.'s Comments Supp. Remand Redetermination Results at 2, ECF No. 87; Consol. Pl.'s Comments Supp. Remand Redetermination Results at 2, ECF No. 88; Def.'s Comments Supp. Second Remand Results at 2, ECF No. 89. Defendant-Intervenor Wheatland Tube Company supports Commerce's redetermination filed under protest. See Def.-Interv. Wheatland Tube Company's Comments Commerce's Second Redetermination Remand at 3, ECF No. 86. No party filed comments opposing the Second Remand Results.

The U.S. Court of Appeals for the Federal Circuit has held that when Commerce advocates a position zealously and must abandon that position in order to comply with a ruling of the U.S. Court of International Trade, Commerce preserves its right to appeal if it adopts a complying position under protest. See Viraj Grp., Ltd. v. United States, 343 F.3d 1371, 1376 (Fed. Cir. 2003). In this case, under protest, Commerce recalculated the weighted-average

Case: 22-1175    Document: 6    Page: 46    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 538 F.Supp.3d 1350...

dumping margins for Pacific Pipe, Saha Thai, and Thai Premium without a particular market situation adjustment. Second Remand Results at 5–6. The weighted-average dumping margins changed from 30.61% to 7.38% for Pacific Pipe, 28% to 0% for Saha Thai, and 30.98% to 5.23% for Thai Premium. Id. at 6. Commerce's recalculation of the weighted-average dumping margins without a particular market situation adjustment, under protest, is consistent with the Court's prior opinions and orders in Saha Thai I and Saha Thai II.

Commerce maintained its determination that a particular market situation distorted the cost of production. Second Remand Results at 1–3, 5–6. The reiterated determination has no effect on the dumping margins because Commerce recalculated the dumping margins without a particular market situation adjustment. No party challenges the determination.

Because the Court sustains Commerce's removal of the particular market situation adjustment, consideration of Commerce's reiterated particular market situation determination in the Second Remand Results would have no practical significance and is mooted. See *1354 Morton Int'l, Inc. v. Cardinal Chem. Co., 967 F.2d 1571, 1574 (Fed. Cir. 1992) (Nies, C.J., dissenting from the orders declining suggestions for rehearing en banc) (citations omitted) ("An issue is also said to be 'mooted' when a court, having decided one dispositive issue, chooses not to address another equally dispositive issue."); Daewoo Elecs. Co. v. Int'l Union of Elec., Elec., Tech., Salaried & Mach. Workers, 6 F.3d 1511, 1513 (Fed. Cir. 1993) ("[O]ur disposition of the tax incidence issue moots two other issues ....").

The Court sustains the Second Remand Results without considering Commerce's reiterated particular market situation determination in the Second Remand Results.

**CONCLUSION**

The Court sustains the Second Remand Results.

Judgment will be entered accordingly.

**All Citations**

538 F.Supp.3d 1350

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADDENDUM 3**

Case: 22-1175  Document: 6  Page: 48  Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 422 F.Supp.3d 1363...

422 F.Supp.3d 1363
United States Court of International Trade.

SAHA THAI STEEL PIPE PUBLIC
COMPANY LIMITED, Plaintiff,
and
Thai Premium Pipe Company, Ltd.
and Pacific Pipe Public Company
Limited, Consolidated Plaintiffs,
v.
UNITED STATES, Defendant,
and
Wheatland Tube Company,
Defendant-Intervenor.

Slip Op. 19-165
|
Consol. Court No. 18-00214
|
December 18, 2019

**Synopsis**

**Background:** Exporters of circular welded carbon steel pipes and tubes from Thailand brought action against United States, challenging final results of Department of Commerce in administrative review of antidumping duty order on pipes and tubes, including Department's application of particular market situation adjustment which altered exporters' costs of production when calculating their weighted-average antidumping margins. Exporters moved for judgment on agency record, and for oral argument.

**Holdings:** The Court of International Trade, Jennifer Choe-Groves, J., held that:

the Court of International Trade would decline to hear oral argument;

adjustment was not in accordance with Tariff Act subsection on constructed value of imported merchandise; and

adjustment was not in accordance with Tariff Act subsection defining "ordinary course of trade."

Remanded.

**Attorneys and Law Firms**

**\*1364** Daniel L. Porter, Christopher Dunn, Tung Nguyen, and Kimberly Reynolds, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, DC, for Plaintiff Saha Thai Steel Pipe Public Company Limited.

Robert G. Gosselink, Jonathan M. Freed, and Aqmar Rahman, Trade Pacific, PLLC, of Washington, DC, for Consolidated Plaintiff Thai Premium Pipe Company, Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP, of Washington, DC, for Consolidated Plaintiff Pacific Pipe Public Company Limited.

Elizabeth A. Speck, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and L. Misha Preheim, Assistant Director. Of counsel on the brief was Brandon J. Custard, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Roger B. Schagrin, Elizabeth J. Drake, Christopher T. Cloutier, and Luke A. Meisner, Schagrin Associates, of Washington, DC, for Defendant-Intervenor Wheatland Tube Company.

## OPINION

Choe-Groves, Judge:

Plaintiff Saha Thai Steel Pipe Public Company Limited ("Saha Thai") and Consolidated Plaintiffs Thai Premium Pipe Company, Ltd. ("Thai Premium") and Pacific Pipe Public Company Limited ("Pacific Pipe") (collectively, "Plaintiffs") challenge the U.S. Department of Commerce's ("Commerce") final results in the March 1, 2016 to February 28, 2017 administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes from Thailand. Before the court are Plaintiffs' motions for judgment on the agency record and Plaintiffs' unopposed motion for oral argument. The court decides the motions on the parties'

Case: 22-1175    Document: 6    Page: 49    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 422 F.Supp.3d 1363...

written submissions without oral argument.[1] For **\*1365** the reasons discussed below, the court remands Commerce's <u>Final Results</u> for further consideration.

[1]    The court has broad discretion to decide dispositive motions on written submissions without oral argument. See <u>Rates Tech., Inc. v. Mediatrix Telecom, Inc.,</u> <u>688 F.3d 742, 749 (Fed. Cir. 2012)</u> (citations omitted).

## ISSUES PRESENTED

1.  Whether Commerce's particular market situation adjustment is supported by substantial evidence and in accordance with the law;

2.  Whether Commerce conducted a fair and impartial administrative review;

3.  Whether Saha Thai exhausted its administrative remedies as to its duty drawback adjustment claim; and if so, whether Commerce's failure to apply a duty drawback adjustment to Saha Thai's cost of production for imputed Thai antidumping and safeguard duties on hot-rolled coil was supported by substantial evidence and otherwise in accordance with the law.

## BACKGROUND

Over thirty years ago, Commerce entered the antidumping duty order on circular welded carbon steel pipes ("CWP") and tubes from Thailand. <u>Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand, 51 Fed. Reg. 8,341 (Dep't Commerce Mar. 11, 1986).</u> Based on the petition from Defendant-Intervenor Wheatland Tube Company ("Defendant-Intervenor" or "Wheatland"), Commerce initiated an administrative review of the antidumping duty order for the period of March 1, 2016, through February 28, 2017. <u>Initiation of Antidumping and Countervailing Duty Administrative Reviews, 82 Fed. Reg. 21,513, 21,514 (Dep't Commerce May 9, 2017).</u> Commerce selected three Thai producers of subject merchandise as mandatory respondents: Saha Thai, Pacific Pipe, and Thai Premium. Plaintiffs responded. Pls.' Initial Questionnaire Resps., PR 31, 48–50, 52–54, and 56–57 (Aug. 17, 2017).

After Saha Thai, Pacific Pipe, and Thai Premium submitted questionnaire responses, but before Commerce issued preliminary results, domestic producer Wheatland "allege[d] that a particular market situation existed in <u>Thailand</u> during

the period of review ("POR") such that the costs of production of [CWP] are distorted and do not accurately reflect the cost of production in the ordinary course of trade." Wheatland Allegation 1, PR 69–71 (Feb. 5, 2018). Wheatland averred that: (1) the Royal Thai Government subsidized Thai producers of hot-rolled coil, enabling its sale at below-market prices to downstream producers of CWP, and (2) the prices for imports of hot-rolled coil into Thailand were distorted through dumping, subsidization, and global overcapacity. <u>Id.</u> at 4–5.

In accepting Wheatland's submission over Saha Thai's objection, Commerce determined that Wheatland had provided new factual information in support of its particular market situation allegation and thus gave interested parties seven days for interested parties to rebut, clarify, or correct the factual information contained in Wheatland's particular market situation allegation. Particular Market Situation Request for Comments Mem. 1–2, PR 81 (Mar. 21, 2018). Saha Thai and Pacific Pipe submitted comments. Saha Thai Rebuttal Factual Information and Comments on Wheatland's Particular Market Situation Allegation, PR 83 (Mar. 28, 2018); Pacific Pipe Comments on Particular Market Situation Allegations, PR 84–85 (Mar. 28, 2018).

Commerce rendered its preliminary decision on April 3, 2018, which was published on April 9, 2018. <u>Circular Welded Carbon Steel Pipes and Tubes from Thailand, 83 Fed. Reg. 15,127 (Dep't Commerce Apr. 9, 2018)</u> (preliminary results of antidumping duty administrative review; 2016–2017). Commerce calculated a preliminarily **\*1366** weighted-average dumping margin of 0.00 percent for Saha Thai, 5.34 percent for Thai Premium, and 10.66 percent for Pacific Pipe. <u>Id. at 15,128.</u> Commerce noted that it had yet to determine whether a particular market situation existed and would "consider [Wheatland's] allegations" further before issuing the final results. Decision Mem. for the Preliminary Results of Antidumping Duty Administrative Review; 2016–2017, PR 87 (Apr. 3, 2018).

Commerce issued Plaintiffs' supplemental questionnaires. Pacific Pipe First Suppl. Questionnaire, PR 93 (Apr. 25, 2018); Saha Thai First Suppl. Questionnaire, PR 94 (Apr. 25, 2018); Thai Premium First Suppl. Questionnaire, PR 95 (Apr. 25, 2018). The first supplemental questionnaires did not explicitly reference Wheatland's particular market situation allegation. See <u>id.</u> Plaintiffs responded. Pacific Pipe's First Suppl. Resp., PR 101 (May 8, 2018); Saha Thai First Suppl. Questionnaire Resp., PR 103–04 (May 14,

Case: 22-1175    Document: 6    Page: 50    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 422 F.Supp.3d 1363...

2018); Thai Premium First Suppl. Questionnaire Resp., CR 98 (May 14, 2018). Wheatland also responded and provided additional factual information supporting its particular market situation allegation. Wheatland's Comments on, and Clarifying Factual Info. Regarding Pacific Pipe and Saha Thai Suppl. Questionnaire Resps., PR 107–09 (May 17, 2018).

In the post-preliminary memorandum, Commerce found that sufficient evidence supported Wheatland's particular market situation allegation. Post-Preliminary Decision Mem. on Particular Market Situation Allegation 1, PR 114 (Aug. 31, 2018) ("PPDM"). Specifically, Commerce found that a particular market situation existed in Thailand during the period of review as to the cost of hot-rolled coil as a component of the cost of production. Id. at 4. Commerce assessed that a combination of the U.S. CVD rate on Thai producers of hot-rolled coil and the Thai AD and safeguard rates on hot-rolled coil imported into Thailand provided an appropriate basis for an adjustment to Thai CWP producers' input costs. Id. at 4, 6. Commerce then applied a particular market situation adjustment, which altered Plaintiffs' costs of production and resulted in a weighted-average antidumping margin calculation of 28.76 percent for Thai Premium, 24.50 percent for Saha Thai, and 10.66 percent for Pacific Pipe. Commerce's Post-Preliminary Decision Mem. on Wheatland's Allegation, PR 114 (Aug. 31, 2018); Analysis Mem. for the Post-Preliminary Results Concerning Saha Thai, PR 113 (Aug. 31, 2018); Pacific Pipe Prelim. Calc. Mem. and Particular Market Situation Adjustment Data, PR 116 (Aug. 31, 2018); Thai Premium Post-Prelim. Calc. Mem. and Particular Market Situation Adjustment Data, PR 117 (Aug. 31, 2018);

Commerce gave interested parties seven days to file case briefs. Briefing Schedule on All Issues Except Particular Market Situation, PR 115 (Aug. 31, 2018). Saha Thai requested a 10-day extension on September 4, 2018. Saha Thai Extension Request, PR 118 (Sept. 4, 2018). Commerce granted Saha Thai's request in part and gave all interested parties an extra three days (one business day) to submit case briefs. Mem. re Extension of Deadline to File Case and Rebuttal Briefs for All Issues, PR 121 (Sept. 6, 2018). The next day, Pacific Pipe requested a four-day extension of the briefing schedule. Pacific Pipe Briefing Schedule Extension Request, PR 123 (Sept. 7, 2018). Commerce granted the request in part and enlarged the briefing schedule by three days for all parties. Mem. re Pacific Pipe Extension Request, PR 124 (Sept. 10, 2018). Defendant-Intervenor requested a one-day extension to file a rebuttal case brief, which

Commerce granted as to all interested parties. Mem. re Extension Request Filing Rebuttal Brs., PR 133, (Sept. 17, 2018). Commerce held a **\*1367** hearing on September 27, 2018. Hr'g Tr., PR 141 (Oct. 4, 2018).

Commerce published the Final Results on October 4, 2018. Circular Welded Carbon Steel Pipes and Tubes from Thailand, 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty administrative review; 2016–2017) ("Final Results"); see also Decision Memorandum for the Final Results of Antidumping Duty Administrative Review; 2016–2017, PR 143 (Oct. 4, 2018) ("Final IDM"); Pls.' Final Calc. Mems., PR 144, 146, 148 (Oct. 4, 2018). In the Final Results, Commerce found that a particular market situation distorted the acquisition cost of hot-rolled coil and adjusted Plaintiffs' costs of production. Final IDM at 8–10. Commerce recalculated Plaintiffs' weighted-average antidumping margins to 30.98 percent for Thai Premium, 30.61 percent for Pacific Pipe, and 28.00 percent for Saha Thai. Final Results at 51,928.

Saha Thai initiated this action challenging Commerce's Final Results on October 18, 2018. Summons, Oct. 18, 2018, ECF No. 1; Compl., Oct. 18, 2018, ECF No. 6. The court entered a statutory injunction on October 22, 2018, granted Wheatland's motion to intervene on November 15, 2018, and consolidated this case with Court Numbers 18-00219 and 18-00231 on January 30, 2019. Order for Statutory Inj. Upon Consent, Oct. 19, 2018, ECF. No. 10; Order, Nov. 15, 2018, ECF No. 15; Order, Jan. 30, 2019, ECF No. 28. Defendant United States ("Defendant") filed the administrative record on January 31, 2019. Ltr. from Brandon Custard, Office of the Chief Counsel for Trade Enforcement & Compliance, Commerce, to Mario Toscano, Clerk of the Court, U.S. Court of International Trade, Jan. 31, 2019, ECF No. 29.

Saha Thai, Thai Premium, and Pacific Pipe moved for judgment on the agency record. Pl. Saha Thai's Mot. J. Agency R. and Br. in Supp. ("Saha Thai Br."), May 15, 2019, ECF No. 39; Consol. Pl. Thai Premium's Mot. J. Agency R., May 15, 2019, ECF No. 37, and Mem. in Supp. ("Thai Premium Br."), May 15, 2019, ECF No. 37-2; Consol. Pl. Pacific Pipe's Mot. J. Agency R., May 15, 2019, ECF No. 41, and Mem. of Points and Authorities in Supp. ("Pacific Pipe Br."), May 15, 2019, ECF No. 41-2. Defendant and Defendant-Intervenor responded. Def.'s Resp. to Pls.' Mots. J. Agency R. ("Def. Resp.") July 29, 2019, ECF No. 44; Def.-Intervenor's Resp. Br. ("Def.-Intervenor Br."), July 29, 2019, ECF No. 42. Plaintiffs replied. Saha Thai's Reply Br., Sept.

Case: 22-1175     Document: 6     Page: 51     Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 422 F.Supp.3d 1363...

16, 2019, ECF No. 51; Thai Premium's Reply Br., Sept. 16, 2019, ECF No. 53; Pacific Pipe's Reply Br., Sept. 16, 2019, ECF No. 54. Defendant filed the joint appendix on September 24, 2019. J.A., Sept. 24, 2019, ECF No. 56.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c). The court will uphold Commerce's determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I. Commerce's Finding of a Particular Market Situation

#### A. Governing Law

In determining antidumping duties, Commerce calculates "the amount by which the normal value [of subject merchandise] exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. When reviewing antidumping duties in an administrative review, Commerce must determine "(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry." Id. *1368 § 1675(a)(2)(A). Normal value represents the price at which the subject merchandise is first sold in the exporting country. See id. §§ 1677b(a)(1)(A), (B)(i). Export price is "the price at which the subject merchandise is first sold (or agreed to be sold)" in the United States. 19 U.S.C. § 1677a(a)).[2]

[2]    Constructed export price represents "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter ...." 19 U.S.C. § 1677a(b).

If Commerce cannot determine the normal value of the subject merchandise based on home-market sales or third-country sales, then Commerce uses a constructed value as a basis for normal value. Id. § 1677b(a)(4). Subsection (e) governs the calculation of a constructed value. Id. § 1677b(e). Constructed

value represents: (1) "the cost of materials and fabrication or other processing of any kind [used] in producing the merchandise;" (2) "the actual amounts incurred and realized" for "selling, general, and administrative expenses, and for profits, in connection with the production and sale of a foreign like product, in the ordinary course of trade, for consumption in the foreign country[;]" and (3) "the cost for packing the subject merchandise. Id. §§ 1677b(e)(1), (e)(2)(A), (e)(3), and (e)(2)(B) (providing for the calculation of constructed value if actual data set out in subsection (2)(A) is unavailable).

When calculating constructed value under 19 U.S.C. § 1677b(e), if Commerce finds the existence of a particular market situation "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, [then] [Commerce] may use another calculation methodology under this part or any other calculation methodology." 19 U.S.C. § 1677b(e).

Section 504(c) of the Trade Preferences Extension Act of 2015 ("TPEA") amended the statutory provision governing constructed value, 19 U.S.C. § 1677b(e). The amendment authorized Commerce to use alternative cost methodologies when computing constructive value after making a particular market situation determination. The amendment added the following language to the statute:

[F]or purposes of paragraph (1) [in reference to calculating constructed value] if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority [Commerce] may use another calculation methodology under this subtitle or any other calculation methodology.

19 U.S.C. § 1677b(e). In other words, the amended statute gives Commerce discretion to adjust the cost of production calculation methodology when determining constructed value if Commerce finds that a particular market situation exists. See id. Section 504 did not amend the statute governing the calculation of cost of production (for below-cost-sales purposes) or application of the below-cost test set out in 19 U.S.C. § 1677(b)(3).

#### B. Application of Particular Market Situation Adjustment

WESTLAW   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Case: 22-1175     Document: 6     Page: 52     Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 422 F.Supp.3d 1363...

**1. Commerce's Cost-Based Particular Market Situation Adjustment When Calculating Normal Value**

In this case, Commerce misapplies a particular market situation adjustment to a respondents' cost of production for purposes of the home-market sales-below-cost test. Under 19 U.S.C. § 1677b(e), **\*1369** Commerce's authority to apply a particular market situation adjustment is limited to the calculation of costs of materials and fabrication under 19 U.S.C. § 1677b(e)(1). See 19 U.S.C. § 1677b(e) ("*For the purposes of paragraph (1)* [19 U.S.C. § 1677b(e)(1)], if a particular market situation exists ... the administering authority may use another calculation methodology...."). The amended statute pertains to particular market situations in the context of constructed value, i.e., when the dumping margin calculation is based on comparing U.S. prices to constructed value, but only when constructed value is the basis of "normal value," not home-market sales.

Commerce applied Section 504 in finding a particular market situation when it increased Plaintiffs' costs of production for purposes of the home-market sales-below-cost test. See Final IDM at 8–10; PPDM at 4–5. Commerce made the particular market situation adjustment after comparing Plaintiffs' U.S. sales to home-market sales. Final IDM at 14, 16, 18. Yet Commerce fails to explain how a cost of sale adjustment is appropriate when comparing U.S. sales and home-market sales. Analysis Mem. for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: [Saha Thai] at 4–5, PR 146 (Oct. 4, 2018) ("Saha Thai Final Calc. Mem."); Analysis Mem. for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: [Thai Premium] 2–4, PR 148 (Oct. 4, 2018) ("Thai Premium Final Calc. Mem."); Analysis Mem. for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: [Pacific Pipe] 3–6, PR 144, (Oct. 4, 2018) ("Pacific Pipe Final Calc. Mem."). Although Section 1677b(e), "Constructed Value," grants Commerce discretion to adjust a respondent's cost of production in an antidumping margin calculation upon finding a particular market situation, that margin calculation must be based on a comparison of U.S. prices to constructed value, not home-market sales prices or third-country sales prices.

Section 504 did not amend 19 U.S.C. § 1677b(b)(3), which governs cost of production calculations for determining whether home-market sales are below costs. Neither the term "ordinary course of trade" nor a reference to a particular market situation cost adjustment appears in Section 1677b(b)(3). Defendant's contention that Section 504 authorized Commerce's comparison of U.S. prices to home-market sales instead of constructed value is an interpretation that is unsupported in the law. See Ad Hoc Comm. v. United States, 13 F.3d 398, 403 (Fed. Cir. 1994) ("*Ad Hoc I*") (When "the antidumping statute is not silent on the question, ... the reasonableness or fairness of Commerce's interpretation of the Antidumping Act is irrelevant."); Thomas v. Nicholson, 423 F.3d 1279, 1284 (Fed. Cir. 2005) ("[W]here 'Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " (quoting Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983)); see also Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (citations omitted)).[3] The court concludes **\*1370** that Commerce's particular market situation adjustment is not in accordance with 19 U.S.C. § 1677b(e).

3     Defendant and Defendant-Intervenor argue that Commerce's particular market situation adjustment to Plaintiffs' costs of production is entitled to deference under Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 842–42, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Def. Resp. at 11–12, 26; Def.-Intervenor Br. at 8, 11–16. Defendant and Defendant-Intervenor's contention is incorrect because Congress has spoken directly to the precise question at issue: how to calculate the cost of production for purposes of the sales-below-cost test. The TPEA amended 19 U.S.C. § 1677b(e)—the definition of constructed value. The TPEA did not amend 19 U.S.C. § 1677b(b)(3)—the applicable statute governing the calculation of cost of production for below-cost-sales—and Section 1677b(b)(3) contains no reference to a "particular market situation" finding. Commerce's particular market situation adjustment runs contrary to the plain meaning of the statute as to how Commerce must calculate the cost of production for purposes of the sales-below-cost test. See Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1329 (Fed. Cir. 2017).

Case: 22-1175     Document: 6     Page: 53     Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 422 F.Supp.3d 1363...

## 2. Sales-Based Particular Market Situations

In the Final Results, Commerce made a particular market situation finding and increased Plaintiffs' costs of production. 83 Fed. Reg. at 51,928; Final IDM at 8; see also Wheatland Allegation at 4 (alleging that "two particular market situations ... distorted the *cost of producing* CWP in Thailand during the POR." (emphasis added)). Saha Thai argues that Commerce made a cost-based particular market situation finding, which means that Commerce's findings cannot be grounded in 19 U.S.C. § 1677(15) (defining "ordinary course of trade") because a sales-based particular market situation adjustment under 19 U.S.C. § 1677(15) is distinct from a cost-based particular market situation adjustment under 19 U.S.C. § 1677b(e). Saha Thai Br. at 15–19. Defendant argues the TPEA "generally expanded the meaning of 'ordinary course of trade' to include any situation in which Commerce finds that a particular market situation prevents a proper comparison between markets." Def. Resp. at 20 (citing 19 U.S.C. § 1677(15)(C)).

Section 504(a) amended 19 U.S.C. § 1677(15), allowing Commerce to consider certain "sales and transactions ... to be outside the ordinary course of trade" when a "particular market situation prevents a proper comparison with the export price or constructed export price." 19 U.S.C. § 1677(15)(C).

In the underlying administrative review, Commerce found a particular market situation and adjusted Plaintiffs' costs of production by applying the particular market situation adjustment to Commerce's home-market sales calculation. See Final IDM at 8–10. Commerce's cost-based particular market situation adjustment does not implicate a sales-based particular market situation in the underlying administrative review. See 19 U.S.C. § 1677(15); 19 U.S.C. § 1677b(e). The record shows that Commerce distinguished between a sales-based and cost-based particular market situation at the administrative level. Wheatland made a cost-based particular market situation allegation. Wheatland Allegation at 1–2 ("[W]e hereby allege that a particular market situation existed in Thailand ... such that the costs of production of ... are distorted. We therefore request Commerce use an alternative methodology to calculate constructed value."). When accepting Wheatland's particular market situation allegation over Saha Thai's objection as being untimely, Commerce reasoned that its "regulations provide[d] a deadline for the submission of a sales-based [particular market situation] ... [but] no such provision exist[ed] for the

TPEA's cost-based [particular market situation] allegation." Final IDM at 5.

Commerce's argument here conflates the sales-based versus cost-based particular **\*1371** market situation provisions in the statute. The court rejects this post hoc rationalization for the Final Results. The TPEA did not provide a basis for calculating the cost of production in the sales-below-cost test. That Congress explicitly amended the sales-below-cost provision for a different purpose shows that Congress was aware of the sales-below-cost calculation when it enacted the TPEA. Section 505(a)(A). Further, Congress amended the sales-below-cost provision and did not make a cross-reference between 19 U.S.C. § 1677(15) and 19 U.S.C. § 1677b(e), which shows that Congress did not intend for Commerce to apply 19 U.S.C. § 1677(15)(C) in the manner Commerce proposes.

Because Commerce chose to make a comparison between home-market sales and U.S. price, Commerce may not apply a cost-based particular market situation adjustment in the context of this sales-based comparison. See Final IDM at 8–15. Commerce's post hoc rationalization does not support the Final Results. The court concludes that Commerce's particular market situation adjustment is not in accordance with the law.

### 3. Conclusion

Because the court determines that the particular market situation adjustment was not in accordance with the law, the court need not decide whether substantial evidence supports Commerce's particular market situation adjustment. The court remands the Final Results for further consideration consistent with this opinion.

### II. Commerce's Actions When Conducting the Antidumping Review

Saha Thai contends that Commerce did not conduct the underlying administrative review in a fair and impartial manner. Saha Thai Br. at 40–52. First, Saha Thai claims that Commerce departed from its two-step approach taken in prior cases when examining a cost-based particular market situation allegation. Id. at 41–44. Second, Saha Thai avers that Commerce showed bias because Commerce: (1) accepted Wheatland's May 17, 2018 factual submission even though it was untimely and contained new factual information about the particular market situation allegation that neither

rebutted, clarified, nor corrected another interested party's questionnaire response, and (2) failed to give interested parties a meaningful opportunity to offer information on Thai antidumping and safeguard duties applied to purchases of hot-rolled coil during the period of review when setting a case briefing schedule. Id. at 44–48.

Defendant responds that Commerce conducted the underlying administrative review fairly and provided interested parties sufficient time to comment on, and for Commerce to obtain, information as to Wheatland's particular market situation allegation. Def. Resp. at 47–49. Defendant also argues that the governing federal regulation, 19 C.F.R. § 351.309(c)(1)(ii), allows Commerce to modify the 30-day deadline in filing case briefs after publication of the preliminary results of review. Id. at 49–50. Defendant avers that Commerce could consider Wheatland's factual submission because it rebutted, clarified, or addressed Saha Thai's supplemental response as to "input purchases and tax and duty on such purchases, and calculations including the duty rates applicable to [hot-rolled coil] imported from certain countries during the period of review." Id. at 48 (citations omitted). Because the court has remanded to Commerce for reconsideration of its particular market situation adjustment, the court need not reach this issue.

### III. Saha Thai's Duty Drawback Adjustment Argument

Saha Thai argues that Commerce should have made a duty drawback adjustment **\*1372** for "imputed Thai AD and safeguard duties that [Commerce] calculated on Saha Thai's purchased [hot-rolled coil] pursuant to its [particular market

situation] adjustment methodology." Saha Thai Br. at 53–54. Wheatland responds that Saha Thai failed to exhaust its administrative remedies because Saha Thai raised the duty drawback argument as a ministerial error, and not in Saha Thai's case brief before Commerce. Def.-Intervenor Br. at 8–10; Ministerial Error Mem., PR 162 (Dec. 20, 2018). Defendants assert that Saha Thai's duty drawback argument falls beyond the nature of a ministerial error as defined in 19 C.F.R. § 351.224. Def. Resp. at 50; Def.-Intervenor Br. at 10. Defendants contend there is no merit to Saha Thai's duty drawback claim because record evidence supports Commerce's determination that Saha Thai was ineligible for the duty drawback adjustment requested in its ministerial error comments. Def. Resp. at 51–54; Def.-Intervenor Br. at 10–11. Because the court remands for reconsideration of Commerce's particular market situation adjustment, the court need not address the issue of whether substantial evidence supports the duty drawback adjustment at this time.

### CONCLUSION

For the foregoing reasons, the court concludes that Commerce's particular market situation adjustment is not in accordance with the law and remands for further consideration consistent with this opinion. An order will issue accordingly.

### All Citations

422 F.Supp.3d 1363

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works. **Appx00012**

**ADDENDUM 4**

A-549-502
Remand Redetermination
Slip Op. 19-165
**Public Version**
E&C/OVII: TP/AC

*Saha Thai Steel Pipe Co., Ltd., et al. v. United States*, Court No. 18-00214, Slip Op. 19-165
(CIT December 18, 2019)

## FINAL RESULTS OF REDETERMINATION
## PURSUANT TO REMAND

## I. <u>SUMMARY</u>

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *Saha Thai*.[1]  This litigation pertains to the antidumping duty (AD) administrative review of

circular welded carbon steel pipes and tubes (circular pipes and tubes) from Thailand.[2]

Commerce released its Draft Results of the Remand Redetermination in *Saha Thai* on February

14, 2020.[3]

In *Saha Thai*, the Court remanded Commerce's particular market situation (PMS)

adjustment finding that it was not in accordance with law "{b}ecause . . . Commerce may not

apply a cost-based particular market situation adjustment in the context of {a} sales-based

comparison."[4]  As fully discussed below, we continue to find that a PMS exists in Thailand that

distorts the price of hot rolled coil.  Therefore, under respectful protest,[5] we have used

---

[1] *See Saha Thai Steel Pipe Co., Ltd. v. United States*, Court No. 18-00214, Slip Op. 19-165
(CIT December 18, 2019) (*Saha Thai*).
[2] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty
Administrative Review; 2016-2017*, 83 FR 51927 (October 15, 2018) (*Final Results*) and accompanying Issues and
Decision Memorandum (IDM).
[3] *See* Memorandum, "Draft Results of Redetermination Pursuant to Remand:  Circular Welded Steel Pipes and
Tubes from Thailand, Saha Thai Steel Pipe Co., Ltd., et al. v. United States, Court No. 18-00214, Slip Op. 19-165,"
dated February 14, 2020 (Draft Results of  Remand Redetermination).
[4] *See Saha Thai* at 14.
[5] *See Viraj Group v. United States*, 343 F. 3d 1371 (Fed. Cir. 2003) (*Viraj*).

constructed value (CV) to calculate normal value and made PMS adjustments to the respondents'

costs used to calculate CV.

## II.   REMANDED ISSUE

**The Statute Limits the Application of an Adjustment to Respondents' Cost of Production
for a PMS to the Calculation of Constructed Value**

1.   Legal Framework

Section 504 of the Trade Preferences Extension Act of 2015 (TPEA) added the concept

of "particular market situation" in the definition of the term "ordinary course of trade," and for

purposes of constructed value under section 773(e) of Tariff Act of 1930, as amended (the Act).[6]

Section 773(e) of the Act states that "if a particular market situation exists such that the cost of

materials and fabrication or other processing of any kind does not accurately reflect the cost of

production in the ordinary course of trade, the administering authority may use another

calculation methodology under this subtitle or any other calculation methodology."  Although

the Act does not define "particular market situation," the Statement of Administrative Action

(SAA) explains that examples where such a situation may exist include "where there is

government control over pricing to such an extent that home market prices cannot be considered

competitively set."[7]

Section 504 of the TPEA also amended the Act to provide Commerce with additional

discretion when applying the "particular market situation" concept to determine normal value.[8]

Specifically, in section 504 of the TPEA, Congress added the PMS concept to sales and

transactions that Commerce will consider outside the "ordinary course of trade," and thus not

---

[6] *See Trade Preferences Extension Act of 2015*, Pub. L. No. 114-27, 129 Stat. 362 (2015) (TPEA).
[7] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316,
vol 1 (1994) at 822 (SAA).
[8] *See* TPEA.

usable in its antidumping calculations.  Under section 771(15) of the Act, Commerce shall find "sales and transactions" to be "outside the ordinary course of trade" in situations in which it "determines that the particular market situation prevents a proper comparison with the export price or constructed export price."[9]

Further, section 504 of the TPEA amended the constructed value provision in section 773(e) of the Act by permitting Commerce to use alternative cost calculation methodologies upon a PMS finding.  Under section 773(e) of the Act, when Commerce, in calculating constructed value, finds that a "particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade," Commerce "may use another calculation methodology under this part or any other calculation methodology."

2. Background

On May 9, 2017, Commerce initiated an administrative review of the *Order*[10] on circular pipes and tubes from Thailand covering the period March 1, 2016 through February 28, 2017.[11] Commerce selected Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai), Pacific Pipe Public Company Limited (Pacific Pipe), and Thai Premium Pipe Co. Ltd. (Thai Premium) as mandatory respondents.[12]  On April 9, 2018, Commerce published the *Preliminary Results*.[13] Shortly before the *Preliminary Results* were issued, Commerce received a PMS allegation

---

[9] *See* TPEA.
[10] *See Antidumping Duty Order:  Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986) (*Order*).
[11] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 82 FR 21513, 21514 (May 9, 2017).
[12] *Id.*
[13] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Preliminary Results of Antidumping Duty Administrative Review; 2016-2017*, 83 FR 15127, 15128 (April 9, 2018) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM).

pursuant to section 773(e) of the Act from the Wheatland Tube Company (Wheatland),[14] a

domestic producer of circular pipes and tubes and a member of the original group of petitioners

in the less-than-fair-value investigation.

Wheatland submitted factual information alleging that a PMS existed in the Thai hot-

rolled steel coil market that distorted the production costs of circular pipes and tubes.[15]

Wheatland predicated its PMS allegation on two factors:  (1) Thai government subsidies to the

Thai hot-rolled steel coil industry; and (2) distortions in the prices of imports of hot-rolled steel

coil into Thailand due to dumping, subsidization, and global steel production overcapacity.[16]

In the *Preliminary Results*, Commerce stated that, because of the timing of the

submission of Wheatland's PMS allegation, we intended to consider the PMS allegation prior to

issuing the final results.[17]  In the Post-Preliminary PMS Memorandum, we determined that,

based on the collective impact of the two factors and supporting evidence, identified by

Wheatland, a PMS existed in Thailand during the period of review which distorted the

production costs of circular pipes and tubes.[18]  Additionally, we preliminarily determined that

sufficient record evidence existed to quantify the PMS which distorted the mandatory

respondents' costs of production.[19]

After further analyzing the record evidence and each interested parties' case briefs,

Commerce maintained its PMS determination in its *Final Results*.[20]  Commerce also continued to

---

[14] *See* Wheatland's Letter, "Circular Welded Steel Pipes and Tubes from Thailand:  Particular Market Situation Allegation," (February 5, 2018) (Wheatland PMS Allegation).
[15] *See* Wheatland PMS Allegation at Exhibit 17.
[16] *See* Wheatland PMS Allegation at 4-5.
[17] *See Preliminary Results,* 83 FR at 15129 and accompanying PDM at 4.
[18] *See* Memorandum, "Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand:  Post-Preliminary Decision Memorandum on Particular Market Situation Allegation," dated August 31, 2018 at 1, 4-5 (Post-Preliminary PMS Memorandum).
[19] *Id.* at 6.
[20] *See Final Results* 83 FR at 51927 and accompanying IDM at 3-14.

find that it was appropriate, as an alternative methodology, to address the resulting distortions

caused by the PMS by increasing the respondents' acquisition costs for hot-rolled steel coil.[21]

Commerce published the *Final Results* of its review on October 15, 2018, calculating weighted-

average dumping margins of 28.00 percent, 30.61 percent, and 30.98 percent for Saha Thai,

Pacific Pipe, and Thai Premium, respectively.[22]

Following the *Final Results*, Saha Thai filed a ministerial error allegation contending that

Commerce failed to add the duty drawback adjustment to U.S. price to the amount of imputed

Thai antidumping and safeguard duties that Commerce added to Saha Thai's cost of

production.[23]   On December 20, 2018, Commerce issued a ministerial error memorandum

finding that:  (1) Saha Thai's claims did not constitute ministerial errors as defined by 19 CFR

351.224; and (2) that there was no merit to Saha Thai's arguments that its imputed antidumping

and safeguard duties should have been included in its duty drawback adjustment.[24]   Therefore,

Commerce declined to amend the *Final Results*.

3.  Remand Order

The Court held that pursuant to section 504 of the TPEA and section 773(e) of the Act,

upon the finding of a PMS, Commerce is only permitted to adjust its cost of production for a

PMS when calculating constructed value, rather than the cost of production used in association

with comparison market sale prices as the basis for deriving normal value.[25]   Thus, the Court

found that because "Commerce chose to make a comparison between {normal value based on}

---

[21] *See Final Results IDM* at 12-15.
[22] *See Final Results* 83 FR at 51927.
[23] *See* Saha Thai's Letter, "Saha Thai's Request to Correct Ministerial Error Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 16-17)," dated October 17, 2018.
[24] *See* Memorandum, "Ministerial Error Memorandum for the Final Results of the 2016-2017 Antidumping Duty Administrative Review of Circular Welded Carbon Steel Pipes and Tubes from Thailand," dated December 20, 2018.
[25] *See Saha Thai* at 9.

home-market sales {prices} and U.S. price, Commerce may not apply a cost-based PMS in the context of this sales-based comparison."[26] Additionally, the Court stated that section 504 of the TPEA did not amend "the statute governing the calculation of cost of production (for below-cost-sales purposes) or the application of the below cost test" under section 773(b)(3) of the Act.[27] The Court also explained that neither the term "ordinary course of trade," nor a reference to a PMS, appears in section 773(b)(3) of the Act.[28] As such, the Court found that Commerce's contention that section 504 of the TPEA authorizes the inclusion of a PMS adjustment in the calculation the respondents' cost of production in the sales-below-costs test was not supported by the statute, and that Commerce's PMS adjustment was not in accordance with section 773(e) of the Act.[29]

Finally, having found that Commerce's PMS adjustment was not in accordance with law, the Court stated that it was not necessary to address the following issues: (1) the magnitude of the particular market situation adjustments; (2) whether the administrative review was conducted in a fair and impartial manner; and (3) whether Commerce should have revised the particular market situation adjustment to account for Saha Thai's claimed duty drawback adjustment.[30]

4. <u>Analysis</u>

As an initial matter, for the reasons explained in the *Final Results*,[31] we respectfully disagree with the Court's finding that the inclusion of a PMS adjustment in the calculation of the respondents' cost of production in the sales-below-cost test is not supported by the statute, and that Commerce's PMS adjustment was not in accordance with section 773(e) of the Act.

---

[26] *Id.* at 14.
[27] *Id.* at 8-9.
[28] *Id.* at 11.
[29] *Id.* at 12.
[30] *Id.* at 12-16.
[31] *See Final Results,* 83 FR at 51927 and accompanying IDM at Comment 2.

Nevertheless, section 771(15) of the Act defines the term ''ordinary course of trade'' to mean the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. Subsection (C) explicitly states that Commerce shall consider situations in which we determine that a particular market situation prevents a proper comparison with the export price or constructed export price, to be outside the ordinary course of trade.[32] Thus, the statute enquires whether the PMS prevents a proper comparison with the export or constructed export price.

Additionally, section 773(a)(1)(B)(i) states that the normal value of subject merchandise shall be based on the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price. On this basis, home market sale prices used as normal value must be sold in the ordinary course of trade.[33]

In our PMS determination, we found that the respondents' cost of materials and fabrication or other processing of any kind do not accurately reflect the cost of production of circular pipes and tubes in the ordinary course of trade.[34] As noted above, section 771(15)(C) of the Act states that Commerce shall consider situations in which we determine that a particular market situation prevents a proper comparison of normal value with the export price or constructed export price, to be outside the ordinary course of trade. On this basis, we determine that, absent a PMS adjustment to the cost of production used in the sales-below-cost test, the

---

[32] *See* section 771(15)(C) of the Act.
[33] *See* section 773(a)(1)(B)(i) of the Act.
[34] *See* Post-Preliminary PMS Memorandum at 3, unchanged in *Final Results* and accompanying IDM.

PMS that existed with respect to the cost of production of circular pipes and tubes in Thailand prevents us from performing a meaningful sales-below-cost test. Comparing home market sale prices to a cost of production that does not accurately reflect production costs in the ordinary course of trade fails to accomplish the intent of the sales-below-cost test, which is to determine whether the respondents' home market sales were made in the ordinary course of trade. As such, pursuant to section 771(15)(C) of the Act, we find that the PMS with respect to the cost of production of circular pipes and tubes prevents a proper comparison of normal value based on the respondents' home market sale prices with the respondents' export prices or constructed export prices. Therefore, absent the ability to determine whether the comparison market sales were made within the ordinary course of trade, we have based normal value on CV in accordance with section 773(a)(4) of the Act.[35]

Section 773(e)(1) states that constructed value is the amount equal to the "cost of materials and fabrication or other processing of any kind employed in producing the merchandise, during a period which would ordinarily permit the production of the merchandise in the ordinary course of trade." The TPEA added language to section 773(e) of the Act which states that "if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."

As noted above, Commerce found that a PMS existed with regard to the price of hot-rolled coil as a constituent element of the cost of production of circular pipes and tubes in

---

[35] *Id.* at *8 (stating "Congress provided for the existence of a PMS when market sales are used for normal value by allowing Commerce to disregard specific sales (because they were made outside the ordinary course of trade) or to move off of home market sales to use third country sales or constructed value."); *see also* section 773(a)(1)(B) – (C),(a)(4).

Thailand.  This PMS existed such that the cost of materials and fabrication reported by each

respondent does not accurately reflect its cost of production of circular pipes and tubes in the

ordinary course of trade.  Therefore, pursuant to section 773(e) of the Act, we will adjust each

respondents' cost of production in the calculation of its CV to account for the distorted prices of

hot-rolled coil in Thailand.[36]

    In accordance with section 773(e) of the Act, for each respondent, we separately

calculated CV based on the sum of the costs of materials and fabrication employed in producing

the subject merchandise, plus amounts for general and administrative (G&A) expenses, financial

expenses, CV profit, selling expenses, and U.S. packing costs.  We recalculated the respective

cost of materials and fabrication to account for distorted hot-rolled coil prices in Thailand based

on information submitted by each respondent in their original and supplemental questionnaire

section D responses.

    Due to the absence of comparison market sales in the ordinary course of trade, we are

unable to calculate CV profit for each of the respondents using the preferred method and must

instead rely on one of the three alternatives outlined in section 773(e)(2)(B)(i) through (iii) of the

Act.  These alternatives are:  (i) the use of the actual amounts incurred and realized by the

specific exporter or producer in connection with the production and sale in the foreign country of

merchandise that is in the same general category of products as the subject merchandise; (ii) the

use of the weighted average of the actual amounts incurred and realized by exporters or

---

[36] *See* Memorandum "Analysis Memorandum for the Draft Remand Redetermination of Circular Welded Steel Pipes and Tubes from Thailand:  Pacific Pipe Public Company Ltd.," dated concurrently with this Draft Remand Redetermination (Pacific Pipe Draft Remand Analysis Memorandum); *see also* Memorandum "Analysis Memorandum for the Draft Remand Redetermination of Circular Welded Steel Pipes and Tubes from Thailand: Saha Thai Steel Pipe (Public) Company, Ltd.," dated concurrently with this Draft Remand Redetermination (Saha Thai Draft Remand Analysis Memorandum); and Memorandum "Analysis Memorandum for the Draft Remand Redetermination of Circular Welded Steel Pipes and Tubes from Thailand:  Thai Premium Pipe Company Ltd.," dated concurrently with this Draft Remand Redetermination (Thai Premium Draft Remand Analysis Memorandum).

producers (other than the respondent) in connection with the production and sale of the foreign

like product, in the ordinary course of trade country, for consumption in the foreign country; or

(iii) based on any other reasonable method, except that the amount for profit may not exceed the

amount realized by exporters or producers (other than the respondent) in connection with the

sale, for consumption in the foreign country, of merchandise that is in the same general category

of products as the subject merchandise (*i.e.*, the "profit cap").

The statute does not establish a hierarchy for selecting among the alternatives for

calculating CV profit.[37]  Moreover, as noted in the SAA, "the selection of an alternative will be

made on a case-by-case basis, and will depend, to an extent, on available data."[38]  Thus,

Commerce has the discretion to select from any of the three alternative methods, depending on

the information available on the record.

In accordance with section 773(e)(2)(B)(iii) of the Act, (*i.e.*, any other reasonable

method), as an available option for calculating each respondent's CV profit rate and selling

expenses (*i.e.*, CV selling expenses, CV credit expenses and CV commission expenses),[39]

Commerce used Saha Thai's comparison market selling expense ratios and profit rate from its

home market sales in the 2015-2016 administrative review.[40]  Saha Thai's comparison market

selling expense ratios and profit rate from the prior period reflect the profit and selling expenses

of a Thai circular pipes and tubes producer, on home market sales of the merchandise under

---

[37] *See* SAA at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods.  Further, no one approach is necessarily appropriate for use in all cases.").

[38] *See* SAA at 840.

[39] *See* Pacific Pipe Draft Remand Analysis Memorandum at "Constructed Value," Saha Thai Draft Remand Analysis Memorandum at "Constructed Value;" and Thai Premium Draft Remand Analysis Memorandum at "Constructed Value."

[40] *See* Memorandum, "Placing Documents on the Record of the Remand Redetermination of Circular Welded Carbon Steel Pipes and Tubes (Pipes and Tubes) from Thailand," dated concurrently with the instant memorandum at Attachment 1.

consideration, in the ordinary course of trade.  Further, we are unable to calculate the profit

amount realized by exporters or producers in connection with the sale, for consumption in the

foreign country, of the merchandise in the same general category of products as the subject

merchandise (*i.e.*, "the profit cap"), in accordance with section 773(e)(2)(B)(iii) of the Act,

because the record does not contain information for making such a calculation.  However, the

SAA makes clear that Commerce might have to apply alternative (iii) on the basis of facts

available.[41]  Therefore, we conclude that the method used to calculate CV profit serves as a

reasonable profit cap for this remand redetermination.

For U.S. packing expenses, we will continue to use the amounts reported by each

respondent in their respective U.S. sales data.[42]

## III.    FINAL RESULTS OF REDETERMINATION PURSUANT TO REMAND

In accordance with *Saha Thai*, Commerce has revised certain aspects of its dumping

analysis.  Based on these changes, the weighted-average dumping margins for Pacific Pipe

Company Limited, Saha Thai Pipe (Public) Company, Ltd. and Thai Premium Pipe Company,

Ltd. are listed in the chart below:

---

[41] *See* SAA at 840.
[42] *See* Pacific Pipe Draft Remand Analysis Memorandum at Attachment 1; Saha Thai Draft Remand Analysis
Memorandum at Attachment 1; and Thai Premium Draft Remand Analysis Memorandum at Attachment 1.

Appx00023

| Exporter or Producer | *Final Results*<br><br>Weighted-Average Dumping Margin[43] | Results of Redetermination<br><br>Weighted-Average Dumping Margin |
|---|---|---|
| Pacific Pipe Company Limited | 30.61 | 36.50[44] |
| Saha Thai Pipe (Public) Company, Ltd. | 28.00 | 30.62[45] |
| Thai Premium Pipe Company, Ltd. | 30.98 | 31.06[46] |

## IV.    COMMENTS ON DRAFT RESULTS OF REMAND REDETERMINATION

**Issue 1.  Whether Commerce's Draft Results of Remand Redetermination Complies with the Court's Decision**

*Respondents' Comments*

- The Court explicitly found Commerce's PMS adjustment unlawful.  Rather than simply complying with the Court's instructions and recalculating Saha Thai's weighted-average dumping margin "absent the PMS adjustment," Commerce maintained the PMS adjustment through yet another unlawful guise.[47]

- Instead of recalculating Pacific Pipe's weighted-average dumping margin, without making PMS adjustments to the COP, Commerce attempted to circumvent the Court's order in *Saha Thai* by improperly using constructed value as the basis for normal value.[48]

---

[43] *See Final Results*.
[44] *See* Pacific Pipe Draft Remand Analysis Memorandum.
[45] *See* Saha Thai Draft Remand Analysis Memorandum.
[46] *See* Thai Premium Draft Remand Analysis Memorandum.
[47] *See* Saha Thai's Letter, "Saha Thai's Comments on Draft Re-determination Circular Welded Carbon Steel Pipe and Tubes from Thailand," dated February 26, 2020 at 2 (citing *Saha Thai* at 14 "{b}ecause the court determines that the particular market situation adjustment was not in accordance with the law, the court need not decide whether substantial evidence supports Commerce's particular market situation adjustment.  The court remands the Final Results for further consideration consistent with this opinion.") (Saha Thai Draft Remand Comments).
[48] *See* Pacific Pipe's Letter, "Circular Welded Carbon Steel Pipe and Tubes from Thailand: Comments on the Draft Remand Redetermination Results," dated February 26, 2020 at 2-3, and 5 (Pacific Pipe Draft Remand Comments).

*Wheatland's Comments*

- The Court did not address the merits of Commerce's affirmative PMS finding but ruled that the statute did not permit Commerce to apply a PMS adjustment to respondents' costs of production for the purposes of the sales-below-cost test. Wheatland respectfully disagrees with the Court's conclusion that Commerce may not adjust costs to account for a PMS for the purposes of the sales-below-cost test.[49]

*Commerce's Position:* We disagree with Saha Thai and Pacific Pipe. The Court did not order Commerce to recalculate each of the respondents' weighted-average dumping margins without making a PMS adjustment. Instead, the Court's ruling focused on the Commerce's application of the PMS adjustment pursuant to section 504 of the TPEA and section 773(e) of the Act. Specifically, the Court held that, upon the finding of a cost-based PMS, Commerce is only permitted to make an adjustment to the cost of production when constructed value is used as the basis for normal value, rather than when comparison market sale prices are used to derive normal value.[50] Thus, the Court found that because "Commerce chose to make a comparison between home-market sales and U.S. price, Commerce may not apply a cost-based particular market situation in the context of this sales-based comparison."[51] Therefore, because the Court remand opinion does not preclude Commerce from maintaining its PMS determination, we believe our final remand redetermination is in compliance with the Court's remand opinion.[52]

---

[49] *See* Wheatland's Letter, "Circular Welded Steel Pipes and Tubes from Thailand: Comments on Draft Remand Redetermination," dated February 26, 2020 at 2 (citing *Saha Thai* at 10-14) (Wheatland Draft Remand Comments).
[50] *See Saha Thai* at 9.
[51] *Id.* at 14.
[52] *Id.*

**Issue 2.  Whether the Regulations and Procedural Fairness Require that Commerce Abandon its Sales-Based PMS Determination in the Final Results of Redetermination Pursuant to Remand**

*Respondents' Comments*

- There is no dispute that, in the underlying review, Commerce initiated its PMS inquiry based on a "cost-based" PMS allegation, and that Commerce made a "cost-based" PMS determination in the *Final Results*.[53]

- In its Draft Results of Remand Redetermination, Commerce made a sales-based PMS determination.[54]  Wheatland did not meet the deadline set by 19 CFR 351.301(c)(2), for making a sales-based PMS allegation and Commerce therefore did not properly initiate its PMS allegation inquiry.[55]

- Quoting the Draft Results of Remand Redetermination –"home market prices used as normal value must be sold in the ordinary course of trade"[56] – the respondents assert that Commerce has made an improper sales-based PMS determination when no such allegation was properly made by Wheatland.

- Commerce failed to meet the regulatory and initiation requirements for a sales-based PMS[57] and Commerce does not have the authority to not comply with its own regulations[58]

---

[53] *See* Thai Premium's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Comments on Commerce's Draft Remand Results," dated February 26, 2020 at 9 (Thai Premium Draft Remand Comments), and Saha Thai Draft Remand Comments at 6-8.

[54] *See* Thai Premium Draft Remand Comments at 9; *see also* Pacific Pipe Draft Remand Comments at 4.

[55] *See* Saha Thai Draft Remand Comments at 7-8.

[56] *See* Draft Results of Remand Redetermination at 7.

[57] *See* Thai Premium Draft Remand Comments at 9; *see also* Pacific Pipe Draft Remand Comments 4-5.

[58] *See* Saha Thai Draft Remand Comments at 7-8 (citing *United States Steel & Fasteners, Inc. v. United States*, 947 F.3d 794, 801 (Fed. Cir 2020) (finding that Commerce's regulation was clear and did not allow suspension of liquidation before a scope inquiry and explaining that affording Commerce deference would permit it to create a *de facto* new regulation); *see e.g., AMS v. United States*, 737 F.3d 1338 ,1344 (CIT 2013) (concluding that Commerce's suspension instructions to CBP were "clearly inconsistent with the limited prospective authority provided by §

- Therefore, Commerce's revised margin calculations for all three respondents do not comport either with procedural fairness or with Commerce's regulations. As such, Commerce should not make any PMS adjustments when it issues its final results of redetermination pursuant to remand.[59]

*Commerce's Position:* We disagree with the respondents' contention that Commerce made a sales-based PMS determination in the Draft Results of Remand Redetermination. Commerce has not considered whether a PMS existed in the home market for the sale of the foreign like product such that home market sale prices cannot be used as the basis for normal value. In the Draft Results of Redetermination, Commerce stated that "home market prices used as {as a basis for} normal value must be sold in the ordinary course of trade." Therefore, without being able to make a PMS adjustment in calculating the respondents' cost of production and perform an accurate sales-below-cost test, we find that the PMS in Thailand which distorted the acquisition cost of HRC has resulted in each respondent's home market sales being outside of the ordinary course of trade.[60] Therefore, consistent with the statute, Commerce has relied on constructed value as the basis for normal value.[61]

---

351.225(1)(2)" and, thus, Commerce exceeded its regulatory authority); *see also Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) ("{I}f there is only one reasonable construction of a regulation . . .. then a court has no business to deferring to any other reading. If a genuine ambiguity remains, then the agency's reading must still be reasonable in order to receive Auer deference."); *see e.g., Auer v. Robbins*, 519 U.S. 452, 461 (1997) (finding that an agency's interpretation of its own ambiguous regulation is controlling unless it is "plainly erroneous or inconsistent with the regulation.")).

[59] *See* Thai Premium Draft Remand Comments at 8; Saha Thai Draft Remand Comments at 3, and 6-8; Pacific Pipe Draft Remand Comments at 2-3, and 8.

[60] *See* section 771(15)(C) of the Act.

[61] *See* section 773(a)(4) of the Act; *see also Husteel Co., Ltd. v. United States,* Ct. No. 18-00169, Slip Op. 20-2 (CIT January 3, 2020) (*Husteel*) (stating "A PMS that affects costs of production would presumably affect prices for domestic sales and export sales so there would be no reason to adjust only the home market prices. If the PMS was of a kind that only affected domestic sales, then it would be one which prevented "a proper comparison with the export price or constructed export price" and Commerce would move to either third country sales or constructed value.); *see also* sections 773(a)(1)(B)(ii)(III), (a)(1)(C)(iii), and (a)(4).

As noted by the respondents, Commerce found that a cost-based PMS existed in Thailand which distorted the acquisition cost HRC, the primary input used in the production of circular pipes and tubes. On this basis, we found that the respondents' cost of materials and fabrication or other processing do not accurately reflect the cost of production of circular pipes and tubes in the ordinary course of trade.[62] The record of this court proceeding shows that Commerce relied on the cost-based PMS finding made in the *Final Result*s in the Draft Results of Remand Redetermination, with no change to our determination that a cost-based PMS existed during the period of review.[63] As such, the respondents' arguments that Commerce is not complying with its own regulations by switching to a sales-based PMS lacks merit.

### Issue 3.  Whether Commerce's Use of Constructed Value for All Respondents Is Illogical and Statutorily Impermissible

*Respondents' Comments*

- Commerce has failed to demonstrate how alleged distortions in the Thai market prevent a proper comparison between U.S. price and home market prices. That is, Commerce fails to explain the rationale for its determination that the home market price and export price (or constructed export price) cannot be meaningfully compared.[64]

---

[62] *See* Post-Preliminary PMS Memorandum at 3, unchanged in *Final Results* and accompanying IDM.
[63] *See* Memoranda, "Analysis Memorandum for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Pacific Pipe Public Company Ltd.," dated October 4, 2018 at 6 and Attachments 1-2 (Pacific Pipe Final Analysis Memorandum); "Analysis Memorandum for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai)," dated October 4, 2018 at 5 and Attachments 1-2 (Saha Thai Final Analysis Memorandum); "Analysis Memorandum for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Thai Premium Pipe Company Ltd. (Thai Premium)," dated October 4, 2018 at 5 and Attachments 1-2 (Thai Premium Final Analysis Memorandum); Pacific Pipe Draft Remand Analysis Memorandum at Attachments 1-2; Saha Thai Draft Remand Analysis Memorandum at Attachments 1-2; and Thai Premium Draft Remand Analysis Memorandum at Attachments 1-2 where we adjusted the respective respondents' total cost of manufacturing (TCOMCOP) by the same calculated PMS adjustment used in both the Final Results and the Draft Remand Results.
[64] *See* Thai Premium Draft Remand Comments at 11-12; *see also* Pacific Pipe Draft Remand Comments at 5-6.

- Commerce's finding that, "absent a PMS adjustment to the cost of production used in the sales-below-cost test, the PMS that existed with respect to the cost of production of circular pipes and tubes in Thailand prevents us from performing a meaningful sales-below-cost test" is illogical. Essentially, Commerce's position is that when it cannot adjust for costs for the sales-below-costs test to account for a PMS, Commerce cannot make a meaningful comparison as to whether a PMS exists, and a PMS must exist such that home market sales are outside the ordinary course of trade.[65]

- Commerce impermissibly resorted to the use of constructed value to determine normal value because it failed to exhaust the statutory requirement of relying first on home market sale prices.[66] Basing normal value on constructed value in accordance with section 773(a)(4) of the Act requires first that Commerce make an affirmative finding that "the normal value of the subject merchandise cannot be determined" by using home market sale prices under section 773(a)(1)(B)(i) of the Act.[67]

- Under the regulations, Commerce is only permitted to disregard those home market sales that are "outside the ordinary course of trade."[68] Moreover, Commerce can disregard a

---

[65] *See* Thai Premium Draft Remand Comments at 12-13; Pacific Pipe Draft Remand Comments at 4.

[66] *See* Thai Premium Draft Remand Comments at 11-12, Saha Thai Draft Remand Comments 3-4, and Pacific Pipe Draft Remand Comments at 6-8.

[67] *See* Thai Premium Draft Remand Comments at 11-12, Saha Thai Draft Remand Comments 3-4, and Pacific Pipe Draft Remand Comments at 6.

[68] *See* Saha Thai Draft Remand Comments at 4-6 and Pacific Pipe Draft Remand Comments at 7 (citing 19 CFR 351.102(35))

> "Ordinary course of trade" has the same meaning as in section 771(15) of the Act. The Secretary may consider sales or transactions to be outside the ordinary course of trade if the Secretary determines, based on an evaluation of all of the circumstances particular to the sales in question, that such sales or transactions have characteristics that are extraordinary for the market in question. Examples of sales that the Secretary might consider as being outside the ordinary course of trade are sales or transactions involving off-quality merchandise or merchandise produced according to unusual product specifications, merchandise sold at aberrational prices or with abnormally high profits, merchandise sold pursuant to unusual terms of sale, or merchandise sold to an affiliated party at a non-arm's length price.

respondent's viable home market if it determines that there is a "particular market situation in the exporting country {home market} {that} does not permit a proper comparison with" the U.S. sales prices.[69]

- Taken together, the statute and Commerce's regulations identify the following home market sales that might be considered outside the ordinary course of trade:

  1. Sales that are below the cost of production;
  2. Sales made to an affiliated customer at non-arms' length price;
  3. Sales involving off-quality merchandise or merchandise produced according to unusual product specifications;
  4. Sales made at aberrational prices or with abnormally high profits; and
  5. Sales made at unusual terms of sale[70]

- Commerce has made no such determination.[71]  By conflating the specific statutory "cannot be determined" standard with an *ultra vires* "cannot determine whether" standard, Commerce impermissibly resorted to constructed value.  Moreover, Commerce's admission that it cannot determine whether the comparison market sales were made within the ordinary course of trade, must result in a conclusion that Commerce in fact has not found that the comparison market sales were outside the ordinary course of trade.[72]

*Wheatland's Comments*

- Commerce correctly found that:  (1) the statute requires any home market prices used as the basis of normal value be in the ordinary course of trade;[73] (2) the statute directs Commerce to consider sales occurring in situations in which a PMS prevents a proper

---

[69] *See* Saha Thai Draft Remand Comments at 4 and Pacific Pipe Draft Remand Comments at 6.
[70] *See* Saha Thai Draft Remand Comments at 5 and Pacific Pipe Draft Remand Comments at 6.
[71] *See* Saha Thai Draft Remand Comments at 6 and Pacific Pipe Draft Remand Comments at 3-8.
[72] *See* Thai Premium Draft Remand Comments at 13, Saha Thai Draft Remand Comments at 5-6, and Pacific Pipe Draft Remand Comments at 6.
[73] *See* Wheatland Draft Remand Comments at 2 (citing section 773(a)(1)(B)(i) of the Act).

comparison with export price to be outside the ordinary course of trade;[74] and (3) comparing home market sales to a cost of production that does not accurately reflect production costs in the ordinary course of trade fails to accomplish the intent of the sales-below cost test, which is to determine which home market sales were made in the ordinary course of trade.

- Indeed, the statute directs that whenever sales are disregarded as the result of the sales-below-costs test, normal value shall be based on any remaining sales made in the ordinary course of trade, or, if no such sales remain, constructed value. Thus, if Commerce cannot use the sales-below-costs test to determine which sales were made in the ordinary course of trade as a result of the Court's order, it must rely on constructed value.[75]

*Commerce's Position:* We disagree with the respondents that Commerce has failed to demonstrate how distortions in the Thai market prevent a proper comparison between U.S. price and home market prices. In the *Final Results*, we found that a PMS existed in Thailand which distorted the acquisition cost of HRC, the primary input used in the production of circular pipe and tube. On this basis, we found that each of the respondent's cost of materials and fabrication or other processing do not accurately reflect the cost of production of circular pipes and tubes in the ordinary course of trade.[76] As noted above, section 771(15)(C) of the Act states that Commerce shall consider situations in which we determine that a particular market situation prevents a proper comparison of normal value with the export price or constructed export price, to be outside the ordinary course of trade. On this basis, we find that the existence of the PMS

---

[74] *See* Wheatland Draft Remand Comments at 2 (citing section 771(15)(C) of the Act).
[75] *Id.* at 3 (citing section 771 (b)(1) of the Act).
[76] *See* Post-Preliminary PMS Memorandum at 3, unchanged in *Final Results* and accompanying IDM.

concerning the cost of production of circular pipes and tubes in Thailand precludes a proper comparison of normal value with U.S. price, pursuant to section 771(15)(C) of the Act.[77]

In addition, section 773(a)(1)(B)(i) states that the NV of subject merchandise shall be based on the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price.  This statutory provision also requires that home market prices, used as NV, must be sold in the ordinary course of trade.

We note that comparing home market sale prices to a cost of production that does not accurately reflect production costs in the ordinary course of trade would be illogical and defeat the intent of the sales-below-costs test, which is to determine whether a respondent's home market sales were made in the ordinary course of trade.  In the *Final Results*, we calculated PMS adjustments ranging from [  ] percent to [  ] percent, meaning that the HRC acquisition costs reported in the respondents' books and records were highly distorted.[78]  Given that these distorted HRC costs comprise 80-90 percent of the cost of production of circular pipes and tubes, a sales-below-costs test run without a PMS adjustment would lead to a significant number of below-cost home market sale prices being used as a basis of NV, which would be compared to export price or constructed export price.[79]

In determining whether to disregard a respondent's home market sales made as a result of the sales-below-costs test, we examined, in accordance with sections 773(b)(1)(A) and (B) of the

---

[77] Section 771(15)(C) of the Act explicitly states that Commerce shall consider situations in which we determine that a PMS prevents a proper comparison with the export price or constructed export price, to be outside the ordinary course of trade.
[78] *See* Pacific Pipe Final Analysis Memorandum at 6; Saha Thai Final Analysis Memorandum at 5; and Thai Premium Final Analysis Memorandum at 5.
[79] *See* Post-Preliminary PMS Memorandum at 4-5.

Act, whether, within an extended period of time, such sales were made in substantial quantities, and whether such sales were made at prices which did not permit the recovery of all costs within a reasonable period of time in the normal course of trade. In accordance with section 773(b) of the Act, where less than 20 percent of a given product was sold at prices less than the COP, we did not disregard below-cost sales of that product, because the below-cost sales were not made in "substantial quantities." However, we disregarded the below-cost sales that: (1) have been made within an extended period of time (within six months to one year) in substantial quantities (20 percent or more), as defined by sections 773(b)(2)(B) and (C) of the Act; and (2) were not made at prices which permit recovery of all costs within a reasonable period of time, as prescribed by section 773(b)(2)(D) of the Act. Pacific Pipe, Saha Thai, and Thai Premium reported [      ], [      ] and [      ] home market sales, respectively.[80] In the *Preliminary Results*, where we did not make a PMS adjustment to the respondent's cost of production, Commerce determined that [      ], [      ], and [      ] of Pacific Pipe's, Saha Thai's, and Thai Premium's respective home market sales were disregarded because of the sales-below-costs test and found to be outside of the ordinary course of trade.[81] In the *Final Results,* where we did make a PMS adjustment to the respondents' cost of production, Commerce determined that [      ], [      ], and [      ] of Pacific Pipe's, Saha Thai's, and Thai Premium's respective home market sales were disregarded because of the sales-below-costs test and found to be outside of the ordinary course of trade.[82] Thus, the

---

[80] *See* Memoranda, "Analysis Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Pacific Pipe Public Company Ltd.," dated April 9, 2018 at Attachment 2; "Analysis Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai)," dated April 9, 2018 at Attachment 1; and "Analysis Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Thai Premium Pipe Company Ltd. (Thai Premium)," dated April 9, 2018 at Attachment 1 (Thai Premium Preliminary Analysis Memorandum)
[81] *See* Pacific Pipe Final Analysis Memorandum at Attachment 2; Saha Thai Final Analysis Memorandum at Attachment 1; and Thai Premium Final Analysis Memorandum at Attachment 1.
[82] *See* Pacific Pipe Final Analysis Memorandum at Attachment 2; Saha Thai Final Analysis Memorandum at Attachment 2; and Thai Premium Final Analysis Memorandum at Attachment 2.

record of the instant review clearly demonstrates how running the sales-below-costs test without

a PMS adjustment to each of the respondent's cost of production led to distorted results (*i.e.*,

large numbers of home market sales made outside the ordinary course of trade formed the basis

for normal value for comparison with export price or constructed export price). Given the

Court's instructions to not apply a cost-based PMS adjustment in the context of the sales-below-

costs test, pursuant to section 771(15)(C) of the Act, we find that the PMS with respect to the

cost of production of circular pipes and tubes prevents a proper comparison of the respondents'

home market prices with the respondents' export prices or constructed export prices. Therefore,

we find that the PMS results in the respondents' comparison market sales being outside of the

ordinary course of trade, and we continue to base normal value on CV in accordance with section

773(a)(4) of the Act for these final results of redetermination.

**Issue 4.  CV Profit**

*Respondents' Comments*

- If Commerce continues to rely on constructed value for normal value in its final results of

  redetermination, Commerce at a minimum should not use Saha Thai's profit ratio from its

  2015-2016 administrative review and revise its determination of the proper amount of CV

  profit.[83]

- In the *Preliminary Results*, Post-Preliminary Results, and the *Final Results* of the

  underlying administrative review, Commerce used CV as a basis for normal value for

  Thai Premium because Thai Premium did not have sales of the foreign like product in the

---

[83] *See* Thai Premium Draft Remand Comments at 13.

ordinary course of trade which is the regulatory preferred method (*i.e.* Thai Premium's foreign market profit) to calculate CV profit.[84]

- Commerce must conduct a sales-below-costs test based on the home market sales and cost data submitted by Thai Premium in this administrative review.  By doing so, Commerce will be able to calculate a CV profit ratio based on its preferred method.[85]

- Because Commerce is able to calculate a CV profit rate under section 772(e)(2)(A) of the Act for Thai Premium, Commerce does not need to use the alternative methodologies prescribed under section 772(e)(2)(B) of the Act because the alternatives apply only when the respondent does not have useable data.[86]

- In the event that Commerce continues to disregard Thai Premium's home market sales data to calculate CV profit based on section 772(e)(2)(A) of the Act, Commerce should use the CV profit and selling expenses that already are on the record of this administrative review in accordance its prior practice.[87]

- Commerce could have used Thai Premium's 2015 financial information on the record of this administrative for Thai Premium's CV profit ratio calculation.[88]  Commerce might surmise that Thai Premium's 2015 financial statements are unusable because Thai Premium's financials shows that the company had a net [     ] during the 2015 calendar year.  However, this argument is without merit.

---

[84] *See* Thai Premium Draft Remand Comments at 16 (citing the Preliminary Results and accompanying PDM ; Thai Premium Preliminary Analysis Memorandum; and Thai Premium Final Analysis Memorandum).

[85] *See* Thai Premium Draft Remand Comments at 17.

[86] *Id.* at 18.

[87] *Id.* at 18 (citing *Certain Steel Nails from the United Arab Emirates: Final Determination of Sales at Less Than Fair Value*, 77 FR 17029 (March 23, 2012) and accompanying Issues and Decision Memorandum; and *Biodiesel from Argentina: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part*, 82 FR 50394 (October 31, 2017) and accompanying Preliminary Decision Memorandum.

[88] *Id.* at 19 (citing Thai Premium's July 31, 2017 Section A Questionnaire Response at Exhibit 10).

- The Court has stated that it is reasonable for Commerce's interpretation of the term "profit" to refer only to positive amounts, and further concluded previously that it was reasonable for Commerce to include only positive profits in its calculation.[89]

- However, Commerce considers negative or zero amounts in the calculation of CV profit when there are no positive profits realized by any of the producers in the industry.[90]  In this review, the exception articulated by the Court applies because the 2015 financial statements of Saha Thai and Pacific Pipe (*i.e.* the two other mandatory respondents in this proceeding) also show that they had [          ] for the calendar year of 2015.[91]

- If Commerce finds that it cannot use Thai Premium's 2015 financial statements, the 2015 financial statements of other sellers of foreign like product are on the record of this review.[92]  The 2015 financial statements for [

                                                           ], distributors of pipe, and those of Sri Poon Thong Co. Ltd. (Sri Poon), a reseller of foreign like product, are on the record.[93]  The profit ratios for each of these companies would be a reliable surrogate for Thai Premium's home market CV profit ratio.

- Commerce failed to create an adequate record for purposes of calculating CV and did not afford parties the opportunity to consider and submit information to value CV profit.[94]

---

[89] *Id.* at 19 (citing *Fuyao Glass Industry Group Co., Ltd. v. United States*, 2003 Ct. Int'l Trade Lexis 171, Slip. Op. 2003-169, 33-34 (CIT December 18, 2003) (*Fuyao*)).

[90] *Id.* at 20 (citing *Floral Trade Council v. United States*, 41 F. Supp. 2d 319, 326-32 (CIT 1999)).

[91] *See* Saha Thai's July 31, 2017 Section A Questionnaire Response at Exhibit A-12 (Saha Thai July 31, 2017 AQR); and Pacific Pipe's July 31, 2017 Section A Questionnaire Response.

[92] *See* Thai Premium Draft Remand Comments at 20.

[93] *Id.* at 20 (referring to Saha Thai July 31, 2017 AQR at Exhibit A-12).

[94] *See* Pacific Pipe Draft Remand Comments at 8.

- In the event Commerce declines to base the CV profit ratio on the evidence already on the record of this administrative review, Commerce should request additional information from interested parties per its practice.[95]

*Commerce's Position:*  In accordance with section 773(e) of the Act, for each respondent, we have continued to separately calculate CV based on the sum of the costs of materials and fabrication employed in producing the subject merchandise, plus amounts for general and administrative (G&A) expenses, financial expenses, CV profit, selling expenses, and U.S. packing costs.  We disagree with respondent's argument that the preferred method of calculating CV profit could be used in this situation because we have found that there are no comparison market sales with which we can perform the sales-below-cost tests, establish whether such comparison market sales were made within the ordinary course of trade, where CV profit would be calculated under the preferred method.

Due to the absence of comparison market sales in the ordinary course of trade, we are unable to calculate CV profit for each of the respondents using the preferred method and must instead rely on one of the three alternatives outlined in section 773(e)(2)(B)(i) through (iii) of the Act.  These alternatives are:  (i) the use of the actual amounts incurred and realized by the specific exporter or producer in connection with the production and sale in the foreign country of merchandise that is in the same general category of products as the subject merchandise; (ii) the use of the weighted average of the actual amounts incurred and realized by exporters or producers (other than the respondent) in connection with the production and sale of the foreign like product, in the ordinary course of trade country, for consumption in the foreign country; or (iii) based on any other reasonable method, except that the amount for profit may not exceed the

---

[95] *See* Thai Premium Draft Remand Comments at 21 and Pacific Pipe Draft Remand Comments at 8.

amount realized by exporters or producers (other than the respondent) in connection with the sale, for consumption in the foreign country, of merchandise that is in the same general category of products as the subject merchandise (*i.e.*, the "profit cap").

In conducting this analysis, we note that the specific language of both the preferred and alternative methods show a preference that the profit and selling expenses: (1) reflect production and sales in the foreign country; and (2) represent the foreign like product, *i.e.*, the merchandise under consideration. However, when selecting a profit rate from available record evidence, we may not be able to find a source that reflects both factors. Consequently, we must weigh the quality of the data against these factors.

The statute does not establish a hierarchy for selecting among the alternatives for calculating CV profit.[96] Moreover, as noted in the SAA, "the selection of an alternative will be made on a case-by-case basis, and will depend, to an extent, on available data."[97] Thus, Commerce has the discretion to select from any of the three alternative methods, depending on the information available on the record. We continue to find that Commerce cannot rely on alternative (i) because there is no general category of merchandise profit information on the record for the respondents. Further, Commerce cannot rely on alternative (ii) because there no other respondents in this review that have comparison market sales in the ordinary course of trade. Therefore, Commerce must resort to the alternative under subsection (iii), *i.e.*, any other reasonable method.

In accordance with section 773(e)(2)(B)(iii) of the Act, (*i.e.*, any other reasonable method), as an available option for calculating each respondent's CV profit rate and selling

---

[96] *See* SAA at 840 ("At the outset, it should be emphasized, consistent with the Antidumping Agreement, new section 773(e)(2)(B) does not establish a hierarchy or preference among these alternative methods. Further, no one approach is necessarily appropriate for use in all cases.").
[97] *Id.*

expenses (*i.e.*, CV selling expenses, CV credit expenses and CV commission expenses).[98]
Commerce will continue to use Saha Thai's comparison market selling expense ratios and profit
rate from its home market sales in the 2015-2016 administrative review.[99]  Saha Thai's
comparison market selling expense ratios and profit rate from the prior period reflect the profit
and selling expenses of a Thai circular pipes and tubes producer, on home market sales of the
merchandise under consideration, in the ordinary course of trade.  Further, we are unable to
calculate the profit amount realized by exporters or producers in connection with the sale, for
consumption in the foreign country, of the merchandise in the same general category of products
as the subject merchandise (*i.e.*, the profit cap), in accordance with section 773(e)(2)(B)(iii) of
the Act, because the record contains no information for making such a calculation.  However, the
SAA makes clear that Commerce might have to apply alternative (iii) on the basis of facts
available.[100]  Therefore, we conclude that the method used to calculate CV profit serves as a
reasonable profit cap for this remand redetermination.

We disagree that Thai Premium's 2015 financial statements are a viable option because
they show a loss.  As the Court found in *Fuyao Glass*, Commerce reasonably only included
positive profits in calculating constructed value.[101]  The 2015 financial statements for [

], distributors of pipe, and those of Sri
Poon, a reseller of foreign like product, are less preferable options because they are resellers or
distributors whose business operations are less similar to the respondents because, unlike the
respondents, they are not producers of circular pipes and tubes.

---

[98] *See* Pacific Pipe Draft Remand Analysis Memorandum at "Constructed Value," Saha Thai Draft Remand Analysis Memorandum at "Constructed Value;" and Thai Premium Draft Remand Analysis Memorandum at "Constructed Value."
[99] *See* Memorandum, "Placing Documents on the Record of the Remand Redetermination of Circular Welded Carbon Steel Pipes and Tubes (Pipes and Tubes) from Thailand," dated February 14, 2020 at Attachment 1.
[100] *See* SAA at 840.
[101] *See Fuyao*, at *34.

## V.    <u>FINAL RESULTS OF REMAND REDETERMINATION</u>

Pursuant to the *Saha Thai* remand order, Commerce will continue to calculate Pacific

Pipe's, Saha Thai's, and Thai Premium's PMS adjustment using CV as the basis for NV instead

of their respective reported home market sales.

3/10/2020

X _____

Signed by: JEFFREY KESSLER

_____
Jeffrey I. Kessler
Assistant Secretary
    for Enforcement and Compliance

**UNITED STATES DEPARTMENT OF COMMERCE**
**Office of the General Counsel**
OFFICE OF THE CHIEF COUNSEL FOR TRADE ENFORCEMENT & COMPLIANCE
Washington, D.C. 20230

March 10, 2020

**FILED ELECTRONICALLY VIA CM/ECF**

Mario Toscano
Clerk of the Court
U.S. Court of International Trade
One Federal Plaza
New York, NY 10278-0001

Re:     Redetermination Pursuant to Court Remand Order in
        *Saha Thai Steel Pipe Public Company Limited v. United States*, Court No. 18-00214

Dear Mr. Toscano:

        Pursuant to the Court's order of February 11, 2020, please find attached the U.S.
Department of Commerce's Redetermination Pursuant to Court Remand in the above-captioned
action.  The remand redetermination is a business proprietary document.  I am also filing a public
version of the remand redetermination.

        In accordance with Court Rule 56.2(h)(1), filing of the administrative record index for the
remand proceeding will follow under separate cover.  Should you have any questions concerning
the matter, please contact me at (202) 482-1823.

                                Respectfully submitted,


                                /s Brandon Jerrold Custard
                                Brandon Jerrold Custard
                                Attorney
                                Office of the Chief Counsel
                                    for Trade Enforcement & Compliance


Attachment

Mr. Mario Toscano
March 10, 2020
Page 2


cc:

Daniel Lewis Porter
Curtis, Mallet-Prevost, Colt & Mosle LLP
1717 Pennsylvania Avenue, NW.
Washington, DC 20006
(202) 452-7340
Fax: (202) 452-7333
Email: dporter@curtis.com

Robert George Gosselink
Trade Pacific, PLLC
660 Pennsylvania Avenue, SE
Suite 401
Washington, DC 20003
(202) 223-3760
Fax: (202) 223-3763
Email: rgosselink@tradepacificlaw.com

Ronald M. Wisla
Fox Rothschild LLP
1030 15th Street, NW.
Suite 380 East
Washington, DC 20005
(202) 794-1183
Fax: (202) 461-3102
Email: rwisla@foxrothschild.com

Roger Brian Schagrin
Schagrin Associates
900 Seventh Street, NW.
Suite 500
Washington, DC 20001
(202) 223-1700
Fax: (202) 429-2522
Email: rschagrin@schagrinassociates.com

Elizabeth Anne Speck
U.S. Department of Justice
Commercial Litigation Branch - Civil Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 307-0369

Mr. Mario Toscano
March 10, 2020
Page 3

Fax: (202) 514-7965
Email: elizabeth.speck@usdoj.gov

# ADDENDUM 5

Case: 22-1175  Document: 6  Page: 88  Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

487 F.Supp.3d 1323
United States Court of International Trade.

SAHA THAI STEEL PIPE PUBLIC
COMPANY LIMITED, Plaintiff,
and

Thai Premium Pipe Company Ltd.
and Pacific Pipe Public Company
Limited, Consolidated Plaintiffs,

v.

UNITED STATES, Defendant,
and

Wheatland Tube Company,
Defendant-Intervenor.

Slip Op. 20-181
|
Consol. Court No. 18-00214
|
December 21, 2020

**Synopsis**
**Background:** Exporters filed suit challenging Department of Commerce's final results in administrative review of antidumping duty order covering circular welded carbon steel pipes and tubes (CWP) from Thailand. Exporters moved for judgment on agency record. The Court of International Trade, Jennifer Choe-Groves, J., 422 F.Supp.3d 1363, remanded. On remand, Department of Commerce issued final results of remand redetermination.

**Holdings:** The Court of International Trade, Choe-Groves, J., held that:

particular market situation allegation was not time-barred, but

cost-based particular market situation determinations were unlawful.

Remanded.

**Attorneys and Law Firms**

**\*1325** Daniel L. Porter, Tung Nguyen, and Kimberly Reynolds, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., for Plaintiff Saha Thai Steel Pipe Public Company Limited.

Robert G. Gosselink, Jonathan M. Freed, and Aqmar Rahman, Trade Pacific, PLLC, of Washington, D.C., for Consolidated Plaintiff Thai Premium Pipe Company Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP, of Washington, D.C., for Consolidated Plaintiff Pacific Pipe Public Company Limited.

Elizabeth A. Speck, Senior Trial Counsel, and L. Misha Preheim, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for Defendant United States. With them on the brief were Joseph H. Hunt, Assistant Attorney General, and Jeanne E. Davidson, Director. Of counsel on the brief was Brandon J. Custard, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

Roger B. Schagrin, Elizabeth J. Drake, Christopher T. Cloutier, and Luke A. Meisner, Schagrin Associates, of Washington, D.C., for Defendant-Intervenor Wheatland Tube Company.

## OPINION AND ORDER

CHOE-GROVES, Judge:

Plaintiff Saha Thai Steel Pipe Public Company Limited ("Saha Thai") and Consolidated Plaintiffs Thai Premium Pipe Company Limited ("Thai Premium") and Pacific Pipe Public Company Limited ("Pacific Pipe") (collectively, "Plaintiffs") filed this consolidated action challenging the final results published by the U.S. Department of Commerce ("Commerce") in the 2016–2017 administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes ("CWP") from Thailand. See Circular Welded Carbon Steel Pipes and Tubes From Thailand ("Final Results"), 83 Fed. Reg. 51,927 (Dep't Commerce Oct. 15, 2018) (final results of antidumping duty administrative review; 2016–2017); see also Decision Mem. for the Final Results of Antidumping Duty Admin. Review; 2016–2017, PD 143 (Oct. 4, 2018) ("Final Decision Memorandum" or

Case: 22-1175    Document: 6    Page: 89    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

"Final IDM").[1] Before the court are the Final Results of Redetermination Pursuant to Remand, ECF Nos. 62, 63 ("Remand Results"), which the court ordered in Saha Thai Steel Pipe Public Co. v. United States ("Saha Thai I"), 43 CIT ——, 422 F. Supp. 3d 1363 (2019).

[1]    Citations to the administrative record reflect the public record ("PD") document numbers.

Plaintiffs argue that Commerce did not comply with the court's remand order, which required Commerce to reconsider its unlawful particular market situation adjustment in accordance with the court's opinion, noting the absence of a direct instruction from the court for Commerce to reverse its particular market situation adjustment. [Thai Premium]'s Comments O'ppn Remand Redetermination at 5–6, ECF Nos. 65, 66 ("Thai Premium Cmts."); Pl. Saha Thai's Comments Commerce's Redetermination Remand at 2–3, ECF No.  *1326  67 ("Saha Thai Cmts."); Pl. Pacific Pipe's Comments Commerce's Remand Redetermination at 2–3, ECF No. 68 ("Pacific Pipe Cmts."). Plaintiffs assert that Commerce's Remand Results set forth an impermissible new justification for a particular market situation adjustment to the cost of production that is contrary to the court's remand order, Commerce's regulations, the applicable statute, and procedural fairness. Thai Premium Cmts. at 7, 9; Saha Thai Cmts. at 3; Pacific Pipe Cmts. at 3.

Thai Premium asserts that normal value for Thai Premium was based on constructed value in the Final Results and asks the court to address whether Commerce's particular market situation adjustments in the Final Results were supported by substantial evidence. Thai Premium Cmts. at 3–4. In the Constructed Value Profit section of the Remand Results, Commerce noted Thai Premium's assertion that in the Final Results "Commerce used [constructed value] as a basis for normal value for Thai Premium because Thai Premium did not have sales of the foreign like product in the ordinary course of trade ...." Remand Results at 22–23 (citing Thai Premium's comments to the draft remand results). On remand, however, the basis for Thai Premium's constructed value was not the lack of sales of the foreign like product in the ordinary course of trade but Commerce's particular market situation determinations, which the court discusses below. Id. at 7–9. Because Commerce changed its methodology in the Remand Results, the issues of (1) whether Thai Premium's normal value was properly based on constructed value due to the lack of sales of the foreign like product in the ordinary course of trade, and (2) whether Commerce's subsequent particular

market situation adjustments were supported by substantial evidence in the Final Results are not before the court at this time.

For the following reasons, the court remands the Remand Results.

## BACKGROUND

The court presumes familiarity with the facts and procedural history as set forth in its prior opinion and recounts the facts relevant to the court's review of the Remand Results. See Saha Thai I, 43 CIT at ——, 422 F. Supp. 3d at 1365–67.

Defendant-Intervenor Wheatland Tube Company ("Wheatland") submitted factual information alleging that a particular market situation in Thailand during the period of review distorted the costs of hot-rolled steel coil. Wheatland Allegation Letter at 1, PD 69–71 (Feb. 5, 2018) ("Wheatland Allegation"). Wheatland alleged the existence of two independent particular market situations, either one of which was purportedly sufficient on its own to distort the cost of production of CWP: (1) the Royal Thai Government subsidized Thai producers of hot-rolled coil, enabling its sale at below-market prices to downstream producers of CWP, and (2) the prices for imports of hot-rolled coil into Thailand were distorted through dumping, subsidization, and global overcapacity. Id. at 4–5. Wheatland requested that Commerce "use an alternative calculation methodology to calculate constructed value under 19 U.S.C. § 1677b(e) in this proceeding." Id. at 1. Commerce accepted Wheatland's submission alleging the existence of a particular market situation as to cost of production under 19 C.F.R. § 351.301(c)(2)(v) and set a deadline for submissions to rebut, clarify, or correct the Wheatland Allegation. Commerce Deadline Mem. at 1–2, PD 81 (Mar. 21, 2018). Saha Thai and Pacific Pipe submitted rebuttal factual information. Saha Thai Rebuttal, PD 83 (Mar. 28, 2018); Pacific Pipe Rebuttal, PD 84–85 (Mar. 28, 2018).

 *1327  In the Final Results, Commerce determined that a particular market situation distorted the acquisition cost of hot-rolled coil, a major CWP input, and applied an upward adjustment to the respondents' reported cost of production.[2] Final IDM at 8–10. Commerce conducted the sales-below-cost test and disregarded certain of Saha Thai's, Pacific Pipe's, and Thai Premium's home market sales made at prices below the cost of production. See Circular Welded Carbon Steel

Case: 22-1175    Document: 6    Page: 90    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

Pipes and Tubes from Thailand: Decision Mem. for the Prelim. Results of Antidumping Duty Admin. Review; 2016–2017 at 15–16, PD 87 (Apr. 3, 2018) ("Preliminary Decision Memorandum" or "Prelim. DM"). Commerce calculated normal value from the remaining above-cost home market sales and stated expressly that "[it] calculated [normal value] based on the price Pacific Pipe, Saha Thai, and Thai Premium reported for home market sales ...." Id. at 16. "Where [Commerce] w[as] unable to determine [normal value] based on home market sale prices of comparable merchandise, ... [Commerce] based [normal value] on constructed value (CV)." Id. Commerce did not state in the Preliminary Decision Memorandum or the Final Decision Memorandum that normal value for Thai Premium was based on constructed value. See Prelim. DM; Final IDM. Commerce calculated Plaintiffs' weighted-average antidumping margins as 28% for Saha Thai, 30.61% for Pacific Pipe, and 30.98% for Thai Premium. Final Results, 83 Fed. Reg. at 51,928. The court concluded in Saha Thai I that Commerce's cost-based particular market situation adjustment was unlawful and remanded to Commerce "for further consideration consistent with this opinion." 43 CIT at ——, 422 F. Supp. 3d at 1371.

2       Saha Thai, Pacific Pipe, and Thai Premium were the only three producer-exporters covered by this administrative review. Final IDM at 2. All three were individually examined as mandatory respondents. Remand Results at 3.

Commerce filed the Remand Results under respectful protest and stated that it disagreed with the court in Saha Thai I. Remand Results at 1, 6. Rather than reverse its particular market situation determination, Commerce maintained its determination that a particular market situation distorted the cost of production. Id. at 7–8. Commerce declined to conduct the sales-below-cost test because it explained that the sales-below-cost test would not be "meaningful" without an adjustment to the cost of production to account for the particular market situation. Id. Commerce instead made a particular market situation determination under 19 U.S.C. § 1677(15)(C), stating that the distorted cost of production prevented a proper comparison between home market sales and export prices, and disregarding all home market sales. Id. at 8. Commerce based normal value on constructed value for each respondent on remand. Id. at 1–2, 8–9. Commerce made a particular market situation determination under 19 U.S.C. § 1677b(e) as to cost of production and calculated constructed value with an adjustment to the cost of production as an alternative calculation methodology. Id. at 8–9. Commerce calculated constructed value profit for each respondent by

the alternative method of using Saha Thai's home market selling expense ratios and profit rate from the 2015–2016 administrative review. Id. at 9–11.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c), which grant the court authority to review actions contesting the final results **\*1328** of an administrative review of an antidumping duty order. The court will uphold Commerce's determinations unless they are unsupported by substantial evidence on the record or otherwise not in accordance with the law. 19 U.S.C. § 1516a(b)(1)(B)(i). The court also reviews determinations made on remand for compliance with the court's remand order. Ad Hoc Shrimp Trade Action Comm. v. United States, 38 CIT ——, ——, 992 F. Supp. 2d 1285, 1290 (2014), aff'd, 802 F.3d 1339 (Fed. Cir. 2015).

## DISCUSSION

### I. Governing Law

Commerce determines antidumping duties by calculating the amount by which the normal value of subject merchandise exceeds the export price or the constructed export price for the merchandise. 19 U.S.C. § 1673. When reviewing antidumping duties in an administrative review, Commerce must determine: (1) the normal value and export price or constructed export price of each entry of the subject merchandise, and (2) the dumping margin for each such entry. Id. § 1675(a)(1)(B), (a)(2)(A). The statute dictates the steps by which Commerce may calculate normal value "to achieve a fair comparison" with export price or constructed export price. Id. § 1677b(a).

First, the statute specifies the methodology for Commerce to determine which sales should be considered and disregarded in calculating normal value. Normal value is "the price at which the foreign like product is first sold ... in the exporting country ... in the ordinary course of trade." Id. § 1677b(a)(1)(B)(i). Sales outside the ordinary course of trade are excluded from normal value. "Ordinary course of trade" is defined in Section 1677(15) as excluding: (1) sales made at less than the cost of production, and (2) sales that cannot be compared properly with the export price or constructed export price due to a particular market situation. Id. § 1677(15)(A), (C). To determine whether "sales ... have been made at prices

Case: 22-1175    Document: 6    Page: 91    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

that represent less than the cost of production," the statute directs Commerce to conduct the sales-below-cost test. Id. § 1677b(b)(1). The cost of production is defined by statute to include the cost of materials and processing, amounts for selling, general, and administrative expenses, and the cost of all containers and expenses incidental for shipment. Id. § 1677b(b)(3). Sales that Commerce determines, by application of the sales-below-cost test, were made at prices below the cost of production, or that Commerce determines were made in a particular market situation, are outside the ordinary course of trade and are disregarded from the calculation of normal value. See id. § 1677b(b)(1), (a)(1)(B)(i). "Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade." See id. §§ 1677b(a)(1)(B)(i), (b)(1); 1677(15)(A), (C).

Second, when using market prices to determine normal value, Commerce may make certain adjustments to the remaining home market prices. The statute lists authorized adjustments for incidental shipping and delivery expenses, direct taxes, and differences between the subject merchandise and foreign like products in quantity, circumstances of sale, or level of trade. Id. § 1677b(a)(6), (7).

Third, if Commerce cannot determine the normal value of the subject merchandise based on home market sales, then Commerce may use qualifying third-country sales or constructed value as a basis for normal value. Id. § 1677b(a)(4), (a)(1)(B)(ii), (b)(1). Constructed value represents: **\*1329** (1) the cost of materials and fabrication or other processing of any kind used in producing the merchandise; (2) the actual amounts incurred and realized for selling, general, and administrative expenses, and for profits, in connection with the production and sales of a foreign like product, in the ordinary course of trade, for consumption in the foreign country; and (3) the cost of packing the subject merchandise. Id. § 1677b(e). When calculating constructed value, if Commerce determines that a particular market situation exists "such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, [then] [Commerce] may use ... any other calculation methodology." Id.

## II. Particular Market Situation Allegation

Plaintiffs argue that Commerce made an impermissible "sales-based" particular market situation determination on remand, when no "sales-based" particular market situation

allegation was submitted before the time period expired and interested parties were not permitted to submit rebuttal factual information. Thai Premium Cmts. at 8–9; Saha Thai Cmts. at 7–10; Pacific Pipe Cmts. at 3–5. Commerce asserted that it relied on remand on the same cost-based particular market situation determination it made in the Final Results. Remand Results at 15–16; see also Def.-Intervenor [Wheatland]'s Comments Commerce's Redetermination Remand at 4–5, ECF No. 69 ("Wheatland Cmts.").

The statute recognizes two types of particular market situations. The first is a particular market situation that prevents a proper comparison between home market sales and the export price or constructed export price under Section 1677(15)(C). 19 U.S.C. § 1677(15)(C). The second is a particular market situation that prevents "the cost of materials and fabrication or other processing of any kind" from "accurately reflect[ing] the cost of production in the ordinary course of trade ...." Id. § 1677b(e).

The applicable regulation provides that "allegations regarding market viability or the exceptions in paragraph (c)(2) of this section, must be filed, with all supporting factual information, in accordance with § 351.301(d)(1)." 19 C.F.R. § 351.404(d). One exception provided in paragraph (c)(2) specifies that "[t]he Secretary may decline to calculate normal value in a particular market ... [if] a particular market situation exists that does not permit a proper comparison with the export price or constructed export price ...." Id. § 351.404(c)(2)(i). Section 351.301 does not have a subsection (d), but subsection (c) provides that "[a]llegations regarding market viability in an antidumping investigation or administrative review, including the exceptions in § 351.404(c)(2), are due, with all supporting factual information, 10 days after the respondent interested party files the response to the relevant section of the questionnaire, unless the Secretary alters this time limit." Id. § 351.301(c)(2)(i); see Final IDM at 5 (recognizing that subsection (c) sets the deadline for allegations as to market viability, including the exceptions in Section 351.404(c)(2)). No deadline is specified for the submission of "factual information in support of other allegations not specified in paragraphs (c)(2)(i)–(iv) of this section," but if Commerce accepts such factual submission, Commerce must "issue a schedule providing deadlines for submission of factual information to rebut, clarify or correct the factual information." 19 C.F.R. § 351.301(c)(2)(v).

Here, Commerce properly accepted the Wheatland Allegation and afforded interested **\*1330** parties the opportunity to

Case: 22-1175      Document: 6      Page: 92      Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

submit information to rebut, clarify, or correct the allegation. Wheatland alleged the existence of a particular market situation that distorted the cost of hot-rolled steel coil. Wheatland Allegation at 1, 4–5. The Wheatland Allegation did not pertain to market viability or a particular market situation that did not permit a proper comparison with the export price or constructed export price, which would have fallen under 19 C.F.R. § 351.404(d) as one of the exceptions identified in 19 C.F.R. § 351.404(c)(2). The deadline for factual submissions under 19 C.F.R. § 351.404(d) did not apply to the Wheatland Allegation. Instead, the Wheatland Allegation fell under 19 C.F.R. § 351.301(c)(2)(v) for "Other allegations," for which there was no specified time limit. See Wheatland Allegation at 1, 4–5; Remand Results at 15. The type of particular market situation alleged in the Wheatland Allegation and the applicable submission deadline were not altered by Commerce's subsequent actions. The court concludes that Commerce's actions in accepting the Wheatland Allegation under 19 C.F.R. § 351.301(c)(2)(v) and setting a deadline for interested parties to submit information to rebut, clarify, or correct the Wheatland Allegation were consistent with its regulations, and the Wheatland Allegation regarding a particular market situation distorting the cost of hot-rolled steel coil was not time-barred as argued by Plaintiffs.

### III. Unauthorized Particular Market Situation Determinations

Plaintiffs assert that Commerce based normal value on constructed value without disregarding home market sales as outside the ordinary course of trade by any of the statutorily mandated methods. Thai Premium Cmts. at 9–12; Saha Thai Cmts. at 3–13; Pacific Pipe Cmts. at 5–7. Plaintiffs argue also that Commerce must show that a particular market situation prevented a proper comparison with the export price or constructed export price before it may disregard home market sales as being outside the ordinary course of trade under 19 U.S.C. § 1677(15)(C). Thai Premium Cmts. at 9–11; Saha Thai Cmts. at 12–13; see Pacific Pipe Cmts. at 6–7. Saha Thai contends that Commerce did not follow the applicable statutory requirement of 19 U.S.C. § 1677b(b)(1), which requires Commerce to first show that home market sales were made at prices below the cost of production by conducting the sales-below-cost test to determine which sales should be disregarded as outside the ordinary course of trade. Saha Thai Cmts. at 11–12.

In the Final Results, Commerce determined that a particular market situation existed that distorted the cost of production and conducted the sales-below-cost test with an adjustment to the cost of production. Final IDM at 9–10. Commerce disregarded the below-cost home market sales and based normal value on the remaining home market sales. Prelim. DM at 16. The court concluded in Saha Thai I that Commerce was not permitted to "apply a cost-based particular market situation adjustment in the context of a sales-based comparison." 43 CIT at ——, 422 F. Supp. 3d at 1371.

Commerce maintained the same particular market situation determination on remand that it made in the Final Results. Remand Results at 16. "Commerce relied on the cost-based [particular market situation] finding made in the *Final Results* in the Draft Results of Remand Redetermination, with no change to [its] determination that a cost-based [particular market situation] existed during the period of review." Id. Commerce asserted that a particular market situation in Thailand distorted the acquisition cost of hot-rolled steel coil, a major input for the subject **\*1331** merchandise, such that the respondents' cost of production of the subject merchandise did not reflect accurately the cost of production of the subject merchandise in the ordinary course of trade. Id. at 19–20.

Commerce did not conduct the sales-below-cost test on remand. Id. at 7–8. Commerce declared that conducting the sales-below-cost test would not be "meaningful" without an adjustment to the cost of production—which the court prohibited in Saha Thai I—to account for the particular market situation and to compare "home market sale prices to a cost of production that does not accurately reflect production costs in the ordinary course of trade fails to accomplish the intent of the sales-below-cost test, which is to determine whether the respondents' home market sales were made in the ordinary course of trade." Id.; see also id. at 19; Wheatland Cmts. at 2. Commerce noted that "without being able to make a [particular market situation] adjustment in calculating the respondents' cost of production and perform an accurate sales-below-cost test, ... the [particular market situation] in Thailand which distorted the acquisition cost of [hot-rolled coil] has resulted in each respondent's home market sales being outside of the ordinary course of trade." Remand Results at 15.

Commerce's exclusion of home market sales due to distortions in the cost of production is not authorized by the statute. Congress provided specifically in Section 1677(15) (A) for Commerce to consider sales outside the ordinary course of trade when sales are below the cost of production.

The path specified by Congress to determine that sales are below the cost of production is for Commerce to first conduct the sales-below-cost test set forth in Section 1677b(b)(1) to affirmatively confirm that sales are made below the cost of production as calculated according to Section 1677b(b)(3). Section 1677b(b)(1) provides:

> Whenever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production of that product, the administering authority shall determine whether, in fact, such sales were made at less than the cost of production. If the administering authority determines that sales made at less than the cost of production—
>
> (A) have been made within an extended period of time in substantial quantities, and
>
> (B) were not at prices which permit recovery of all costs within a reasonable period of time,
>
> such sales may be disregarded in the determination of normal value. Whenever such sales are disregarded, normal value shall be based on the remaining sales of the foreign like product in the ordinary course of trade. If no sales made in the ordinary course of trade remain, the normal value shall be based on the constructed value of the merchandise.

19 U.S.C. § 1677b(b)(1). The statute directs Commerce to compare the reported home market sales prices to the cost of production calculated by adding the component costs and expenses listed in Section 1677b(b)(3). Id. § 1677b(b)(1), (3); see also Prelim. DM at 15. After conducting the sales-below-cost test, Commerce shall disregard those reported home market sales prices that are less than the calculated cost of production as outside the ordinary course of trade. 19 U.S.C. § 1677(15)–(15)(A).

Here, Commerce did not follow the specified method when it disregarded as **\*1332** outside the ordinary course of trade sales made purportedly at prices below the cost of production, without confirming that the sales were in fact made below the cost of production by conducting the sales-below-cost test. The statute requires Commerce to conduct the sales-below-cost test set forth in Section 1677b(b)(1) before disregarding below-cost sales as outside the ordinary course of trade under Section 1677(15)(A). Nothing in the statute grants Commerce authority to bypass the sales-below-cost test, and the specificity of the sales-below-cost test leaves no

ambiguity. See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The court concludes that Commerce's exclusion of home market sales due to distortions in the cost of production without conducting the sales-below-cost test to determine whether those sales were in fact outside the ordinary course of trade is contrary to law.

Commerce's exclusion of below-cost sales is not redeemed by invoking Section 1677(15)(C) with a determination that the distorted cost of production created a particular market situation preventing a proper comparison between reported home market sales prices and export price. Section 504 of the Trade Preferences Extension Act of 2015 ("TPEA"), Pub. L. No. 114-27, 129 Stat. 362, added a particular market situation provision to the list of sales and transactions outside the ordinary course of trade. The amended provision provides:

> (15) Ordinary course of trade. The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the subject merchandise, have been normal in the trade under consideration with respect to merchandise of the same class or kind. The administering authority shall consider the following sales and transactions, among others, to be outside the ordinary course of trade:
>
> (A) Sales disregarded under section 773(b)(1) [19 USCS § 1677b(b)(1)].
>
> ...
>
> (C) Situations in which the administering authority determines that the particular market situation prevents a proper comparison with the export price or constructed export price.

19 U.S.C. § 1677(15). The statute defines "situations" narrowly as "sales and transactions" by directing Commerce to consider "sales and transactions ... to be outside the ordinary course of trade [including] ... [s]ituations in which [Commerce] determines that the particular market situation prevents a proper comparison with the export price or constructed export price." See id.

Commerce did not explain how a particular market situation affecting sales and transactions in the home market prevented a proper comparison between reported home market sales prices and export prices. In fact, Commerce conceded in

Case: 22-1175    Document: 6    Page: 94    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

the <u>Remand Results</u> that "[it] ha[d] not considered whether a [particular market situation] existed in the home market for the sale of the foreign like product such that home market sales cannot be used as the basis for normal value." <u>Remand Results</u> at 15. No allegation that a particular market situation affecting sales and transactions in the home market and preventing a proper comparison between reported home market sales prices and export prices was submitted.

Commerce determined instead "that the [particular market situation] with respect to the cost of production of circular pipes **1333** and tubes prevent[ed] a proper comparison of normal value based on the respondents' home market sale prices with the respondents' export prices or constructed export prices." <u>Id.</u> at 8, 19–20; <u>see also</u> Def.'s Resp. Comments Remand Redetermination at 12–13, ECF No. 70 ("Def. Resp."). Commerce did not explain how a particular market situation affecting the cost of production prevented a comparison between the reported home market sales prices and the export prices. Commerce merely repeated its conclusory determination that the particular market situation as to cost of production prevented a proper comparison:

> [S]ection [1677](15)(C) of the Act states that Commerce shall consider situations in which we determine that a particular market situation prevents a proper comparison of normal value with the export price or constructed export price, to be outside the ordinary course of trade. On this basis, we find that the existence of the [particular market situation] concerning the cost of production of circular pipes and tubes in Thailand precludes a proper comparison of normal value with U.S. price, pursuant to section [1677](15)(C) of the Act.

<u>Remand Results</u> at 19–20.

The statute cannot be read to authorize Commerce to make a particular market situation determination under Section 1677(15)(C) on the basis of distorted cost of production. Congress provided a separate mechanism under Section 1677(15)(A) for Commerce to consider sales and transactions outside the ordinary course of trade when the cost of production of that merchandise is implicated. Because Congress specified in Sections 1677(15)(A) and 1677b(b) the method by which Commerce may disregard below-cost sales, Congress obviated consideration of a particular market situation affecting the cost of production from Section 1677(15)(C). An alternative reading would render impermissibly superfluous Sections 1677(15)(A) and 1677b(b). Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 538, 135 S.Ct. 2507,

192 L.Ed.2d 514 (2015) (citing Gustafson v. Alloyd Co., 513 U.S. 561, 574, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("[T]he Court will avoid a reading which renders some words altogether redundant.")). The distinction between exclusions of sales as below the cost of production under Section 1677(15)(A) and exclusions of sales due to a particular market situation preventing proper comparison under Section 1677(15)(C) "makes a great deal of sense." See Husteel Co. v. United States, 44 CIT ——, ——, 426 F. Supp. 3d 1376, 1388 (2020). A particular market situation that affects the cost of production would presumably affect prices for domestic sales and export sales alike and thus would have no preclusive effect on the comparison between the two. See id. The court concludes that Commerce's cost-based particular market situation determination to disregard sales as outside the ordinary course of trade under Section 1677(15)(C) is contrary to law.

In response to Pacific Pipe's and Saha Thai's argument that Commerce cannot exclude home market sales based on a cost-based particular market situation determination, Defendant asserts:

> Because the term "ordinary course of trade" is contained in 19 U.S.C. § 1677b(e), Commerce acted in accordance with the statute when it "found that a cost-based [particular market situation] existed in Thailand which distorted the acquisition cost of [hot-rolled coil], the primary input used in the production of circular pipes and tubes, [and, as a result] ... that the respondents' cost of materials and fabrication or other **1334** processing do not accurately reflect the cost of production of circular pipes and tubes in the ordinary course of trade.

Def. Resp. at 9–10 (alterations in original). Defendant also argues that "Commerce's determination that it could not use the respondent's [sic] home market sales as the basis for normal value because they are outside of the ordinary course of trade" was lawful. Id. at 12. Defendant apparently argues that Commerce can disregard sales as outside the ordinary course of trade due to distortions in the cost of production based on Section 1677b(e)'s reference to the ordinary course of trade.

Commerce cannot invoke Section 1677b(e) as its authority to exclude home market sales and base normal value on constructed value. Section 504 of the TPEA amended the statutory provisions governing constructed value. The amendment provided for Commerce to determine whether a particular market situation distorted the cost of production

Case: 22-1175    Document: 6    Page: 95    Filed: 09/12/2022

Saha Thai Steel Pipe Public Company Limited v. United States, 487 F.Supp.3d 1323...

when computing constructed value. The amended language provides:

> [F]or purposes of paragraph (1) [in reference to calculating constructed value] if a particular market situation exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority [Commerce] may use another calculation methodology under this subtitle or any other calculation methodology.

19 U.S.C. § 1677b(e). Section 1677b(e) only applies if the precondition "for purposes of paragraph (1)" is met. Id. Paragraph (1) lists the costs to be added to calculate constructed value. Id. § 1677b(e)(1). Commerce must meet the precondition of calculating constructed value before it can rely on Section 1677b(e) to make a cost-based particular market situation determination. Here, Commerce had not met the precondition of calculating constructed value when it made a particular market situation determination based on distorted cost of production. Contrary to Defendant's assertion, Commerce was not authorized to make a cost-based particular market situation determination under Section 1677b(e), when the precondition of calculating constructed value was not yet satisfied.

Defendant's argument conflates the language in Section 1677(15) ("the following sales and transactions, among others, to be outside the ordinary course of trade") with the language in Section 1677b(e) ("the cost of production in the ordinary course of trade") based on the common phrase "ordinary course of trade." See id. §§ 1677b(e); 1677(15). The statutory framework sets forth a sequence of steps, as explained above, that Commerce must follow in determining antidumping duties. Sections 1677b(a)(1)(B)(i) and 1677(15) provide that the home market sales price excludes sales and transactions made outside the ordinary course of trade. Id. §§ 1677b(a)(1)(B)(i); 1677(15). If the conditions to base normal value on constructed value are met, Section 1677b(e) provides that Commerce may consider whether the cost of production is reflected accurately in the ordinary course of trade. Id. § 1677b(e). The fact that the phrase "ordinary course of trade" is found in Section 1677b(e) does not insert "distorted cost of production" into Section 1677(15)'s list of sales and transactions outside the ordinary course of trade. Defendant's interpretation is "untenable in light of [the statute] as a whole." Dep't of Revenue of Or. v. ACF Indus., 510 U.S. 332, 343, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (citing United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988)

("A provision that may seem ambiguous in isolation is often clarified by the remainder of the *1335 statutory scheme ... because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law ....")).

Commerce did not follow the statutory framework in this case. Commerce's determination that the cost of production is not reflected accurately in the ordinary course of trade is not interchangeable with a determination that sales are outside the ordinary course of trade.

The court concludes that Commerce's exclusion of home market sales is not in accordance with the law because Commerce unlawfully excluded purported below-cost sales without conducting the sales-below-cost test and Commerce unlawfully determined that a particular market situation existed under Section 1677(15)(C) based on distortions to the cost of production. The court concludes that Commerce's application of an alternative calculation methodology is not in accordance with the law because Commerce was not authorized to conduct a cost-based particular market situation analysis under Section 1677b(e) without a statutory ground for calculating constructed value. The court directs Commerce to remove the particular market situation determinations under Sections 1677(15)(C) and 1677b(e) as to the cost of production on second remand and recalculate the respondents' weighted-average dumping margins without disregarding home market sales from the calculation of normal value on that basis.

## CONCLUSION

The court concludes that Commerce's cost-based particular market situation determinations are not in accordance with the law.

Accordingly, it is hereby

**ORDERED** that the Remand Results are remanded for Commerce to remove the cost-based particular market situation determinations and recalculate the relevant margins without a particular market situation adjustment; and it is further

**ORDERED** that Commerce shall afford the parties at least twelve (12) business days to comment on the draft second remand results; and it is further

Appx00051

**ORDERED** that this case shall proceed according to the following schedule:

(1) Commerce shall file the second remand results on or before February 16, 2021;

(2) Commerce shall file the administrative record on or before March 2, 2021;

(3) Comments in opposition to the second remand results shall be filed on or before April 2, 2021;

(4) Comments in support of the second remand results shall be filed on or before May 3, 2021; and

(5) The joint appendix shall be filed on or before May 17, 2021.

**All Citations**

487 F.Supp.3d 1323

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**ADDENDUM 6**

A-549-502
Remand Redetermination
Slip Op. 20-181
POR: 03/01/2016–02/28/2017
**Public Document**
E&C/OVII: TP

*Saha Thai Steel Pipe Co., Ltd. v. United States*, Consol. Court No. 18-00214, Slip Op. 20-181
(CIT December 21, 2020)

### FINAL RESULTS OF REDETERMINATION
### PURSUANT TO CIT ORDER

## I.   SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (CIT) in

*Saha Thai II*.[1]  This litigation pertains to the 2016-2017 antidumping duty administrative review

of the antidumping duty order on circular welded carbon steel pipes and tubes (pipes and tubes)

from Thailand and the *First Redetermination*.[2]

In *Saha Thai II*, the CIT ordered Commerce to "remove the particular market situation

determination under {sections 771(15)(C) and 773(e) of the Tariff Act of 1930, as amended (the

Act)} as to the cost of production … and recalculate the respondents' weighted-average dumping

margins without disregarding home market sales from the calculation of normal value on that

basis."[3]  The respondents and plaintiffs are Pacific Pipe Company Limited, Saha Thai Pipe

(Public) Company, Ltd., and Thai Premium Pipe Company, Ltd.  Commerce continues to find

that a particular market situation existed in Thailand during the period of review that distorted

the price of hot rolled coil, the principle material input for the production of the subject

---

[1] *See Saha Thai Steel Pipe Co., Ltd. v. United States*, Consol. Court No. 18-00214, Slip Op. 20-181
(CIT December 21, 2020) (*Saha Thai II*).
[2] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Final Results of Antidumping Duty
Administrative Review; 2016-2017*, 83 FR 51927 (October 15, 2018) (*Final Results*), and accompanying Issues and
Decision Memorandum; *see also* "Final Results of Redetermination Pursuant to Remand, *Saha Thai Steel Pipe Co.,
Ltd., et al. v. United States*, Court No. 18-00214, Slip Op. 19-165," dated March 10, 2020 (*First Redetermination*).
[3] *See Saha Thai II* at 19.

merchandise and significant component of the cost of production of the subject merchandise. Nevertheless, because the CIT has directed Commerce not to make an adjustment, under respectful protest,[4] we have recalculated the relevant weighted-average dumping margins without an adjustment for the particular market situation that has been found to have existed during the period of review.[5]

## II.   DRAFT RESULTS OF REDETERMINATION

In accordance with the CIT's remand order, Commerce has recalculated the weighted-average dumping margin for each of the respondents without making an adjustment to account for the particular market situation concerning the input costs for hot-rolled steel.  We are filing this redetermination under protest because, consistent with section 771(15)(C) of the Act, Commerce found that a cost-based particular market situation existed during the period of review, which distorted the cost of hot rolled coil in the production of the merchandise sold in Thailand.

Under section 504 of the Trade Preferences Extension Act of 2015, Congress provided that, when Commerce determines that a cost-based particular market situation exists, Commerce may, in accordance with section 773(e), remedy the cost-based particular market situation through "any other calculation methodology."  Here, Commerce found the existence of a particular market situation in Thailand that resulted in distortions in the Thai market for hot-rolled coil.  Yet, despite the clear intent of Congress for Commerce to remedy a particular market situation which may distort the costs of particular inputs used to produce the foreign like product

---

[4] *See Viraj Group, Ltd. v. United States*, 343 F.3d 1371 (Fed. Cir. 2003).
[5] *See Saha Thai II* at 19; *see also* Memoranda, "Draft Results of Redetermination Pursuant to Second Remand of Circular Welded Steel Pipes and Tubes from Thailand:  Pacific Pipe Public Company Ltd. Calculation Memorandum," dated concurrently with the instant draft remand results; "Draft Results of Redetermination Pursuant to Second Remand of Circular Welded Steel Pipes and Tubes from Thailand:  Saha Thai Steel Pipe (Public) Company, Ltd. Calculation Memorandum," dated concurrently with the instant draft remand results; and "Draft Results of Redetermination Pursuant to Second Remand of Circular Welded Steel Pipes and Tubes from Thailand: Thai Premium Pipe Company Ltd. Calculation Memorandum," dated concurrently with the instant draft remand results.

and subject merchandise, including when certain U.S. sale prices are compared with a normal value based on constructed value, the CIT, in its opinion, has ordered Commerce to "recalculate the relevant {weighted-average dumping} margins without a particular market situation adjustment."[6]  Commerce, thus, in accordance with the Court's directed order, is unable on remand to provide a remedy to address the particular market situation found in this administrative review, contrary to the statutory intent of Congress.[7]  This includes making an adjustment to the cost of production for the sales-below-cost test, as well as an adjustment to constructed value for normal value.  For this reason, we are filing this remand with the Court under respectful protest.

## III.    COMMENTS ON DRAFT RESULTS OF REDETERMINATION

*Wheatland Tube Company's Comments*[8]

- Commerce was correct in finding that a particular market situation existed in Thailand during the period of review (POR) and for adjusting the mandatory respondents' costs of production accordingly.[9]

- The Court did not address the merits of Commerce's affirmative particular market situation finding; however, the Court did rule that the statute did not permit Commerce to adjust respondents' costs of production for the purposes of the sales-below-cost test to account for the particular market situation that was found to have existed.[10]

- In accordance with sections 771(15)(C), 773(a)(1)(B)(i), 773(b)(1), and 773(e) of the Act:

    1. Comparison market prices used as the basis of normal value must be in the ordinary course of trade;

---

[6] *See Saha Thai II* at 19.
[7] *See Altx, Inc. v. United States*, 370 F.3d 1108, 1111 n.2 (Fed. Cir. 2004).
[8] *See* Wheatland Tube Company's Letter, "Circular Welded Steel Pipes and Tubes from Thailand:  Comments on Draft Remand Redetermination," dated March 1, 2021 (Wheatland's Draft Remand comments).
[9] Wheatland's Draft Remand comments at 1-2.
[10] *Id.* at 2.

2.  Commerce is directed to consider that sales and transactions occurring in situations in which a particular market situation prevents a proper comparison with export price to be outside the ordinary course of trade; and

3.  Comparing home market sales to a cost of production that does not accurately reflect production costs in the ordinary course of trade fails to accomplish the intent of the sales-below-cost test, which is to determine which home market sales were made in the ordinary course of trade.[11]

- Section 773(b)(1) of the Act directs that whenever home market sales are disregarded as the result of the sales-below-cost test, normal value shall be based on the remaining home market sales made in the ordinary course of trade, or, if no such sales remain, constructed value. Thus, if Commerce cannot use the sales-below-cost test to determine which home market sales were made in the ordinary course of trade as a result of the Court's order, it must rely on constructed value.[12]

- Section 773(e) of the Act permits Commerce to use "any other calculation methodology" to calculate constructed value if the agency determines that a particular market situation existed such that the cost of materials does not accurately reflect the cost of production in the ordinary course of trade.[13]

- Commerce correctly determined that a particular market situation distorted the costs of the primary input, hot-rolled coil, into the production of pipes and tubes such that the costs of producing pipes and tubes in Thailand during the POR did not accurately reflect the cost of production in the ordinary course of trade and thus correctly used another calculation methodology to calculate constructed value in the First Remand Results.[14]

---

[11] *Id.* at 3-4.
[12] *Id.* at 4.
[13] *Id.*
[14] *Id.* at 4.

4

- For these reasons, Wheatland continues to respectfully disagree with the Court's conclusion that Commerce may not adjust costs to account for a particular market situation for the purposes of the sales-below-cost test.[15]

*Pacific Pipe's Comments*[16] *and Saha Thai's Comments*[17]

- Commerce's draft results of redetermination stated that it recalculated the weighted-average dumping margin for each respondent without finding that all of the home market sales for each respondent are outside of the ordinary course of trade and did not make any adjustments to constructed value.[18]

- Thus, Commerce's draft results of redetermination complies with the Court's Order.[19]

*Commerce's Position:* Commerce found that a cost-based particular market situation existed during the POR that distorted the cost of hot rolled coil in the production of the merchandise in Thailand. As noted by Wheatland Tube, the Court did not address the merits of Commerce's affirmative particular market situation finding. Instead, the Court ordered Commerce not to make an adjustment to account for a particular market situation that existed in Thailand during the POR. Accordingly, Commerce is obligated to implement the Court's order to "recalculate the relevant {weighted-average dumping} margins without a particular market situation adjustment."[20]

Without recourse to address the particular market situation, which existed in Thailand during the POR, we, under respectful protest, have made no adjustments to the calculation of each respondent's weighted-average dumping margin to account for a particular market situation,

---

[15] *Id.* at 1.
[16] *See* Pacific Pipe's Letter, "Circular Welded Carbon Steel Pipe and Tubes from Thailand: Comments on Draft Remand Redetermination," dated March 1, 2021 (Pacific Pipe's Draft Remand Comments).
[17] *See* Saha Thai's Letter, "Saha Thai's Comments on Commerce's Draft Remand Results Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 16-17)," dated March 1, 2021 (Saha Thai's Draft Remand Comments).
[18] *See* Pacific Pipe's Draft Remand Comments at 2; and Saha Thai's Draft Remand Comments at 2.
[19] *Id*.
[20] *See Saha Thai II* at 19.

despite clear statutory language permitting Commerce to remedy a cost-based particular market situation which has distorted the costs of particular inputs used to produce the foreign like product and the subject merchandise. Therefore, under respectful protest, Commerce has not made an adjustment to the costs of production for the merchandise under review.

## IV.     FINAL RESULTS OF REMAND REDETERMINATION

Pursuant to the Court's remand order, for *Saha Thai II,* Commerce recalculated Pacific Pipe's, Saha Thai's, and Thai Premium's weighted-average dumping margins without finding that all of the home market sales for each respondent are outside of the ordinary course of trade and without making an adjustment to constructed value. Accordingly, the revised weight-averaged dumping margin for each respondent is listed in the chart below:

| Exporter or Producer | Final Results of Review Weighted-Average Dumping Margin[21] (percent) | Second Final Results of Redetermination Weighted-Average Dumping Margin (percent) |
|---|---|---|
| Pacific Pipe Company Limited | 30.61 | 7.38[22] |
| Saha Thai Pipe (Public) Company, Ltd. | 28.00 | 0.00[23] |
| Thai Premium Pipe Company, Ltd. | 30.98 | 5.23[24] |

3/14/2021

X _____

Signed by: CHRISTIAN MARSH

Christian Marsh
Acting Assistant Secretary
 for Enforcement and Compliance

---

[21] *See Final Results.*
[22] *See* Pacific Pipe Second Final Results Analysis Memorandum.
[23] *See* Saha Thai Second Final Results Analysis Memorandum.
[24] *See* Thai Premium Second Final Results Analysis Memorandum.

**ADDENDUM PD5**

Dated: October 9, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2018–22365 Filed 10–12–18; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–570–086, A–549–839]**

## Steel Propane Cylinders From the People's Republic of China and Thailand: Postponement of Preliminary Determinations in the Less-Than-Fair-Value Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable October 15, 2018.

**FOR FURTHER INFORMATION CONTACT:** Jonathan Cornfeld or Laura Griffith at (202) 482–3855, or (202) 482–6430, respectively (People's Republic of China (China)) and Cindy Robinson or Stephanie Moore at (202) 482–3797, or (202) 482–3692, respectively (Thailand), AD/CVD Operations, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

### Background

On June 11, 2018, the Department of Commerce (Commerce) initiated less-than-fair-value (LTFV) investigations of imports of steel propane cylinders from China, Taiwan, and Thailand.[1] On June 20, 2018, Commerce terminated its antidumping duty investigation of imports of steel propane cylinders from Taiwan, following the petitioners'[2] withdrawal of the petition and request that the investigation be terminated.[3] Because Commerce has terminated its investigation of steel propane cylinders from Taiwan, the U.S. International Trade Commission (ITC)'s investigation is also terminated.[4] The preliminary

determinations for China and Thailand are currently due no later than October 29, 2018.

### Postponement of Preliminary Determinations

Section 733(b)(1)(A) of the Tariff Act of 1930, as amended (the Act), requires Commerce to issue the preliminary determination in an LTFV investigation within 140 days after the date on which Commerce initiated the investigation. However, section 733(c)(1) of the Act permits Commerce to postpone the preliminary determination until no later than 190 days after the date on which Commerce initiated the investigation if: (A) The petitioner makes a timely request for a postponement; or (B) Commerce concludes that the parties concerned are cooperating, that the investigation is extraordinarily complicated, and that additional time is necessary to make a preliminary determination. Under 19 CFR 351.205(e), the petitioner must submit a request for postponement 25 days or more before the scheduled date of the preliminary determination and must state the reasons for the request. Commerce will grant the request unless it finds compelling reasons to deny the request.[5]

On October 1, 2018, the petitioners submitted timely requests to postpone the preliminary determinations in these LTFV investigations.[6] The petitioners stated that they requested postponement because Commerce is still gathering data and questionnaire responses from the foreign producers in these investigations, and additional time is necessary for interested parties to respond to additional requests from Commerce before Commerce makes its preliminary determinations.

For the reasons stated above and because there are no compelling reasons to deny the petitioners' request, Commerce, in accordance with section 733(c)(1)(A) of the Act, is postponing the deadline for the preliminary determinations by 50 days (*i.e.,* 190 days after the date on which these investigations were initiated). As a result, Commerce will issue its preliminary determinations no later than December 18, 2018. In accordance with section 735(a)(1) of the Act and 19 CFR 351.210(b)(1), the deadline for the final determinations of these investigations will continue to be 75 days after the date of the preliminary

determinations, unless postponed at a later date.

This notice is issued and published pursuant to section 733(c)(2) of the Act and 19 CFR 351.205(f)(1).

Dated: October 9, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2018–22367 Filed 10–12–18; 8:45 am]

**BILLING CODE 3510–DS–P**

---

# DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–549–502]**

## Circular Welded Carbon Steel Pipes and Tubes From Thailand: Final Results of Antidumping Duty Administrative Review; 2016–2017

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The Department of Commerce (Commerce) determines that circular welded carbon steel pipes and tubes (pipes and tubes) from Thailand are being, or are likely to be sold, at less than normal value during the period of review (POR), March 1, 2016, through February 28, 2017.

**DATES:** *Applicable:* October 15, 2018.

**FOR FURTHER INFORMATION CONTACT:** Toni Page or Kathryn Wallace, AD/CVD Operations, Office VII, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–1398 or (202) 482–6251, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 9, 2018, Commerce published the *Preliminary Results* of the 2016–2017 administrative review of the antidumping duty order on pipes and tubes from Thailand.[1] For a discussion of the events subsequent to the *Preliminary Results, see* the Issues and Decision Memorandum dated concurrently with and hereby adopted by this notice.[2]

---

[1] *See Steel Propane Cylinders from the People's Republic of China, Taiwan, and Thailand: Initiation of Less-Than-Fair-Value Investigations,* 83 FR 28196 (June 18, 2018).

[2] The petitioners are Worthington Industries and Manchester Tank &, Equipment Co.

[3] *See Steel Propane Cylinders from Taiwan: Termination of Less-Than-Fair-Value Investigation,* 83 FR 29748 (June 26, 2018).

[4] *See* ITC Investigation No. 731–TA–1418 (Preliminary). *See also Steel Propane Cylinders from Taiwan, Termination of Investigation,* 83 FR 31174 (July 3, 2018).

[5] *See* 19 CFR 351.205(e).

[6] *See* letter from the petitioners, "Steel Propane Cylinders from the People's Republic of China and Thailand—Petitioners' Request to Extend the Preliminary Antidumping Duty Determination" dated October 1, 2018.

[1] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review; 2016–2017,* 83 FR 15127 (April 9, 2018) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM).

[2] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Decision
Continued

## Scope of the Order

The products covered by this review are certain circular welded carbon steel pipes and tubes from Thailand. For a full description of the scope, see the Issues and Decision Memorandum.[3]

## Analysis of Comments Received

All issues raised in the case and rebuttal briefs by parties to this administrative review are addressed in the Issues and Decision Memorandum.[4] A list of issues raised, and to which we responded in the Issues and Decision Memorandum, is attached to this notice as an Appendix. The Issues and Decision Memorandum is a public document and is on-file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov*, and it is available to all parties in the Central Records Unit (CRU), Room B8024 of the main Department of Commerce building. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly on the internet at *http://enforcement.trade.gov/frn/index.html*. The signed Issues and Decision Memorandum and the electronic versions of the Issues and Decision Memorandum are identical in content.

## Changes Since the Preliminary Results

Based on a review of the record and comments received from interested parties, we have made certain changes to Pacific Pipe Public Company Limited's (Pacific Pipe); Saha Thai Steel Pipe (Public) Company, Ltd.'s (Saha Thai); and Thai Premium Pipe Co., Ltd.'s (Thai Premium) weighted-average dumping margins. For further discussion, *see* the Issues and Decision Memorandum.

## Final Results of Review

We determine that, for the period March 1, 2016, through February 28, 2017, the following weighted-average dumping margins exist:

| Producer or exporter | Weighted-average dumping margin (percent) |
|---|---|
| Pacific Pipe Company Limited ............... | 30.61 |
| Saha Thai Steel Pipe (Public) Company, Ltd ............................................ | 28.00 |

| Producer or exporter | Weighted-average dumping margin (percent) |
|---|---|
| Thai Premium Pipe Company Ltd ......... | 30.98 |

## Assessment Rates

Pursuant to section 751(a)(2)(C) of the Tariff Act of 1930, as amended (the Act) and 19 CFR 351.212(b)(1), Commerce determined, and U.S. Customs and Border Protection (CBP) shall assess, antidumping duties on all appropriate entries of subject merchandise, in accordance with the final results of this review. If a respondent's weighted-average dumping margin is not zero or *de minimis* (*i.e.*, less than 0.5 percent), we will calculate importer-specific *ad valorem* assessment rates on the basis of the ratio of the total amount of dumping calculated for an importer's examined sales and the total entered value of such sales in accordance with 19 CFR 351.212(b)(1). Where either the respondent's weighted-average dumping margin is zero or *de minimis* within the meaning of 19 CFR 351.106(c), or an importer-specific rate is zero or *de minimis*, we will instruct CBP to liquidate the appropriate entries without regard to antidumping duties. Commerce intends to issue appropriate assessment instructions to CBP 15 days after the date of publication of the final results of review.

## Cash Deposit Requirements

The following cash deposit requirements will be effective for all shipments of subject merchandise entered, or withdrawn from warehouse, for consumption on or after the date of publication of the final results of this administrative review, as provided for by section 751(a)(2)(C) of the Act: (1) The cash deposit rate for the companies under review will be equal to the weighted-average dumping margin established in the final results of this review; (2) for previously reviewed or investigated companies not listed above in the Final Results of Review, including those for which Commerce may determine had no shipments during the POR, the cash deposit rate will continue to be the company-specific rate published for the most recently completed segment of this proceeding; (3) if the exporter is not a firm covered in this review or another completed segment of this proceeding, but the producer is, then the cash deposit rate will be the rate established for the most recently completed segment of this proceeding for the producer of the merchandise; and (4) if neither the exporter nor the producer is a firm

covered in this or a previously completed segment of this proceeding, then the cash deposit rate will be the "all-others" rate of 15.67 percent established in the less-than-fair-value investigation.[5] These cash deposit requirements, when imposed, shall remain in effect until further notice.

## Notification to Importers

This notice serves as a final reminder to importers of their responsibility under 19 CFR 351.402(f)(2) to file a certificate regarding the reimbursement of antidumping duties prior to liquidation of the relevant entries during this review period. Failure to comply with this requirement could result in the Secretary's presumption that reimbursement of antidumping duties occurred and the subsequent assessment of doubled antidumping duties.

## Administrative Protective Order

This notice also serves as a reminder to parties subject to administrative protective order (APO) of their responsibility concerning the destruction of proprietary information disclosed under APO in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a sanctionable violation.

## Notification to Interested Parties

We are issuing and publishing this notice in accordance with sections 751(a)(1) and 777(i) of the Act and 19 CFR 351.221(b)(5).

Dated: October 4, 2018.

**Gary Taverman,**

*Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix

**Issues and Decision Memorandum**

I. Summary
II. List of Comments
III. Background
IV. Scope of the Order
V. Discussion of the Comments
  Comment 1: Whether to Accept Certain New Factual Information Regarding Particular Market Situation (PMS) Allegation
  Comment 2: Whether Commerce Improperly Made PMS Adjustments to the Respondents' Cost of Production.

---

Memorandum for the Final Results of Antidumping Duty Administrative Review; 2016–2017," dated concurrently with this notice (Issues and Decision Memorandum).

[3] *Id.*

[4] *Id.*

---

[5] *See Antidumping Duty Order; Circular Welded Carbon Steel Pipes and Tubes from Thailand*, 51 FR 8341 (March 11, 1986).

Comment 3: PMS Adjustments to Pacific Pipe's and Saha Thai's Calculations

Comment 4: Sales Date Parameters of Pacific Pipe's Home Market and U.S. Sales Programs

Comment 5: Pacific Pipe's Fixed Overhead Costs

Comment 6: Assignment of Surrogate Costs to Certain Pacific Pipe Home Market Sales

Comment 7: Pacific Pipe's Home Market Discounts and Rebates

Comment 8: Sales Date Parameters of Saha Thai's Home Market and U.S. Sales Programs

Comment 9: Saha Thai's Duty Drawback Adjustment

Comment 10: Differential Pricing Analysis of Saha Thai's U.S. Sales

Comment 11: Sales Date Parameters of Thai Premium's Home Market Sales Program

Comment 12: Assignment of Surrogate Costs to Certain Thai Premium Home Market Sales

Comment 13: Revision of Variable Names in Thai Premium's Home Market Program

VI. Recommendation

[FR Doc. 2018–22237 Filed 10–12–18; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### Notice of Findings Regarding Non-U.S. Commercial Availability of Satellite Imagery With Respect to Israel

**ACTION:** Notice.

**SUMMARY:** Consistent with the requirement that commercial remote sensing licensees operate their systems in a manner that protects national security concerns, foreign policy and international obligations, Section 1064, Public Law 104–201, (the 1997 Defense Authorization Act), referred to as the Kyl-Bingaman Amendment, requires that ''[a] department or agency of the United States may issue a license for the collection or dissemination by a non-Federal entity of satellite imagery with respect to Israel only if such imagery is no more detailed or precise than satellite imagery of Israel that is available from commercial sources.'' Pursuant to this law, the Department of Commerce will make findings as to the level of detail or precision of satellite imagery of Israel available from commercial sources. The Department has found that imagery over Israel is not readily and consistently available in sufficient quantities from non-U.S. sources at under the 2 m Ground Sample Distance (GSD) resolution limit currently set by the Department; therefore, the Department is not changing this resolution limit.

**SUPPLEMENTARY INFORMATION:** This Notice informs U.S. satellite operators collecting imagery over Israel or with plans to collect imagery over Israel that current restrictions regarding data collection/dissemination of imagery over Israel remain in place with the resolution limit at 2 m GSD. This Notice is consistent with the requirement that the Department of Commerce review non-U.S. commercial availability of imagery over Israel and any input from licensees or from the general public and publish findings of this review in the **Federal Register**.

To determine what imagery is ''available from commercial sources,'' the Department looks to what ''level of imagery resolution [is] readily and consistently available in sufficient quantities from non-U.S. sources.'' Licensing of Private Land Remote-Sensing Space Systems, 71 FR 24474, 24479 (Apr. 25, 2006). After a recent investigation and analysis, the Department determined that imagery over Israel is not readily and consistently available in sufficient quantities from non-U.S. sources at under 2 m GSD to consider sub-2 m imagery ''commercially available.''

There are non-U.S. commercial sources that are capturing imagery at lower than the 2 m resolution limit, but very little of this imagery is available for sale. Further, the imagery is not easily accessible enough to be readily available. A customer must apply to acquire the imagery. Even if their application is granted and the customer is able to buy imagery at under 2 m, the license terms of the sale often restrict the customer from further disseminating the imagery. Therefore, the Department has determined that commercial imagery is not readily or consistently available from non-U.S. sources in sufficient quantities to be considered commercially available.

The Department of Commerce may re-evaluate this finding in the future as additional information is made available.

**FOR FURTHER INFORMATION CONTACT:**
Tahara Dawkins, Commercial Remote Sensing Regulatory Affairs Office, NOAA Satellite and Information Services, 1335 East-West Highway, Suite G–101, Silver Spring, Maryland 20910; telephone (301) 713–3385, email *tahara.dawkins@noaa.gov.*

**Tahara Dawkins,**
*Director, Commercial Remote Sensing Regulatory Affairs.*

[FR Doc. 2018–22366 Filed 10–12–18; 8:45 am]

**BILLING CODE 3510–HR–P**

## DEPARTMENT OF DEFENSE

### Department of the Army

### Notice of Intent to Grant Exclusive Patent License to Dilatant, LLC; Kansas City, MO

**AGENCY:** Department of the Army, DoD.

**ACTION:** Notice of intent.

**SUMMARY:** The Department of the Army hereby gives notice of its intent to grant to Dilatant, LLC; a company having its principle place of business at 1111 West 46th Street #45, Kansas City, MO 64112, an exclusive license.

**DATES:** Written objections must be filed not later than 15 days following publication of this announcement.

**ADDRESSES:** Send written objections to U.S. Army Research Laboratory Technology Transfer and Outreach Office, RDRL-DPT/Annmarie Martin, Building 321 Room 113, 6375 Johnson Rd., Aberdeen Proving Ground, MD 21005–5425.

**FOR FURTHER INFORMATION CONTACT:**
Annmarie Martin, (410) 278–9106, email: *ORTA@arl.army.mil.*

**SUPPLEMENTARY INFORMATION:** The Department of the Army plans to grant an exclusive license to Dilatant, LLC in the field of use related to head and body resistant systems incorporating rate-actuated tethers for use in automotive racing applications relative to the following—

• ''Rate-Responsive, Stretchable Devices'', US Patent No. 9,303,717, Filing Date June 26, 2013, Issue Date April 5, 2016.

• ''Rate-Responsive, Stretchable Devices (Further Improvements)'', US Patent No. 9,958,023, Filing Date March 1, 2016, Issue Date May 1, 2018.

• ''Head Restraint System Having a Rate Sensitive Device'', US Patent Application No. 15/366,578, Filed December 1, 2016.

The prospective exclusive license may be granted unless within fifteen (15) days from the date of this published notice, the U.S. Army Research Laboratory receives written objections including evidence and argument that establish that the grant of the license would not be consistent with the requirements of 35 U.S.C. 209(e) and 37 CFR 404.7(a)(1)(i). Competing applications completed and received by the U.S. Army Research Laboratory within fifteen (15) days from the date of this published notice will also be treated as objections to the grant of the contemplated exclusive license.

Objections submitted in response to this notice will not be made available to the public for inspection and, to the

# ADDENDUM PD6

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

A-549-502
POR: 3/1/2016-2/28/2017
**Public Document**
E&C/Office VII: TP/KW

**DATE:**            October 4, 2018

**MEMORANDUM TO:**   Gary Taverman
                     Deputy Assistant Secretary
                       for Antidumping and Countervailing Duty Operations,
                       performing the non-exclusive functions and duties of the
                       Assistant Secretary for Enforcement and Compliance

**FROM:**            James Maeder
                     Associate Deputy Assistant Secretary
                       for Antidumping and Countervailing Duty Operations
                       performing the duties of Deputy Assistant Secretary
                       for Antidumping and Countervailing Duty Operations

**SUBJECT:**         Circular Welded Carbon Steel Pipes and Tubes from Thailand:
                     Decision Memorandum for the Final Results of Antidumping Duty
                     Administrative Review; 2016-2017

## I.    SUMMARY

The Department of Commerce (Commerce) analyzed the case and rebuttal briefs submitted by interested parties in the administrative review of the antidumping duty order on circular welded carbon steel pipes and tubes (pipes and tubes) from Thailand. As a result of this analysis, we have recalculated the weighted-average dumping margins for Pacific Pipe Public Company Limited (Pacific Pipe); Saha Thai Steel Pipe (Public) Company, Ltd. (Saha Thai); and Thai Premium Pipe Co., Ltd. (Thai Premium). We recommend that you approve the positions described in the "Discussion of Comments" section of this memorandum.

## II.    LIST OF COMMENTS

   Comment 1: Whether to Accept Certain New Factual Information Regarding Particular
              Market Situation (PMS) Allegation
   Comment 2: Whether Commerce Improperly Made PMS Adjustments to the Respondents'
              Cost of Production
   Comment 3: PMS Adjustments to Pacific Pipe's and Saha Thai's Calculations
   Comment 4: Sales Date Parameters of Pacific Pipe's Home Market and U.S. Sales Programs
   Comment 5: Pacific Pipe's Fixed Overhead Costs
   Comment 6: Assignment of Surrogate Costs to Certain Pacific Pipe Home Market Sales
   Comment 7: Pacific Pipe's Home Market Discounts and Rebates

Comment 8:  Sales Date Parameters of Saha Thai's Home Market and U.S. Sales Programs
Comment 9:  Saha Thai's Duty Drawback Adjustment
Comment 10:  Differential Pricing Analysis of Saha Thai's U.S. Sales
Comment 11:  Sales Date Parameters of Thai Premium's Home Market Sales Program
Comment 12:  Assignment of Surrogate Costs to Certain Thai Premium Home Market Sales
Comment 13:  Revision of Variable Names in Thai Premium's Home Market Program

## III.    BACKGROUND

The review covers three producers and/or exporters of the subject merchandise: Pacific Pipe, Saha Thai, and Thai Premium.  The period of review (POR) is March 1, 2016, through February 28, 2017.  On April 9, 2018, Commerce published the *Preliminary Results* of the 2016-2017 administrative review of the antidumping duty order on pipes and tubes from Thailand.[1]  In those results, Commerce preliminarily determined that subject merchandise was being sold in the United States at prices below normal value during the POR.[2]  On August 31, 2018, Commerce issued its post-preliminary findings regarding whether a particular market situation exists in Thailand.[3]  Between September 7, 2018, and September 18, 2018, the petitioner and respondents timely submitted case briefs as well as rebuttal briefs.[4]  On September 27, 2018, Commerce held a hearing at its main office building.[5]

## IV.    SCOPE OF THE ORDER

The products covered by this order are certain circular welded carbon steel pipes and tubes from Thailand.  The subject merchandise has an outside diameter of 0.375 inches or more, but not exceeding 16 inches.  These products, which are commonly referred to in the industry as "standard pipe" or "structural tubing" are hereinafter designated as "pipes and tubes."  The merchandise is classifiable under the Harmonized Tariff Schedule of the United States (HTSUS)

---

[1] *See Circular Welded Carbon Steel Pipes and Tubes from Thailand: Preliminary Results of Antidumping Duty Administrative Review; 2016–2017*, 83 FR 15127 (April 9, 2018) (*Preliminary Results*) and accompanying Preliminary Decision Memorandum (PDM).

[2] *Preliminary Results*, 83 FR at 15128.

[3] *See* Memorandum, "Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand: Post-Preliminary Decision Memorandum on Particular Market Situation Allegation," dated August 31, 2018 (Post-Preliminary Decision Memorandum).

[4] *See* Petitioner's Case Brief, "Circular Welded Steel Pipes and Tubes from Thailand: Case Brief," dated September 10, 2018 (Petitioner's Case Brief); Petitioner's Rebuttal Brief, Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated September 18, 2018 (Petitioner's Rebuttal Brief); Thai Premium's Case Brief, "Circular Welded Carbon Steel Pipes and Tubes from Thailand—Thai Premium Pipe Company's Case Brief," dated September 7, 2018 (Thai Premium's Case Brief); Saha Thai's Case Brief, "Resubmission of Saha Thai's Case Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 16-17)," dated September 17, 2018 (Saha Thai's Case Brief); Saha Thai's Rebuttal Brief, "Saha Thai's Rebuttal Brief Circular Welded Carbon Steel Pipe and Tubes from Thailand (AR 16-17)," dated September 18, 2018 (Saha Thai's Rebuttal Brief); Pacific Pipe's Case Brief, "Circular Welded Carbon Steel Pipes and Tubes from Thailand:  Administrative Case Brief," dated September 13, 2018 (Pacific Pipe's Case Brief); and Pacific Pipe's Rebuttal Brief, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Rebuttal Brief," dated September 17, 2018 (Pacific Pipe's Rebuttal Brief).

[5] *See* "Transcript of Hearing in the Antidumping Duty Administrative Review of Circular Welded Carbon Steel Pipes and Tubes from Thailand," dated September 27, 2018.

item numbers 7306.30.1000, 7306.30.5025, 7306.30.5032, 7306.30.5040, 7306.30.5055, 7306.30.5085 and 7306.30.5090.  Although the HTSUS subheadings are provided for convenience and purposes of U.S. Customs and Border Protection (CBP), the written description of the merchandise subject to the order is dispositive.

## V.    DISCUSSION OF COMMENTS

**Comment 1:  Whether to Accept Certain New Factual Information Regarding Particular Market Situation (PMS) Allegation**

*Respondents' Case Briefs*
- The petitioner's February 5, 2018, PMS allegation should be rejected because it contained new factual information and did not identify which subsection of 19 CFR 351.102(b)(21) (i) – (v) under which it was being submitted, as required by 19 CFR 351.301(b).[6]
- In accepting the PMS allegation, submitted only 28 days before the *Preliminary Results*, and issuing a PMS finding only 30 days before the *Final Determination*, Commerce denied interested parties their statutorily mandated time to brief and prepare for a hearing.[7]
- The petitioner ensured that Commerce would not have enough time to conduct a proper investigation into the PMS allegation by filing the PMS allegation well after certain respondents reported using imported HRC to produce subject merchandise.[8]
- Commerce set March 28, 2018, as the deadline for parties to place rebuttal factual information with respect the PMS allegation.[9]  Commerce's Post-Preliminary Decision Memorandum relied heavily on information found in the petitioner's May 17, 2018, submission, which contained untimely filed new factual information with respect to the PMS allegation.  Commerce should reject the petitioner's May 17, 2018, submission and not rely on information contained therein for the final results.[10]

*Petitioner's Rebuttal Brief*
- Commerce should continue to find that the PMS allegation and supporting information was properly filed and investigated in this review.[11]
- Contrary to Saha Thai's claim, the PMS allegation did identify the type of information it submitted by stating that the information therein was being submitted in support of a

---

[6] *See* Saha Thai's Case Brief at 7 (citing, *e.g.*, *Ripe Olives from Spain: Final Affirmative Countervailing Duty Determination*, 83 FR 28186 (June 18, 2018) (*Olives from Spain*)).

[7] *See, e.g.*, *Certain Softwood Lumber Products from Canada: Final Affirmative Determination of Sales at Less Than Fair Value and Affirmative Final Determination of Critical Circumstances*, 82 FR 51806 (November 8, 2017) (*Softwood Lumber from Canada*).

[8] *See* Saha Thai's Case Brief at 9 (citing Saha Thai's August 17, 2017 CDQR at 42-8 and Exhibit D-10).

[9] *See* Memorandum, "Antidumping Duty Administrative Review:  Circular Welded Carbon Steel Pipes and Tubes from Thailand – Deadline for Submission of Factual Information Relating to Particular Market Situation Allegation," dated March 21, 2018 (March 21, 2018 Memorandum).

[10] *See* Saha Thai's Case Brief at 10-12 (citing Petitioner's Letter, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Comments on, and Clarifying Factual Information regarding, Pacific Pipe and Saha Thai Supplemental Questionnaire Responses," dated May 17, 2018 at 2 (Petitioner's May 17, 2018 Letter); *see also* Saha Thai's Letter, "Request for Rejection of Petitioner's May 17, 2018 Factual Submission Circular Welded Steel Pipes and Tubes from Thailand," dated May 21, 2018); *see also* Pacific Pipe's Case Brief at 6-7.

[11] *See* Petitioner's Rebuttal Brief at 8-9.

PMS allegation, which qualifies as factual information under 19 CFR 351.102(b)(21)(ii).[12]

- The petitioner's PMS allegation was clearly titled "Particular Market Situation Allegation," cited the appropriate regulatory provision for accepting the submission of factual information in support of a PMS and cited previous cases in which Commerce had accepted PMS allegations and factual information supporting those allegations.[13]

- There is no deadline for a PMS allegation.[14]  The PMS allegation in the instant review was submitted nearly 60 days prior to the *Preliminary Determination* – earlier in the segment than other PMS allegations that have been accepted.[15]  Commerce provided all parties the opportunity to submit factual information and argument regarding the allegation.[16]  Saha Thai and Pacific Pipe submitted each submitted comments and rebuttal factual information on March 28, 2018.[17]

**Commerce's Position:**  We have not rejected the petitioner's February 5, 2018, PMS allegation nor its May 17, 2018, submission for these final results.

Pursuant to 19 CFR 351.301(b), "{e}very submission of factual information must be accompanied by a *written* explanation identifying the subsection of 19 CFR 351.102(b)(21) under which the information is being submitted."[18]  As noted in Commerce's March 21, 2018, memorandum accepting the allegation and providing deadlines for submission of factual information to rebut, clarify, or correct the factual information,[19] the petitioner's PMS allegation properly references the criteria for determining the existence of a PMS.[20]  Specifically, the allegation states, "{Commerce} should accept the factual information accompanying this submission as timely filed under 19 CFR 351.301(c)(2)(v), which {Commerce} has previously determined is the appropriate provision for the submission of factual information in support of a particular market situation allegation."[21]  Moreover, the petitioner rightly points to the various references throughout its allegation that constitute a "written explanation" that identifies Commerce's regulation on factual information pertaining to other allegations.  Thus, we continue

---

[12] *See* Petitioner's Rebuttal Brief at 7-8 (citing 19 CFR 351.301(b); Petitioner's Letter, "Circular Welded Steel Pipes and Tubes from Thailand: Particular Market Situation Allegation," dated February 5, 2018 (PMS Allegation) at 1-2).

[13] *See* Petitioner's Rebuttal Brief at 7-8 (citing 19 CFR 351.102(b)(21)(ii)).

[14] *See* 19 CFR 351.301(c)(2)(v).

[15] *See, e.g., Certain Cold-Drawn Mechanical Tubing of Carbon and Alloy Steel from the Republic of Korea: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Preliminary Affirmative Determination of Critical Circumstances, in Part, Postponement of Final Determination, and Extension of Provisional Measures*, 82 FR 55564 (November 22, 2017) and accompanying Preliminary Decision Memorandum at 5-6 (accepting a PMS allegation filed 26 days before the preliminary determination); *Large Diameter Welded Pipe from the Republic of Korea: Preliminary Determination of Sales at Less Than Fair Value and Postponement of Final Determination*, 83 FR 43651 (August 27, 2018) (*Large Diameter Welded Pipe from Korea*) and accompanying Issues and Decision Memorandum at 13 – 14 (accepting a PMS allegation filed 46 days prior to the preliminary determination).

[16] *See* Petitioner's Rebuttal Brief at 8-9 (citing March 21, 2018 Memorandum).

[17] *See* Saha Thai's Letter, "Saha Thai's Rebuttal Factual Information and Comments on Wheatland Tube's PMS Allegation: Circular Welded Steel Pipes and Tubes from Thailand," dated March 28, 2018 (Saha Thai's PMS Comments); *see also* Pacific Pipe's Letter, "Welded Circular Carbon Steel Pipe and Tube from Thailand: Amended Comments on Particular Market Situation," dated March 28, 2018 (Pacific Pipe's PMS Comments).

[18] Emphasis added.

[19] *See* 19 CFR 351.301(c)(2)(v).

[20] *See* March 21, 2018 Memorandum.

[21] *See* PMS Allegation at 1-2 (citing *Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2015-2016*, 83 FR 17146 (April 18, 2018) (*OCTG from Korea 2015-16*)).

to find that the petitioner's submission properly references the regulations for filing new factual information as it pertains to a cost-based PMS allegation.

Saha Thai's claim that interested parties were denied sufficient time to address the allegation and findings because Commerce accepted the PMS allegation that was submitted 28 days before the *Preliminary Determination*, and issued a PMS finding just 30 days before the *Final Determination* is misplaced. First, the PMS allegation was submitted nearly 60 days prior to the *Preliminary Determination*, not 28 days as Saha Thai claims.[22] In addition, as noted by both Saha Thai and the petitioner, the subsection of Commerce's regulations that governs the submission of new factual information concerning a cost-based PMS allegation does not establish a time limit or deadline for these allegations.[23]

Section 504 of the TPEA[24] modified certain provisions of the Act concerning the definition of a "particular market situation," including to section 773(e) of the Act "where a particular market exists that distorts pricing or cost in a foreign producer's home market."[25] Commerce's regulations provide a deadline for the submission of a sales-based PMS allegation;[26] however, no such provision exists for the TPEA's cost-based PMS allegation. As such, a cost-based PMS allegation falls under the "Other allegations" provision of 19 CFR 351.301(c)(2). Accordingly, Commerce analyzed the submission and determined that there was sufficient time in the proceeding to conduct a proper analysis of the allegation.[27] Interested parties were permitted time to submit rebuttal factual information with regard to the PMS allegation.[28] Indeed, Saha Thai and Pacific Pipe submitted new factual information and argument with respect to the PMS allegation on March 28, 2018.[29] Moreover, all parties had the opportunity to submit arguments with respect to Commerce's PMS decision in their case and rebuttal briefs.[30] As such, we find that the PMS allegation was properly filed, accepted and investigated in the course of this review.

We reviewed the record with respect to the respondents' contention that the petitioner's May 17, 2018, submission contained certain untimely rebuttal factual information.[31] The petitioner's submission contained new factual information to rebut, clarify, or correct supplemental questionnaire responses filed by Saha Thai and Pacific Pipe.[32] Saha Thai and Pacific Pipe argue that section II: "Clarifying Factual Information Regarding Distortions to Imported HRC Prices" and the associated exhibits – WTO and Government of Thailand (GOT) reports concerning HRC duty rates from certain countries – did not pertain to the information contained in the respective

---

[22] The PMS Allegation was submitted on February 5, 2018; the *Preliminary Determination* was signed on April 3, 2018, 57 days apart.

[23] *See* Saha Thai Case Brief at 8 (citing *Softwood Lumber from Canada*); *see also* Petitioner's Rebuttal Brief at 8 (citing 19 CFR 351.301(c)(2)(v)).

[24] *See* Trade Preferences Extension Act of 2015, 114 PL 27.

[25] *See* "Trade Facilitation and Trade Enforcement Act of 2015", S. Rept. 114-45 (May 13, 2015).

[26] *See* 19 CFR 351.301(c)(2)(i), *see also* sections 773(a)(1)(B)(ii)(III) and 773(a)(1)(C)(iii) of the Tariff Act of 1930 (the Act).

[27] *See* March 21, 2018 Memorandum.

[28] *See* 19 CFR 351.301(c)(2)(vi) and March 21, 2018 Memorandum.

[29] *See* Saha Thai's PMS Comments and Pacific Pipe's PMS Comments.

[30] *See* Memorandum, "Circular Welded Carbon Steel Pipes and Tubes from Thailand: Extension of Deadline to File Case and Rebuttal Briefs for all Issues," dated September 6, 2018.

[31] *See* Petitioner's May 17, 2018 Letter at Exhibits 2-4.

[32] *See* Petitioner's May 17, 2018 Letter at Exhibits 2-4. (citing 19 CFR 351.102(b)(21)(i); Saha Thai's Case Brief at 10-12; Pacific Pipe's Case Brief at 6-7).

supplemental questionnaire responses.[33]  However, we note that Saha Thai's May 14, 2018, supplemental response contains information regarding "input purchases and tax and duty on such purchases," and calculations including the applicable duty rates applicable to HRC imported from certain countries during the POR.[34]  Accordingly, we find that section II of the petitioner's May 17, 2018, submission and the associated exhibits rebut, clarify or correct information contained in Saha Thai's May 14, 2018, supplemental questionnaire response.[35]

**Comment 2:  Whether Commerce Improperly Made PMS Adjustments to the Respondents' Cost of Production.**

*Respondents' Case Briefs*

- Section 504(b) of the TPEA only permits an adjustment to the producer's actual costs of production (because of an alleged PMS) for purposes of calculating constructed value; there is no statutory authority for use of an alleged PMS to adjust a producer's production costs for the purposes of analyzing sales below cost.[36]
- Because section 504(b) of the TPEA did not make any other changes, including the provisions regarding the calculation of the cost of production or the application of the sales-below-cost test, Commerce's adjustment to Saha Thai's cost of production is contrary to the statute.
- Based on the plain language of section 504(b) of the Act[37] and Commerce's prior interpretations of the statute,[38] a PMS is reserved for limited and unusual circumstances.
- Any finding that a PMS exists must rely on strong, substantial evidence that the respondents' actual cost of production is unusually and exhaustively distorted and thus not in the "ordinary course of trade."[39]
- Commerce's *Preliminary Determination* fails to demonstrate how and why respondents' use of imported steel, pursuant to Thai law, is out of the ordinary course of trade, or how and why the alleged distortion is so significant that it creates an inability to compare foreign and domestic prices.[40]
- Global steel overcapacity is a condition within the ordinary course of trade in Thailand, is impossible to quantify,[41] and does not satisfy the threshold required by section 504 of the TPEA for a PMS.

---

[33] *See* Saha Thai's Case Brief at 7; *see also* Pacific Pipe's Case Brief at 6-7.

[34] *See* Saha Thai's May 14, 2018 Supplemental Questionnaire Response (Saha Thai's May 14, 2018 SQR).

[35] *See* 19 CFR 351.102(b)(21)(i).

[36] *See* Saha Thai's Case Brief at 13-14 (citing section 504(b) of the TPEA); *see also* Pacific Pipe's Case Brief at 6-7.

[37] *See* Saha Thai's Case Brief at 15-16 (citing, *e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term appearing in several places in a statutory text is generally read the same way each time it appears.").

[38] *See* Saha Thai's Case Brief at 15-16 (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol 1 (1994) (SAA) at 822; *see also Notice of Final Determinations of Sales at Less Than Fair Value: Certain Drum Wheat and Hard Red Spring Wheat from Canada*, 68 FR 52741 (September 5, 2003) (*Wheat from Canada*) and accompanying Issues and Decision Memorandum and Comment 1; *see also Certain Cold-Rolled and Corrosion-Resistant Carbon Steel Flat Products from Korea: Final Results of Antidumping Duty Administrative Reviews*, 62 FR 18404, 18414 (April 15, 1997) (*Cold-Rolled from Korea*)).

[39] *See* Saha Thai's Case Brief at 17 (citing section 773(e) of the Act).

[40] *See* Saha Thai's Case Brief at 19 (citing *Olives from Spain*, 83 FR at 28186, and accompanying Memorandum on Particular Market Situation Allegation, dated March 26, 2018.

[41] *See* Pacific Pipe's Case Brief at 6 (citing, *e.g.*, *Welded Line Pipe Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 1023 (January 9, 2018), and accompanying Decision Memorandum at 10-14).

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

*Petitioner's Rebuttal Brief*

- Commerce's post-preliminary PMS finding was supported by substantial record evidence, namely: (1) the acquisition costs of HRC constitute 80 to 90 percent of the cost of producing CWP; (2) the GOT subsidizes all Thai HRC producers;[42] (3) because of the significant global overcapacity in steel production, the Thai steel market has been flooded with imports of cheap steel products, including HRC, from China; (4) the GOT imposed antidumping and safeguard measures on imported HRC, which were intended to impact the acquisition cost of HRC into the Thai market during the POR; (5) because respondents did not ultimately pay these antidumping or safeguard duties, the measures imposed by the GOT to address price distortions and injury caused by global steel overcapacity are not effectively remedying those distortions and injury.[43]

- Respondents' claim that global overcapacity in steel production is now "ordinary" and not outside the ordinary course of trade neglects: (1) Commerce's recognition that distortions that are widespread or long-standing may still cause prices and costs to be outside the ordinary course of trade; and (2) the confirmation from various sources, including the GOT, that global overcapacity in steel was distorting the Thai HRC market.[44]

- Commerce's inability to quantify the impact of global overcapacity on steel prices in other cases is distinct from the record of this proceeding where specific measures, including subsidies and dumping, are present.[45]

- There are direct links among the types of excess-capacity-driven surges the GOT sought to remedy through safeguard duties, the countervailable subsidies the GOT provides to its own HRC producers, and the dumping by foreign HRC producers seeking to offload excess production into Thailand.

- The following antidumping and safeguard measures implemented to remedy the distortions in the Thai HRC market provide an appropriate means of quantifying these distortions, as Commerce reasonably found: (1) U.S. countervailing duty (CVD) order on Thai HRC, (2) Thai safeguard measure on HRC, and (3) 19 Thai antidumping orders on HRC.[46]

- The PMS provision of the statute plainly provided Commerce with broad authority to use "any other calculation methodology" if costs are distorted by a PMS,[47] including for the purposes of COP under section 773(b)(3).[48]

---

[42] All imports of HRC from Thailand into the United States are subject to a CVD rate of 2.38 percent. *See* Post-Preliminary Decision Memorandum.

[43] *See* Post-Preliminary Decision Memorandum at 4-6 (citing PMS Allegation).

[44] *See* PMS Allegation at 11-16 and Exhibits 1, 3, 6-15, and 17; *see also Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Preliminary Results of Antidumping Duty Administrative Review; 2015-2016*, 82 FR 57583 (December 6, 2017) and accompanying Issues and Decision Memorandum at 14 (*CWP from Korea 2015-16 Prelim*); *see also Biodiesel from Argentina: Final Determination of Sales at Less Than Fair Value and Final Affirmative Determination of Critical Circumstances, in Part*, 83 FR 8837 (March 1, 2018) and accompanying Issues and Decision Memorandum at Comment 3 (*Biodiesel from Argentina*).

[45] *See* Petitioner's Rebuttal Brief at 5.

[46] *Id*. at 6.

[47] *Id*. at 6-7 (citing the TPEA at 504).

[48] *See, e.g., Certain Oil Country Tubular Goods from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2014-2015*, 82 FR 18105 (April 17, 2017) (*OCTG from Korea 2014-15*), and accompanying Issues and Decision Memorandum at Comment 3; *OCTG from Korea 2015-16* and accompanying Issues and Decision Memorandum at Comment 1; *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: Final Results of Antidumping Duty Administrative Review; 2015-2016*, 83 FR 27541 (June 13, 2018) (*CWP from Korea*) and accompanying Issues and Decision Memorandum at Comment 1.

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

**Commerce's Position:**  We have continued to make PMS adjustments to the respondents' cost of production for these final results.

Section 504 of the TPEA added the concept of "particular market situation" in the definition of the term "ordinary course of trade," for purposes of constructed value under section 773(e) of the Act.  Section 773(e) of the Act states that "if a {PMS} exists such that the cost of materials and fabrication or other processing of any kind does not accurately reflect the cost of production in the ordinary course of trade, the administering authority may use another calculation methodology under this subtitle or any other calculation methodology."  Prior to the TPEA, in a limited number of situations, Commerce found that a PMS existed and, as a result, declined to use the sale prices of the foreign like product in an entire market for purposes of calculating normal value, as provided for in section 351.404(c)(2) of Commerce's regulations.[49]  More recently, Commerce determined that a PMS existed which distorted the domestic costs of inputs used in the production of merchandise under consideration.[50]  Although the Act does not define "particular market situation," the SAA explains that examples where such a situation may exist include "where there is government control over pricing to such an extent that home market prices cannot be considered competitively set."[51]  Saha Thai contends that any finding that a PMS exists must rely on strong, substantial evidence that the respondents' cost of production is "unusually and exhaustively" distorted and thus not in the "ordinary course of trade."[52]  While we agree with Saha Thai that a finding that a PMS exists is reserved for limited circumstances and must be based on substantial evidence that the alleged distortion is so significant that it creates an inability to compare foreign and domestic prices, we disagree that such evidence doesn't exist on the record of this segment of the proceeding.

There is substantial record evidence to support a finding that a PMS exists.  Specifically, as noted in the Post-Preliminary Decision Memorandum, the record shows that (1) the acquisition costs of HRC constitute 80 to 90 percent of the cost of producing pipes and tubes;[53] (2) the GOT subsidizes all Thai HRC producers;[54] (3) because of the significant global overcapacity in steel production, the Thai steel market has been flooded with imports of cheap steel products, including HRC;[55] (4) the GOT imposed antidumping and safeguard measures on imported HRC, which were intended to impact the price of HRC into the Thai market during the POR;[56] and (5) because respondents did not ultimately pay these antidumping or safeguard duties, the measures

---

[49] For examples of prior situations where we have found a particular market situation, *see Notice of Final Determination of Sales at Less Than Fair Value: Fresh Atlantic Salmon from Chile*, 63 FR 31411 (June 9, 1998); *Mechanical Transfer Presses from Japan; Final Results of Antidumping Duty Administrative Review and Revocation of Antidumping Duty Administrative Order in Part*, 63 FR 37331 (July 10, 1998); and *Notice of Final Results of the Ninth Administrative Review of the Antidumping Duty Order on Certain Pasta from Italy*, 72 FR 7011 (February 14, 2007).

[50] *See, e.g.*, *OCTG from Korea 2014-15*, 82 FR at 18105 and accompanying Issues and Decision Memorandum at 40-41.

[51] *See* Saha Thai's Case Brief at 15-16 (citing SAA at 822).

[52] *See* Saha Thai's Case Brief at 17 (citing section 773(e) of the Act; *see also Wheat from Canada*, 68 FR at 52741, and accompanying Issues and Decision Memorandum and Comment 1, *Cold-Rolled from Korea*, 62 FR at 18414, and *Olives from Spain*, 83 FR at 28186.).

[53] *See, e.g.*, Saha Thai Section A Response (Public Version) (July 31, 2017) at 27.

[54] *See Final Affirmative Countervailing Duty Determination:  Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 50410 (October 3, 2001).

[55] *See* PMS Allegation at Exhibit 17.

[56] *Id*.

Filed By: Toni Page, Filed Date: 10/5/18 12:42 PM, Submission Status: Approved

imposed by the GOT to address price distortions and injury caused by global steel overcapacity are not effectively remedying those distortions and injury.[57]  Commerce finds that this evidence, taken as a whole, demonstrates that the prices of domestically-sourced and imported HRC in Thailand were distorted during the POR, such that the cost of producing subject merchandise in Thailand was outside the ordinary course of trade.[58]

We disagree with respondents' claim that global overcapacity in steel production is now ordinary, and therefore, costs distorted by this overcapacity cannot be considered outside the ordinary course of trade.[59]  As the petitioner notes, in *Biodiesel from Argentina*, we recognized that distortions that are widespread or long-standing may still cause prices and costs to be outside the ordinary course of trade.[60]  The record clearly indicates that prices in the Thai HRC market, as a whole, have been and continue to be distorted.  Specifically, the GOT cited the impact of global overcapacity as an impetus for imposing safeguard duties.[61]  Further, industry analysts and Thai steel companies confirmed that global overcapacity in steel was distorting the Thai market, particularly given the high level of import penetration in the country.[62]  As discussed in the Post-Preliminary Decision Memorandum, the surge of cheap imported steel has led to artificially low prices in the Thai domestic market, reduced Thai production, and extremely low Thai capacity utilization, resulting in slim margins, bankruptcies, and defaults in the Thai steel industry.[63]  Therefore, it is reasonable to find that Thai domestic prices for HRC, including the costs for HRC to HRC consumers, are outside the ordinary course of trade.

There are direct links between the trade remedies imposed to mitigate the distortions in the Thai HRC market.  The U.S. CVD order on HRC from Thailand unquestionably was issued to address Thai subsidization of the domestic production of HRC.  Similarly, Thailand itself recognized that the overcapacity of imported HRC resulted in price suppression, and as a result, the Thai safeguard measures on imported HRC were put in place.  Furthermore, the Thai antidumping orders on HRC from various countries were also imposed to address imported HRC which was being dumped into the Thai market and injuring domestic producers as a result.  Accordingly, we agree with the petitioner that these measures provide indicia of the market distortions created in Thailand by domestic subsidies and created outside of Thailand by the dumped sales of imported HRC, as well as further distortions caused by HRC overcapacity.[64]

With respect to the respondents' arguments concerning the legal standard for finding a cost-based PMS, all parties agree that section 504 of the TPEA enables Commerce to address a PMS where the cost of materials, fabrication, or processing fail to accurately reflect the COP in the ordinary course of trade.[65]  Saha Thai and Pacific Pipe contend that section 504(b) of the TPEA modified provisions concerning only the calculation of constructed value, but that there is no

---

[57] *See* Saha Thai Section C Response (Public Version) (August 17, 2017) at 14-15 and 43; Pacific Pipe's Initial Section C Questionnaire Response (August 18, 2017) at 28; and Thai Premium's Initial Section C Questionnaire Response (August 17, 2017) at 35.
[58] *See* Post-Preliminary Decision Memorandum.
[59] *See* Pacific Pipe's Case Brief at 6.
[60] *See* Petitioner's Rebuttal Brief at 5 (citing *Biodiesel from Argentina*, 83 FR 8837 and accompanying Issues and Decision Memorandum at Comment 3).
[61] *See* PMS Allegation at Exhibit 17.
[62] *Id*. at 11-15, Exhibits 1,3, and 6-15.
[63] *Id*.
[64] *See* Petitioner's Rebuttal Brief at 6.
[65] *See*, *e.g.*, OCTG Korea 14-15.

additional statutory authority for Commerce to use an alleged cost-based PMS to adjust a producer's production costs to determine whether or not there were sales below cost.[66] They claim that when Commerce does not calculate constructed value (or when it calculates constructed value, but the cost of materials and fabrication does not accurately reflect cost of production), the calculations are governed by other, existing statutory provisions, namely section 773(b) of the Act.[67] Thus, on this basis, Saha Thai and Pacific Pipe claim that Commerce does not have the statutory authority to adjust a producer's production costs for the purposes of analyzing sales below cost are misplaced.[68]

We disagree with the respondents' interpretation of the Act. Specifically, the term "ordinary course of trade," defined in section 771(15) of the Act, includes "situations in which the administering authority determines that the particular market situation prevents a proper comparison {of normal value} with the export price or constructed export price."[69] Thus, where a PMS affects the cost of production for the foreign like product, such as through distortions to the cost of inputs, it is reasonable to conclude that such a situation may prevent a proper comparison of normal value with the export price or constructed value. Respondents' claim that an examination of a PMS for purposes of the cost of production goes beyond the plain language of the Act fails to consider that the provision at issue, section 773(e) of the Act, specifically includes the term "ordinary course of trade." Thus, the definition of that term, again, found in section 771(15) of the Act, is integral to that PMS provision. Accordingly, we disagree with the argument that Commerce cannot analyze a PMS claim in determining whether or not a company's sales were made at below cost, and therefore, are outside the "ordinary course of trade." Indeed, we find that the respondent's interpretation would defeat the very purpose of an "ordinary course of trade" analysis under the PMS provision, which is to ensure that the distortions caused by a PMS do not prevent fair comparisons of normal value with U.S. price.[70]

Accordingly, we find that Saha Thai's and Pacific Pipe's arguments are inconsistent with the intent of Congress in adding this provision to the Act, and we agree with the petitioner's argument that Commerce is granted the discretion to use "any other calculation methodology" if costs are distorted by a PMS, including for the purposes of COP under section 773(b)(3) of the Act.[71]

**Comment 3:  PMS Adjustments to Pacific Pipe's and Saha Thai's Calculations**

*Respondents' Case Briefs*
- Commerce mistakenly applied the 2.38 percent CVD rate to adjust upwardly the cost of all HRC (domestic and imported) consumed by Thai producers of pipes and tubes, regardless of origin of the HRC, which contradicts basic principles of international trade law and is inconsistent with Commerce's administrative practice.[72]
- Commerce also failed to offer an explanation for the 2.38 percent CVD adjustment to all

---

[66] *See* Saha Thai's Case Brief at 13-14 (citing section 504(b) of the TPEA); *see also* Pacific Pipe's Case Brief at 6-7).
[67] *Id.*
[68] *Id.*
[69] *See* section 771(15)(C).
[70] *See* section 773(a) of the Act ("a fair comparison shall be made between the export price or constructed export price and normal value.").
[71] *See* Petitioner's Rebuttal Brief at 6-7 (citing *OCTG from Korea 2014-15*, *OCTG from Korea 2015-16*, and *CWP from Korea*.
[72] *See* Saha Thai's Case Brief at 21-22.

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 – 2/28/17

HRC purchased by Pacific Pipe during the POR.

- For the final results, Commerce should not make an upward adjustment to non-Thai-produced HRC on the basis of the U.S. CVD Order on Thai-produced HRC.

- The 2.38 percent CVD rate was calculated based on GOT subsidy programs that existed in 1999, some of which have expired, and does not reasonably and accurately indicate the level of alleged price distortions.

- Commerce also incorrectly made an upward adjustment to the cost of Thai-produced HRC purchases by the Thai safeguard duty rate of 22.85 percent because safeguard measures are protective tariffs intended to protect a specific *domestic industry* (*i.e.*, Thai producers of HRC) from injury resulting from an increase in imports of a product.[73]

- Commerce also erred by applying safeguard duties to imports of HRC from China, Egypt, and Vietnam because the GOT has not imposed safeguard duties on imports from those countries.

- Commerce failed to explain the source of the 22.85 percent safeguard duty rate used to adjust the acquisition costs of imported HRC from countries subject to the Thai safeguard action.[74] Moreover, the GOT antidumping (AD) duty rates on hot-rolled steel from China, Taiwan, and Korea submitted by the petitioner were outdated and not in effect during the POR.

- Commerce failed to offset the imputed AD and safeguard duties with duties actually paid.

*Petitioner's Rebuttal Brief*

- Commerce's application of the prevailing CVD rate for Thai HRC to all purchases of HRC, regardless of source, was necessary to account for the distortions to HRC costs caused by GOT subsidies, global overcapacity, and injuriously low pricing that led to the imposition of CVD and safeguard duties that were not paid on HRC used to produce pipes and tubes for export.[75]

- Commerce has previously found it appropriate to use CVD rates for domestically sourced HRC as an adjustment to import prices that are distorted by global overcapacity.[76]

- The CVD rate used by Commerce is not outdated because it is the one currently in effect for all Thai producers of HRC.[77]

- The safeguard duty rate adjustment was necessary to account for the distortions to HRC costs caused by GOT subsidies, global overcapacity, and injuriously low pricing that led to the imposition of CVD and safeguard duties that were not paid on HRC used to produce pipes and tubes for export.[78]

- Commerce correctly applied an adjustment to account for AD duties that were not paid on imports of HRC from certain countries based on the best available information on the record.[79]

- Commerce correctly found that none of the respondents ultimately paid AD or safeguard duties on imported HRC used to produce exported subject merchandise.

---

[73] *See* Saha Thai's Case Brief at 22-23.
[74] *Id.* at 23.
[75] *See* Petitioner's Rebuttal Brief at 9-11.
[76] *See, e.g.*, *Large Diameter Welded Pipe from Korea* and accompanying Decision Memorandum at 16-17.
[77] *See* Petitioner's Rebuttal Brief at 10-11.
[78] *Id.*
[79] *Id.* at 12-13.

**Commerce's Position:**  We have continued to adjust the respondents' acquisition costs for HRC in Thailand by the applicable countervailing duty and GOT safeguard duty rate for these final results.  We have also continued to adjust the respondents' acquisition costs from Taiwan, China and Korea for unpaid AD duties.

Information on the record indicates that Thai HRC was subject to a CVD rate of 2.38 percent during the POR.[80]  Moreover, the record also shows that, during the POR, the GOT imposed a safeguard duty rate of 21.52 percent from June 7, 2015 – June 6, 2016, and 21.13 percent from June 7, 2016, to June 6, 2017, on imports of HRC from certain countries.[81]  Finally,  the record shows that the GOT imposed AD duty rates of 3.45 – 25.15 percent, 30.91 percent, and 13.58 – 58.85 percent, on imports from Taiwan, China, and Korea, respectively.[82]

As discussed in Issue 1, we continue to find that the cost of HRC in Thailand was distorted during the POR by a combination of global overcapacity and subsidies provided by the GOT.  In addition, the GOT found that imports from Taiwan, China and Korea were being sold at dumped prices and injuring the domestic Thai industry, also during the POR.  Therefore, these import prices were also distorted.

As noted in the Post-Preliminary Memorandum, the United States concluded in a prior CVD investigation that the GOT subsidizes Thai production of HRC.[83]  Accordingly, the prices paid by the respondent for domestically-produced HRC were directly distorted by the GOT subsidies on HRC.  We have therefore continued to upwardly adjust the respondents' acquisition costs to for domestically produced HRC to account for the countervailing duties.[84]

Moreover, the record shows that the GOT imposed safeguard duties as a direct result of distortions in the Thai market from global steel overcapacity.  Thus, to the extent that the companies did not pay the safeguard duties, the prices paid by the respondents for imported HRC were distorted by the effects of global overcapacity.  We have therefore continued to upwardly adjust the respondents' acquisition costs for HRC to account for the unpaid safeguard duties on imported HRC.

Saha Thai and Pacific Pipe argue that, in the Post-Preliminary Memorandum, Commerce incorrectly made an upward adjustment to the acquisition cost of imported HRC purchases by the U.S. CVD rate, when those purchases never benefited from the GOT subsidies.  While those purchases never directly benefited from the GOT subsidies, we disagree with the respondents' contention that the GOT's subsidies on domestically-produced HRC had no effect on the price of HRC imported into Thailand.  In a market economy, where, and goods are competitively priced,

---

[80] *See* PMS Allegation at 11.

[81] *Id.* at Exhibit 17.

[82] *Id*. at Exhibit 2 and 16.

[83] *See Notice of Countervailing Duty Order: Certain Hot-Rolled Carbon Steel Flat Products from Thailand*, 66 FR 60197 (December 3, 2001).

[84] *See* Memorandum "Analysis Memorandum for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand:  Pacific Pipe Public Company Ltd.," dated October 4, 2018 (Pacific Pipe Final Calculation Memorandum); "Analysis Memorandum for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand:  Saha Thai Steel Pipe (Public) Company, Ltd.," dated October 4, 2018 (Saha Thai Final Calculation Memorandum); and Memorandum "Analysis Memorandum for the Final Results of the Antidumping Duty Administrative Review of Circular Welded Steel Pipes and Tubes from Thailand:  Thai Premium Pipe Company Ltd.," dated October 4, 2018 (Thai Premium Final Calculation Memorandum).

domestic and imported prices will converge at an equilibrium.[85]  This is particularly true with a common and fungible commodity such as HRC.  Thus, because domestic subsidies lower the cost of production and the price of HRC in Thailand, it is logical to find that to remain competitive, imported HRC will sell at prices competitive with the domestically produced and subsidized HRC.  In other words, domestic and imported prices of HRC converge to a lower market equilibrium price than if the domestically produced Thai HRC did not benefit from GOT subsidies.  Thus, in accordance with our practice,[86] we have continued to upwardly adjust the respondents' acquisition costs to account for the CVD rate of 2.38 percent on all HRC imported into Thailand as reported by respondents.

Saha Thai and Pacific Pipe also argue that Commerce erred in making an upward adjustment to the cost of Thai-produced, *domestic* HRC purchases by the GOT safeguard duty rate[87] when those purchases were never subject to those safeguard duties.  While those purchases were never subject to those safeguard duties, we disagree with the conclusion that the low prices of imported HRC, which avoided the payment of a substantial safeguard duty of more than 21 percent, had no effect themselves on the Thai price of domestically-produced HRC.  As stated in the Post-Preliminary Memorandum, none of the respondents reported paying the safeguard duties.[88]  Those respondents represent some of the largest exporters of subject merchandise to the United States, and from the evidence on the administrative record of this segment of the proceeding, there is no indication that any other producer of subject merchandise in Thailand paid safeguard duties either.  Accordingly, there is zero evidence that the GOT collected any safeguard duties that were implemented to neutralize the downward pricing effects of overcapacity.

Consistent with our conclusion that domestic subsidies in a market economy can drive down the Thai price of imported merchandise to the market equilibrium price, so too can the price of distorted low-priced imported merchandise drive down the price of HRC produced in the Thai market.[89]  Because the respondents did not pay the safeguard duty in effect during the POR, and there is no evidence that any other Thai producer paid the safeguard duties either, we find that it is a reasonable presumption that the respondents paid not only distorted prices for imported HRC, but also distorted prices for Thai-produced HRC in Thailand to the extent that the safeguard remedy was ineffective.  Thus, whether domestically produced or imported, we find that as a result of the ineffectiveness of the safeguard measure, it is reasonable to presume that the import prices undervalued as a result of overcapacity lowered the equilibrium prices of HRC throughout the entire Thai market even further.  We have therefore upwardly adjusted the

---

[85] *See generally Daewoo Electronics Co., Ltd. v. United States*, 760 F. Supp. 200, 204 (CIT 1991) (stating that the equilibrium price is "the price that consumers are willing to pay and manufacturers are willing to accept.")

[86] *See Large Diameter Welded Pipe from Korea* and accompanying Decision Memorandum at 16-17; *see also Large Diameter Welded Pipe from the Republic of Turkey:  Preliminary Determination of Sales at Less than Fair Value and Postponement of Final Determination*, 83 FR 43646 (August 27, 2018) and accompanying Decision Memorandum at 15.

[87] The appropriate safeguard duty rate is 21.23 percent rather than 22.85 percent: the weighted-average of the two safeguard duty rates in effect during the POR (21.52 percent from June 7, 2015 – June 6, 2016, and 21.13 percent from June 7, 2016 to June 6, 2017).  *See* Pacific Pipe Calculation Memorandum; Saha Thai Calculation Memorandum; and Thai Premium Calculation Memorandum.

[88] *See* Post-Preliminary Memorandum at 5-6.

[89] *See* PMS Allegation at 9.  *See generally Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1355 n.28 (CIT 2015) ("General equilibrium analysis stud{y} markets as a single interrelated system. . . and what happens in any one market will affect many other markets—and in principle could affect all other markets.").

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

respondents' costs to also account for the uncollected safeguard duties of 21.23 percent for Thai-produced HRC purchases.

In addition, as stated in the Post-Preliminary Memorandum, none of the respondents reported paying the AD duties;[90] therefore, we have continued to adjust the acquisition costs for HRC imported from countries subject to GOT AD orders[91] by the unpaid AD duties to remedy the distortion to the Thai HRC market from injuriously low-priced (dumped) imports.[92]

Finally, we have not offset the Saha Thai PMS adjustment for duties "paid" because, contrary to Saha Thai's arguments, the record evidence does not indicate that it paid AD or safeguard duties. Saha Thai reported that participates in a bonded warehouse program under which it is exempt from paying duties on imported inputs if the inputs are used to produce exports.[93]  The bonded warehouse inspection report which Saha Thai relies on to demonstrate that it paid safeguard duties and AD duties[94] denotes a "value" of certain imported materials and a "duty" value associated with those materials.  However, the report at issue does not demonstrate that Saha Thai paid safeguard or AD duties on HRC.  Moreover, we note that the quarterly values of imported HRC reported in exhibit C-6 of Saha Thai's August 17, 2018, CQR do not tie to the value of imported "materials" in exhibit C-5 of the same response.  Accordingly, we will continue not to apply an offset to Saha Thai's PMS adjustment.

**Comment 4:  Sales Date Parameters of Pacific Pipe's Home Market and U.S. Sales Programs**

*Petitioner's Case Brief*
- Commerce should change the sales date range in Pacific Pipe's home market and U.S. market programs.[95]

*Pacific Pipe's Rebuttal Brief*
- Commerce should revise the sales date parameters in the U.S. margin program and set the home market program date range to begin three months prior to the POR and end on the last day of the second month after the end of the POR to allow for contemporaneous price comparisons.

**Commerce's Position:**  Pursuant to 19 CFR 351.414(f), we have revised Pacific Pipe's calculations so that we compare its U.S. sales to home market sales of the product under review

---

[90] *Id.*

[91] We relied on the average country-specific AD duty rates in effect during the POR where company-specific rates were not available on the record.

[92] *See* Pacific Pipe Final Calculation Memorandum; Saha Thai Final Calculation Memorandum; and Thai Premium Final Calculation Memorandum.

[93] *See* Saha Thai's August 17, 2017 Section D Questionnaire Response at 15 ("During the POR, Saha Thai sold some imported coil in Thailand.  Since this coil was not used in the production of a good for export, Saha Thai was required to pay the applicable import duty.  This duty is included in Saha Thai's reported hot-rolled coil cost.  Otherwise, Saha Thai incurs no net tax costs on input purchases.").

[94] *See* Saha Thai's August 17, 2018 Section C Questionnaire Response (Saha Thai's August 17, 2018 CQR) at Exhibit C-15.

[95] For a complete business proprietary discussion of the proposed changes, *see* Pacific Pipe Final Calculation Memorandum.

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

within the contemporaneous window period, *i.e.*, from three months prior to the month of the first U.S. sale through two months after the month of the last U.S. sale. [96]

## Comment 5:  Pacific Pipe's Fixed Overhead Costs

*Pacific Pipe's Case Brief*
- Commerce failed to define what constitutes the fixed overhead costs (FOH) costs in Pacific Pipe's home market program.
- It is necessary to define the FOH because it is used in calculating the variable cost of production (VCOMCOP).

*Petitioner's Case Brief*
- Commerce should revise its FOH cost calculation for the final results.

**Commerce's Position:**  Commerce has revised how it calculates Pacific Pipe's fixed overhead costs for these final results.[97]

## Comment 6:  Assignment of Surrogate Costs to Certain Pacific Pipe Home Market Sales

*Pacific Pipe's Case Brief*
- Commerce should activate the macro in the home market program that assigns costs to those home market products that were not produced during the POR for the final results.

*Petitioner's Case Brief*
- Commerce should assign surrogate costs for certain merchandise sold, but not produced during the POR

**Commerce's Position:**  Commerce has revised Pacific Pipe's home market program so that it assigns costs to Pacific Pipe's home market sales that were not produced during the POR.[98]

## Comment 7:  Pacific Pipe's Home Market Discounts and Rebates

*Petitioner's Case Brief*
- Commerce should revise how it calculated Pacific Pipe's home market discounts and rebates.[99]

*Pacific Pipe did not rebut this comment.*

---

[96] For a complete business proprietary discussion of the proposed changes, *see* Pacific Pipe Final Calculation Memorandum.
[97] For a business proprietary discussion of the specific adjustment to FOH, *see* the Pacific Pipe Final Calculation Memorandum.
[98] For a business proprietary discussion of the revision to our surrogate cost methodology, *see* the Pacific Pipe Final Calculation Memorandum.
[99] For a complete business proprietary discussion of the revisions to the home market discount and rebate calculations, *see* Pacific Pipe Final Calculation Memorandum.

Filed By: Toni Page, Filed Date: 10/5/18 12:42 PM, Submission Status: Approved

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

**Commerce's Position:** Commerce has revised its calculation of Pacific Pipe's home market discounts and rebates for these final results.[100]

**Comment 8: Sales Date Parameters of Saha Thai's Home Market and U.S. Sales Programs**

*Saha Thai's Case Brief*
- Contract date is the appropriate date of sale in the United States.[101]
- If Commerce continues to use invoice date as the U.S. date of sale, it should change the date range in the SAS margin programming to cover the period February 1, 2016, through February 28, 2017.

*Petitioner's Rebuttal Brief*
- If Commerce uses invoice date as the date of sale in the U.S. market and updates the date range for U.S. sales as requested by Saha Thai, there will be numerous U.S. sales at the end of the POR that will have no contemporaneous home market sales in the same month and no next-best home market sales in the closest months which will result in inaccurate comparisons and distorted margin calculations.
- In order to account for the missing contemporaneous home market sales, Commerce should use facts available with an adverse inference in accordance with *Cookware from Mexico*.

**Commerce's Position:** We have reexamined the record, including the documentation for sample U.S. sales submitted by Saha Thai, and have determined that there was no change to the prices or quantities between contract date and shipment date. Further, there is no other information on the record identifying changes in the terms of sale between contract date and invoice date. Therefore, we will use contract date as the date of sale for Saha Thai's U.S. sales in these final results.

Given that Saha Thai reported the appropriate home market sales, we have compared its U.S. sales to its home market sales within the contemporaneous window period, *i.e.*, from three months prior to the month of the U.S. date of sale through two months after the month of the U.S. date of sale, in accordance with 19 CFR 351.414(f). Further, the range of home market dates of sale will provide such comparisons for the earliest and the last U.S. date of sale. Thus, the question of whether to use facts available to account for the last two months of Saha Thai's home market sales is moot.

**Comment 9: Saha Thai's Duty Drawback Adjustment**

*Petitioner's Case Brief*
- Commerce erred when it added the import duty adjustment to the total cost of production and should, instead, add it to the total cost of manufacturing for the final results.

*Saha Thai's Rebuttal Brief*
- Consistent with its practice in prior review of Saha Thai, Commerce should continue to add the import duty adjustment to the total cost of production rather than add it to the

---

[100] For a business proprietary discussion of the specific adjustment, *see* the Pacific Pipe Final Calculation Memorandum.
[101] *See* Saha Thai's May 14, 2018 First Supplemental Questionnaire Response at 5-7.

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

total cost of manufacturing.

- It is a deliberate practice of Commerce to add an import duty adjustment to the cost of production because if the import duty adjustment was added at the cost of manufacturing stage of the home market calculation program, any subsequent changes to general and administrative and interest expense ratios would then be applied to the wrong total cost of manufacturing, as the ratio calculation does not include the imputed import duties that constitute the import duty adjustment.

- That is why Commerce has added the import duty adjustment to the cost of production in this and all prior annual reviews in which an import duty adjustment to cost was made.

- It is also important to note that if the general and administrative and financial expenses in the respondent's cost of production file is not recalculated in Commerce's program, then the only impact that moving the addition of the import duty adjustment amount from the total cost of manufacturing to the total cost of production is in the 20 percent limit to the adjustment for difference in merchandise for similar merchandise. Under the petitioner's proposed change, the import duty adjustment would be treated as a variable cost of manufacturing, as well as a total cost of manufacturing.

- Given that Commerce is required under law to compare the normal value of the most similar product with U.S. price, there is no justification for a change in the dumping analysis which, in essence, would lead to the comparison of the normal value for more dissimilar products with U.S. price.

**Commerce's Position:** We have added Saha Thai's import duty adjustment to its cost of manufacturing for these final results. Commerce's normal practice has been to add an import duty adjustment to the cost of manufacturing.[102] In addition, the U.S. Court of Appeals for the Federal Circuit has previously ruled in prior segments of this proceeding that Commerce was correct to include the exempted import duties in Saha Thai's cost of manufacture when calculating cost of production and constructed value.[103]

We disagree with Saha Thai's position that any subsequent changes to general and administrative and financial expense ratios would then be applied to the wrong cost value, as the ratio calculations do not include the duties that constitute the import duty adjustment by adding the import duty adjustment to total cost of manufacturing. In the instant administrative review, we have relied on Saha Thai's reported general and administrative and financial expense ratios without making further adjustments; therefore, the concern about distortions in the calculation of the per-unit general and administrative expenses and the per-unit financial expenses is moot.[104]

**Comment 10: Differential Pricing Analysis of Saha Thai's U.S. Sales**

*Petitioner's Case Brief*
- Commerce should change a differential pricing variable it used in its differential pricing

---

[102] *See, e.g., Light-Walled Rectangular Pipe and Tube from Turkey: Notice of Final Determination of Sales at Less Than Fair Value*, 69 FR 53675 (September 2, 2004) and accompanying Issues and Decision Memorandum at Comment 2; *Certain Corrosion-Resistant Steel Products from India: Final Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 81 FR 35329 (June 2, 2016) and accompanying Issues and Decision Memorandum at Comment 1.

[103] *See Saha Thai Steel Pipe (Pub.) Co., Ltd., v. United States*, 635 F.3d 1335, 1344 (Fed. Cir. 2011).

[104] For a business proprietary discussion of Saha Thai's duty drawback adjustment, *see* Saha Thai Final Calculation Memorandum.

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

analysis of Saha Thai's U.S. sales.[105]

*Saha Thai did not rebut this argument.*

**Commerce's Position:**  Commerce has changed the variable at issue, used in the differential pricing analysis of Saha Thai's sales, for the final results.[106]

### Comment 11:  Sales Date Parameters of Thai Premium's Home Market Sales Program

*Petitioner's Case Brief*
- Commerce needs to correct Thai Premium's home market sales date range.

*Thai Premium did not rebut this comment.*

**Commerce's Position:**  Pursuant to 19 CFR 351.414(f), we have revised Thai Premium's calculations so that we compared its U.S. sales to its home market sales of subject merchandise within the contemporaneous window period, *i.e.*, from three months prior to the month of the first U.S. sale through two months after the month of the last U.S. sale.[107]

### Comment 12:  Assignment of Surrogate Costs to Certain Thai Premium Home Market Sales

*Petitioner's Case Brief*
- Commerce should assign costs to those home market products that were sold and not produced during the POR for the final results.

*Thai Premium's Case Brief*
- Commerce should use the appropriate surrogate costs for products that were not produced during the POR in the home market program.

**Commerce's Position:**  Commerce has revised Thai Premium's reported cost data to include costs for products reported in Pacific Pipe's HM sales that were not produced during the POR.[108]

### Comment 13:  Revision of Variable Names in Thai Premium's Home Market Program

*Petitioner's Case Brief*
- Commerce should revise the variable name for one of the product characteristics in Thai Premium's home market SAS program.

*Thai Premium did not rebut this comment.*

---

[105] For a complete business proprietary discussion of the petitioner's proposed change, *see* Saha Thai Final Calculation Memorandum.

[106] For a business proprietary discussion of the specific adjustment to Commerce's differential pricing analysis, *see* the Saha Thai Final Calculation Memorandum.

[107] For a complete business proprietary discussion of the revision to Thai Premium's home market sales date, *see* Thai Premium's Final Calculation Memorandum.

[108] For a business proprietary discussion of the surrogate cost revision, *see* the Thai Premium Final Calculation Memorandum.

Filed By: Toni Page, Filed Date: 10/5/18 12:42 PM, Submission Status: Approved

Barcode:3760062-01 A-549-502 REV - Admin Review 3/1/16 - 2/28/17

**Commerce's Position:** We have reviewed the record and there is no basis for revising the name of the variable in question.  Therefore, we have not made the change suggested by the petitioner for these final results.[109]

**RECOMMENDATION**

Based on our analysis of the comments received, we recommend adopting the above positions. If these recommendations are accepted, we will publish the final results of this review and the final weighted-average dumping margins in the *Federal Register*.

☒                                    ☐
_____        _____
Agree                              Disagree


10/4/2018

X   _____

Signed by: GARY TAVERMAN

_____
Gary Taverman
Deputy Assistant Secretary
  for Antidumping and Countervailing Duty Operations,
  performing the non-exclusive functions and duties of the
  Assistant Secretary for Enforcement and Compliance

---

[109] For a business proprietary discussion of the physical characteristic at issue, *see* the Thai Premium Final Calculation Memorandum.

Filed By: Toni Page, Filed Date: 10/5/18 12:42 PM, Submission Status: Approved